1  **McAllister Olivarius**
2  Jan "Honza" Cervenka (SBN 344997)
3  641 Lexington Avenue, 13th Floor
   New York, NY 10022
4  Telephone: (212) 433-3456
   hcervenka@mcolaw.com
5
6  *Attorneys for Plaintiffs*
7
8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10
11  MARIAN BARBU                      Case No.: 5:25-cv-02428-SSS-MAA
12                    Plaintiff,      **CONSOLIDATED AMENDED**
                                      **COMPLAINT**
13        vs.
14                                    DEMAND FOR JURY TRIAL
15  HARVEST CHRISTIAN FELLOWSHIP,
    GREG LAURIE, RICHARD SCHUTTE,     Consolidated with Civil Action Nos.:
16  and PAUL HAVSGAARD,               5:25-cv-02429, 5:25-cv-02461,
                                      5:25-cv-02559, 5:25-cv-02560,
17                                    5:25-cv-02561, 5:25-cv-03048,
                    Defendants.       5:25-cv-03052, 5:25-cv-03074,
18                                    5:25-cv-03076, 5:25-cv-03092,
19                                    5:25-cv-03093, 5:25-cv-03488,
20                                    5:25-cv-03493, 5:25-cv-03495,
                                      5:25-cv-03496, 5:25-cv-03497,
21                                    5:25-cv-03499, 5:25-cv-03501,
22                                    5:25-cv-03503, 5:25-cv-03505, and
23                                    5:25-cv-03506.
24  _____
25
26
27
28
                            - 1 -
                CONSOLIDATED AMENDED COMPLAINT
           *Barbu, et al. v. Harvest Christian Fellowship, et al.*

# **TABLE OF CONTENTS**

Introduction ............................................................................................. 3

Jurisdiction and Venue ........................................................................... 8

Choice of Law & Statute of Limitations ................................................ 9

Parties ................................................................................................... 11

General Allegations ............................................................................. 47

Claims for Relief ................................................................................ 187

*First Cause of Action: Negligence* .................................................. 187

*Second Cause of Action: Negligent Supervision* ............................ 192

*Third Cause of Action: Negligent Retention* ................................... 193

*Fourth Cause of Action: Intentional Infliction of Emotional Distress* ................ 195

*Fifth Cause of Action: Civil Conspiracy in Violation of California Law* ............ 196

*Sixth Cause of Action: Aiding and Abetting* .................................... 198

*Seventh Cause of Action: Trafficking Victims Protection Reauthorization Act* ... 199

*Eight Cause of Action: Illicit Sexual Conduct in Foreign Places* ........................ 200

Demand for Jury Trial ........................................................................ 200

Prayer for Relief ................................................................................. 200

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Plaintiff MARIAN BARBU ("MARIAN B."), by and through his attorneys, McAllister Olivarius, on behalf of himself and MIHAI-CONSTANTIN PETCU, CRISTIAN AEROAIEI, CONSTANTIN-ALIN NITU, RAZVAN-GHEORGHE NITU, GEORGE ADRIAN VASILE, AURELIAN BUSCA, ALEXANDRU-CRISTIAN BUSCA, MARIAN DRAGNE, FLORIN CRISTIAN CARAGEA, ALEXANDRU BADALUTA, BOGDAN IONESCU, MARIAN LIVIU MIHAILA, ALEXANDRA-ELENA LANGA, IOANA COSMINA PIRVU, GHEORGHITA-BOGDANA TICI, MARIA GHENCIULESCU, DENIS-VASILE OTCUPARU, EMILIA-MARIANA TUDOSIE, ROXANA-MARIA TURUIANU, CRISTINA-BIANCA POPESCU, and ALEXANDRU IONITA (collectively, "Plaintiffs"), files this Consolidated Amended Complaint against Defendants Harvest Christian Fellowship ("Harvest Riverside"), Greg Laurie ("Laurie"), Richard Schutte ("Schutte"), and Paul Havsgaard ("Havsgaard") (collectively, "Defendants"), for damages and other relief.

In support of these claims, Plaintiffs allege as follows:

## **INTRODUCTION**

1.    In or around 1998 through 2008, when Plaintiffs were minors as young as four, Defendant Havsgaard and others he supervised sexually abused them on many occasions.

2.    Havsgaard was a pastor and an employee and/or agent of Defendant Harvest Riverside, based in Riverside, California, and is arguably one of the most prolific child sex abusers alive in the United States today, having committed thousands of individual acts of abuse. Havsgaard managed the network of orphanages/foster homes where Plaintiffs resided ("Harvest Homes" or "Homes"). The Harvest Homes were operated, funded, and administered in California by Harvest Riverside, whose long-time leader and unquestioned authority is Defendant Laurie. Defendant Schutte,

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Harvest Riverside's Missions Pastor, had operational responsibility under Laurie for supervising the Harvest Homes.

3.    Defendants conducted major, successful fundraising programs in California based on Harvest Riverside's operation of the Harvest Homes.

4.    In the decade between 1998 and 2008 when Defendants operated the Harvest Homes in Romania, Havsgaard sexually abused and terrorized scores of Romanian children in his custody and care, including Plaintiffs.

5.    At all relevant times, Harvest Riverside has been a highly successful church based in Riverside, California, with weekly services attracting up to 15,000 people. Laurie, Harvest Riverside's charismatic founder and chief pastor, attracts national attention as an evangelist, podcaster and the subject of a Hollywood movie about his early days, *Jesus Revolution*, which grossed $53 million in its first year.

6.    Havsgaard was a senior pastor at Harvest Riverside and kept that position as he embarked in 1998 on a foreign mission to Romania, then the sex trafficking capital of Europe, at the direction of Harvest Riverside, Laurie, and Schutte.

7.    Prior to the last time each Plaintiff was sexually abused as a minor, Harvest Riverside, Laurie, and Schutte had received multiple reports in California that Havsgaard was sexually abusing the children in the care of Harvest Riverside at the Harvest Homes. These reports started in 1999. They came from the child residents, from multiple local Romanian employees of the homes, from volunteers who travelled there from California, from the wife of a Harvest Riverside pastor living in California, and from pastors themselves.

8.    From their offices in California, Harvest Riverside, Laurie, and Schutte turned a blind eye. For years, they ordered no regular inspections or staff training, instituted no safeguarding measures or relevant policies. Harvest Riverside continued to pay Havsgaard's salary, to list him as a pastor on its website, to fund the Harvest Homes by making large payments from its own offices and accounts in California into

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1  his personal bank account with no proper accounting of his spending, and to bring

2  Havsgaard and some residents of the Homes to California to raise money in the United

3  States (and to suffer Havsgaard's sexual abuse in California too).

4       9.    Finally, by 2004, Havsgaard's abuse had become so notorious that an

5  American missionary from another Calvary church in California, Steve Quarles

6  ("Quarles"), heard about it and complained to Schutte in Riverside, ultimately

7  prompting Schutte, the pastor in charge of all missionary work at Harvest Riverside

8  and Laurie's trusted lieutenant, to authorize an inspection by Quarles and two other

9  Calvary ministers.

10      10.   Quarles and his team performed the inspection in October 2004. They

11  were so alarmed that they spoke to Schutte in California, asking him to come see for

12  himself.

13      11.   Schutte travelled to Bucharest and met with the inspection team, who laid

14  out conclusive evidence that Havsgaard was sexually abusing children and

15  misappropriating money, both on a shocking scale. Quarles told Schutte, "Paul

16  [Havsgaard] needs to be on that plane with you when you leave tomorrow. He doesn't

17  need to be another day in Romania. He needs to be gone. He is an embarrassment to

18  every single missionary and Christian worker. Get him out of here and into

19  counselling."

20      12.   But Havsgaard was an important fundraiser for Laurie's church whose

21  "good works" also brought credit to Laurie. As senior Harvest figures told Quarles,

22  Havsgaard "is very important because he's the face of the ministry. He's the one who

23  goes and talks to the churches and raises the money. And we can't have him not be

24  part of things." Firing Havsgaard would have hurt donations in California and possibly

25  unleash a scandal that would have hurt Laurie's reputation.

26      13.   So, despite proof that Havsgaard was a devious and unrelenting

27  pedophile, and despite knowing they had provided him a perfect laboratory of

28

- 5 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

desperate and vulnerable children to exploit, Harvest Riverside, Laurie and Schutte did nothing. They did not fire, suspend, withdraw or discipline Havsgaard despite their clear authority to do so under California law and Laurie's unquestioned authority over all Harvest Riverside policies, decisions and activities. They neither reported Havsgaard to the authorities, as was their duty under California law, nor instituted any new policies or procedures at the Harvest Homes. They did nothing to protect the children there, who remained completely subject to Havsgaard's domination and voracious appetites. Nor did they do anything to support Havsgaard's victims.

14.    Laurie instead engineered a "soft landing": he let Havsgaard stay in charge, free to molest and rape, while Laurie slowly closed the money spigot, until the Romanian homes finally withered to nothing—*four years* later in 2008.

15.    During this extended period, Havsgaard continued to abuse Plaintiffs and other children in the Harvest Homes, both those who were already there and the new ones he was left free to recruit, without any new restraints imposed by Harvest Riverside, Laurie or Schutte.

16.    Laurie even authorized a gift to Havsgaard from Harvest Riverside funds in California of some $200,000 in severance as he continued in his post as if nothing had happened. Romanian authorities were told nothing.

17.    Harvest Riverside continued to solicit and collect funds in California for the Homes despite knowing they were closed.

18.    In 2009, a year after Havsgaard's return to California from Bucharest, Laurie called him "a pastor who faithfully served the Lord for many years at Harvest Christian Fellowship, the church where I pastor," and even compared his work in Romania to that of Moses with the Israelites, because his "life demonstrates the power that just one godly person can have."[1]

---

[1] Greg Laurie, *What One Can Do,* Crosswalk (June 23, 2009), https://www.crosswalk.com/faith/spiritual-life/what-one-can-do-11604878.html.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

19.     Since his return to California in 2008, Havsgaard has continued to work at Calvary churches in California linked to Harvest Riverside, with unsupervised access to children, which Defendants could easily have stopped but did not. He has never been publicly repudiated or admonished by Laurie, Schutte or Harvest Riverside, and even performed a wedding at Harvest Riverside in 2016.

20.     The cover-up has worked well for Laurie. As Havsgaard raped his way through scores of children in Harvest Riverside's care, including Plaintiffs, and returned to a comfortable life in California, Laurie grew in national prominence and wealth, with a $5.5 million home in Newport Beach, a home in Hawaii, a $90,000 car, a top-rated podcast, and a Hollywood movie.

21.     In sharp contrast, Plaintiffs and the scores of other Romanian victims of Havsgaard's abuse and Defendants' cover-up in California went back on the streets with no money, no plan for the future, no medical care, no therapy for PTSD and other medical and psychological damage that Defendants caused, and certainly no gifts of severance payments that Havsgaard enjoyed. Defendants promised Plaintiffs and other children security and support, but betrayed that promise with years of sexual abuse, and then chucked them on the street without an iota of practical help or human sympathy.

22.     Defendants have continued to conspire in California to cover up these horrors for which they were all responsible. The cover-up has succeeded for 20 years—until now.

23.     In fact, the "Havsgaard cover-up" mirrors many others by Laurie and his senior pastors, including of repeated complaints about senior pastors' extramarital affairs on Harvest Riverside's campus, which resulted in no investigations but quiet exits and at least one multi-million dollar payoff; mistreatment and sexual abuse of children at a Calvary "boot camp" for teens in Mexico; diversion of donations to

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

purposes different from those advertised; and covert electronic surveillance of employees, among others.

24.     The failure of Harvest Riverside, Laurie and Schutte to investigate Havsgaard took place in California. They made money in California by using their Romanian venture to raise funds and brought children to California to raise more, where Havsgaard sexually abused them. Harvest Riverside's, Laurie's, and Schutte's failure to supervise or remove Havsgaard and to warn future victims took place in California. They knowingly raised money in California for the Harvest Homes after they shut them down. The ongoing conspiracy and cover-up have been directed from California.

25.     As a result of the acts and omissions that took place in California, Havsgaard sexually abused and sexually trafficked Plaintiffs, who suffered permanent physical and psychological injuries.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over Plaintiffs' California state law claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity between the parties, with Plaintiffs residing in Romania, Spain, or the United Kingdom, and each Defendant residing or situated in California.

27.     This Court further has subject matter jurisdiction over Plaintiffs' California state law claims pursuant to 28 U.S.C. § 1367(a), as the claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28.     This Court has subject-matter jurisdiction over Plaintiffs' claims arising under 18 U.S.C. § 1595, the Trafficking Victims Protection Reauthorization Act, and under 18 U.S.C. §§ 2423(c) and 2255, prohibiting illicit sexual conduct in foreign places, pursuant to 28 U.S.C. §§ 1331 and 1343.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

29.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that all Defendants reside in this district, and 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## CHOICE OF LAW & STATUTE OF LIMITATIONS

30.     Cal. Civ. P. Code § 361 permits Plaintiffs' California state law claims even though Plaintiffs are Romanian because Plaintiffs are bringing claims which arose in California and are based on acts and omissions that occurred in California. Both the substantive and procedural law of California apply to Plaintiffs' California law claims.

31.     At the time of commencing this action, all Plaintiffs are entitled to bring claims arising from child sex abuse under California law. *See* Cal. Civ. P. Code § 340.11 (2024).

32.     All Plaintiffs were under the age of 40 at the time this action was commenced.

33.     Due to circumstances resulting from Defendants' sex trafficking scheme, it was previously impracticable for Plaintiffs to bring a case under 18 U.S.C. §1595.

34.     Plaintiffs, to the extent applicable here, have pursued their rights diligently and were impeded because of extraordinary threats and coercion that Defendants applied to Plaintiffs during the period of their residency in the Harvest Homes. Plaintiffs were further impeded in pursing their claims by the extraordinary mental and emotional damage that Defendants inflicted on Plaintiffs; Havsgaard's order not to talk about what he was doing with them lest they be punished; and the disappearance of Havsgaard and Harvest Riverside back to California after 2008, which left no evident route of redress to young, poorly educated and traumatized Romanian children.

35.     Defendants conspired to and did fraudulently conceal the sexual assaults perpetrated against Plaintiffs and other Romanian children.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

36.    Defendants' wrongful and/or negligent acts and omissions as described below were a substantial factor in bringing about childhood sex abuse of Plaintiffs which caused them injury.

37.    As a result, to the extent necessary, all applicable statutes of limitations should be equitably tolled.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

# PARTIES

I.    **PLAINTIFFS**

    **A.    Plaintiff Marian Barbu**

*Figure 1: Plaintiff Marian Barbu, circa 2004*



38.    Plaintiff MARIAN BARBU ("MARIAN B.") is a citizen of Romania and a former resident of the Harvest Homes.

39.    MARIAN B. was born in 1992 in Bucharest. His mother died when he was five years old, and his father was an alcoholic who was unable to care for him properly and died when MARIAN B. was 15.

40.    In or around 2000, when MARIAN B. was eight years old, police found him living alone on the street and took him to Havsgaard. MARIAN B. was acutely vulnerable, desperate for food, shelter and stability. Havsgaard invited him into Harvest's care. At various points MARIAN B. lived at the Buftea, Dămăroaia, and Bârlogeni homes, all of which were established by Harvest Riverside at Laurie's direction and run day-to-day by Havsgaard.

41.    Havsgaard regularly physically and sexually abused MARIAN B., who was at all relevant times a child under the custody, care and supervision of Defendants,

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

for eight years until he left the Harvest Homes at the age of 16. It was reasonably foreseeable to Defendants that Havsgaard would sexually abuse MARIAN B., as they knew or should have known about Havsgaard's rampant sexual abuse of scores of other children in the Harvest Homes.

### B.    Plaintiff Mihai-Constantin Petcu

*Figure 2: Mihai-Constantin Petcu, circa 2002*



42.    Plaintiff MIHAI-CONSTANTIN PETCU ("MIHAI-CONSTANTIN") is a citizen of Romania and a former resident of Harvest Homes.

43.    MIHAI-CONSTANTIN was born in 1985 in Bucharest. Since his father was an alcoholic and mostly absent, MIHAI-CONSTANTIN was raised by his mother. She suffered from diabetes and struggled to look after MIHAI-CONSTANTIN and his younger brother, with whom MIHAI-CONSTANTIN no longer has a relationship.

44.    MIHAI-CONSTANTIN ran away from home with his brother on several occasions. From a young age up until he was 14 years old, he alternated between living at home and on the streets in Bucharest.

45.    In 2000, MIHAI-CONSTANTIN met Havsgaard while he was homeless in Bucharest. Havsgaard visited MIHAI-CONSTANTIN and his brother several times,

- 12 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

with Leo L.[2] by his side. Havsgaard bought a McDonald's meal for MIHAI-CONSTANTIN and his brother. He asked if MIHAI-CONSTANTIN wanted to live in one of the Harvest Homes and told him that he would be fed, clothed, and able to go to school. MIHAI-CONSTANTIN agreed.

46.    Havsgaard regularly physically and sexually abused MIHAI-CONSTANTIN, who was a child under the custody, care and supervision of Defendants until he turned 18 in 2004, and MIHAI-CONSTANTIN remained at the Harvest Homes until they closed in 2008. It was reasonably foreseeable to Defendants that Havsgaard would sexually abuse MIHAI-CONSTANTIN, as they knew or should have known about Havsgaard's rampant sexual abuse of scores of other children in the Harvest Homes.

*(This space is left intentionally blank)*

---

[2] Pseudonyms are employed in this Complaint to protect the anonymity of certain minor victims of Defendants, in the form of a first name plus an initial for the surname, such as "Abigail A." or "Peter P.".

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### C.    Plaintiff Cristian Aeroaiei

*Figure 3: Plaintiff Cristian Aeroaiei, circa 2001*



47.    Plaintiff CRISTIAN AEROAIEI ("CRISTIAN") is a citizen of Romania and a former resident of the Harvest Homes.

48.    Cristian was born in 1989 in Bucharest. He lived with his parents and brother until he was about eight years old. Cristian's father was an alcoholic and used to beat him. Cristian has a younger sister but he has never met her. Cristian has not seen his father since he was a child.

49.    CRISTIAN's mother escaped their abusive household, and CRISTIAN ran away a year later. CRISTIAN stayed with his godmother for two years but left, in

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

or around 2000, when he was ten or eleven years old, due to his fears that his father would find him.

### D.    Plaintiff Constantin-Alin Nitu

50.    Plaintiff CONSTANTIN-ALIN NITU ("ALIN") is a citizen of Romania and a former resident of the Harvest Homes.

51.    ALIN was born in 1989 in Bucharest. He has an older brother, Plaintiff RAZVAN-GHEORGHE NITU who also stayed at the Harvest Homes. ALIN's father died when he was four years old, and he and his siblings grew up under the sole care of their mother.

52.    When ALIN's father died, his mother moved into her brother's house. ALIN and his brother were left behind, homeless, and lived on the streets.

53.    In or around 2000 or 2001, they met Stefan S. at a train station in Bucharest and explained their living situation. He told them about a place called Harvest where they could sleep, eat, and go to school.

54.    ALIN and his brother, lured by the promise of a roof over their heads and food to eat, subsequently became residents of the Bârlogeni Harvest Home.

55.    While at Harvest Homes, ALIN was permitted to see his mother occasionally, but Havsgaard would threaten him and his brother with stopping this if they did not do as he wished.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### E.    Plaintiff Razvan-Gheorghe Nitu

*Figure 4: Plaintiff Razvan-Gheorghe Nitu, circa 2004*



56.    RAZVAN-GHEORGHE NITU ("RAZVAN") is a citizen of Romania and a former resident of the Harvest Homes.

57.    Răzvan was born in 1987 in Bucharest. He has a younger brother, ALIN, who also stayed at the Harvest Homes. He also has two sisters. RAZVAN's father died when he was six years old, and he and his siblings grew up under the sole care of their mother.

58.    When RAZVAN's father died, his mother moved into her brother's house. RAZVAN and his brother were left behind, homeless, and lived on the streets.

59.    40. In or around 2000 or 2001, they met Stefan S. at a train station in Bucharest and explained their living situation. He told them about a place called Harvest where they could sleep, eat, and go to school.

60.    RAZVAN and his brother, lured by the promise of a roof over their heads and food to eat, subsequently became residents of the Bârlogeni Harvest Home.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

61.    While at Harvest Homes, RAZVAN was permitted to see his mother occasionally, but Havsgaard would threaten him and his brother with stopping this if they did not do as he wished.

**F.    Plaintiff George Adrian Vasile**

*Figure 5: Plaintiff George-Adrian Vasile, circa 1999*



62.    Plaintiff GEORGE ADRIAN VASILE ("ADRIAN") is a citizen of Romania and a former resident of the Harvest Homes.

63.    ADRIAN was born in 1992 in Bucharest. He believes he has nine siblings (he has not met all of them). ADRIAN lived with his parents until he was eight years old. His father was an alcoholic, and his mother became ill with schizophrenia.

64.    ADRIAN's family was poor, and from around the age of seven, he was sent to beg for food and money with his siblings on the streets of Bucharest. Havsgaard found ADRIAN and his brothers begging in the streets and offered to take them to Harvest. His parents believed this would be an improvement for them.

65.    Havsgaard drove ADRIAN and his brother to the Harvest Homes in or around 2000. At first, ADRIAN and his brother lived at the Buftea house, but Havsgaard soon separated them and forced ADRIAN to move to the Dămăroaia house.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### G.    Plaintiff Aurelian Busca

*Figure 6: Plaintiff Aurelian Busca, circa 2002*



66.    Plaintiff AURELIAN BUSCA ("AURELIAN") is a citizen of Romania and a former resident of the Harvest Homes.

67.    AURELIAN was born in 1987 in Bucharest. He has two brothers, one of whom, ALEXANDRU-CRISTIAN BUSCA ("ALEXANDRU-CRISTIAN"), was also a child resident at the Harvest Homes, and two sisters. AURELIAN's father was an alcoholic and died when AURELIAN was a child; his mother struggled to parent her children alone, so AURELIAN and ALEXANDRU-CRISTIAN stayed with their grandparents for a while.

68.    Eventually, ALEXANDRU-CRISTIAN, AURELIAN and one of their sisters ended up living on the streets. They stayed in the sewers of Bucharest and begged for food and money. One day, Romanian Child Protection Services picked up the brothers and housed them in a state orphanage. The other children at the orphanage were violent and abusive, so ALEXANDRU-CRISTIAN and AURELIAN ran away to live back on the streets.

69.    Then Havsgaard noticed ALEXANDRU-CRISTIAN, gave him a bracelet that read "Jesus Loves You," and invited him to become a resident of Harvest Homes.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Some time later, ALEXANDRU-CRISTIAN, accompanied by Havsgaard, went to see AURELIAN. AURELIAN was impressed by the nice clothes that ALEXANDRU-CRISTIAN was wearing and asked to move into the Harvest Homes too. Havsgaard initially declined to admit AURELIAN, but eventually let him move to the Harvest Home located in Bârlogeni—separate from ALEXANDRU-CRISTIAN, who lived in the house in Buftea.

70. Havsgaard intentionally kept AURELIAN and ALEXANDRU-CRISTIAN separated throughout their time at the Harvest Homes.

**H.     Plaintiff Alexandru-Cristian Busca**

*Figure 7: Plaintiff Alexandru-Cristian Busca, circa 2004*



71. Plaintiff Alexandru-Cristian Busca ("ALEXANDRU-CRISTIAN") is a citizen of Romania and a former resident of the Harvest Homes.

72. ALEXANDRU-CRISTIAN was born in 1986 in Bucharest. He has two sisters and two brothers, one of whom, AURELIAN, also lived at the Harvest Homes.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

ALEXANDRU-CRISTIAN's father was an alcoholic and died when ALEXANDRU-CRISTIAN was a child; ALEXANDRU-CRISTIAN's mother struggled to parent her children alone, so ALEXANDRU-CRISTIAN and AURELIAN lived for some time with their grandparents.

73. Eventually, ALEXANDRU-CRISTIAN, AURELIAN, and one of their sisters ended up living on the streets. They stayed in the sewers of Bucharest and begged for food and money. One day, Romanian Child Protection Services picked up the brothers and housed them in a state orphanage. The other children at the orphanage were violent, so ALEXANDRU-CRISTIAN ran away to live back on the streets.

74. Then Havsgaard noticed ALEXANDRU-CRISTIAN, gave him a bracelet that read "Jesus Loves You," and invited him to live at the Harvest Homes.

75. At first, ALEXANDRU-CRISTIAN declined. Soon thereafter, he became ill with appendicitis and was hospitalized. The nurses alerted Child Protection Services, who again placed ALEXANDRU-CRISTIAN in a state orphanage once he recovered. Eventually, Havsgaard located ALEXANDRU-CRISTIAN and took him to live at the Harvest Homes.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

I.    **Plaintiff Marian Dragne**

*Figure 8: Plaintiff Marian Dragne, circa 2002*



76.    Plaintiff MARIAN DRAGNE ("MARIAN D.") is a citizen of Romania and a former resident of the Harvest Homes.

77.    MARIAN D. was born in 1988 in Bucharest. He has two brothers and two sisters. His family was poor. MARIAN D.'s mother died when he was eight and MARIAN D.'s father died three years later, following which MARIAN D. moved in with his grandparents.

78.    MARIAN D.'s grandparents died when MARIAN D. was 14 and a neighbor took MARIAN D. to live at the Harvest Homes in Buftea. None of his siblings joined him.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### J.    Plaintiff Florin Cristian Caragea

*Figure 9: Plaintiff Florin Cristian Caragea, circa 2002*



79.    Plaintiff FLORIN CRISTIAN CARAGEA ("FLORIN") is a citizen of Romania and a former resident of the Harvest Homes.

80.    FLORIN was born in 1992 in Alexandria, Romania. When he was six months old, his parents separated, and FLORIN's father got custody. His father remarried and had six other children with his new wife. FLORIN was neglected by his family and did not know anything about his biological mother. FLORIN's father forced him to beg on the streets to support the family. FLORIN ran away from home when he was nine or ten years old.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

81.    In or around 2002, FLORIN met Havsgaard at a McDonald's in Bucharest. Havsgaard promised FLORIN a good life if he came with him to Harvest Homes. Enticed by the promises of food, clothing, and a place to live, FLORIN agreed to go with Havsgaard.

82.    During his time at Harvest Homes, FLORIN lived in the house in Bârlogeni before moving to Buftea when the Bârlogeni house closed in 2007.

### K.    Plaintiff Alexandru Badaluta

*Figure 10: Plaintiff Alexandru Badaluta, circa 2004*



83.    Plaintiff ALEXANDRU BADALUTA ("ALEXANDRU B.") is a citizen of Romania and a former resident of the Harvest Homes.

84.    ALEXANDRU B. was born in 1989 in Constanța, Romania. He never knew his father, who died when ALEXANDRU B. was a child. His mother started a new family with a different man and did not take care of ALEXANDRU B. well.

85.    ALEXANDRU B. ran away from this unhappy home when he was seven years old. For five years, he lived on the streets and begged for food.

86.     When ALEXANDRU B. was twelve years old, Havsgaard and his driver, Marcel Musceleanu ("Musceleanu"), noticed him, brought him a McDonald's meal, and gave him a bracelet that read, "Jesus Loves You."

87.     Havsgaard and Musceleanu hugged ALEXANDRU B. and explained that his life would be better if he came with them to Buftea: He would have food, be able to go to school, and be surrounded by other children. ALEXANDRU B. agreed and moved into the Buftea house in or around 2001. At a later date, Havsgaard relocated ALEXANDRU B. to the Harvest Home located in Strada Bârlogeni.

**L.     Plaintiff Bogdan Ionescu**

*Figure 11: Plaintiff Bogdan Ionescu, circa 2004*



88.     Plaintiff BOGDAN IONESCU ("BOGDAN") is a citizen of Romania and a former resident of the Harvest Homes.

89.     BOGDAN was born in 1990 in Bucharest. He never knew his parents or the rest of his family as they abandoned him shortly after he was born.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

90.    BOGDAN moved frequently between various Romanian state-run orphanages in his early childhood. He stayed for some time at a state orphanage called Casa Pinocchio together with CRISTINA POPESCU ("CRISTINA").

91.    When BOGDAN was nine, he ran away from Casa Pinocchio with CRISTINA (who was seven) due to the poor living conditions there. To survive, they stayed at a railway station in Bucharest for two weeks, sleeping on benches.

92.    Eventually, Havsgaard and his wife noticed BOGDAN and CRISTINA, fed them, and invited them to come with him to the Harvest Homes with promises of better lives. They accepted.

93.    At first, BOGDAN lived in the Iancului house but Havsgaard later moved him to the Dămăroaia house and then to the house in Buftea.

**M.    Plaintiff Marian Liviu Mihaila**

*Figure 12: Plaintiff Marian Liviu Mihaila, circa 2003*



94.    Plaintiff Marian Liviu Mihaila ("MARIAN LIVIU") is a citizen of Romania and a former resident of the Harvest Homes.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

95.    MARIAN LIVIU was born in 1987 in Bucharest, Romania. When he was around six years old, his mother abandoned him to the care of his alcoholic father. His father struggled financially, and they ended up losing their apartment.

96.    From the age of nine to 15, MARIAN LIVIU and his father lived on the streets or sometimes MARIAN LIVIU would end up in a children's home, including a center called Saint Macrina. MARIAN LIVIU nonetheless managed to distinguish himself as a talented wrestler, competed semi-professionally in the sport, and received a modest allowance from Romania's Sport Institute.

97.    Eventually, MARIAN LIVIU started attending a "Back to School" program led by Sorin Gheorghe ("Sorin"), who introduced MARIAN LIVIU to Havsgaard and Harvest Homes.

98.    In or around December 2002, when MARIAN LIVIU was 15 years old, he moved into the Harvest Home in Strada Bârlogeni.

## N.    Plaintiff Alexandra-Elena Langa

*Figure 13: Plaintiff Alexandra-Elena Langa, circa 2004*



99.    Plaintiff ALEXANDRA-ELENA LANGA ("ALEXANDRA") is a citizen of Romania and a former resident of the Harvest Homes.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

100.   ALEXANDRA was born in 1997 in Bucharest. She grew up with her father, mother, and brother DENIS-VASILE OTCUPARU ("DENIS"), who also stayed at Harvest Homes. When ALEXANDRA was very young, her father was diagnosed with a brain tumor and underwent several surgeries, leaving him paralyzed and needing assistance to walk. ALEXANDRA was sent to live with her aunt, who was abusive and eventually threw ALEXANDRA out of the house.

101.   ALEXANDRA's mother then sent her to Harvest Homes, which she had learned about through her church. ALEXANDRA was about four years old at the time.

102.   ALEXANDRA was meant to stay at Harvest Homes during the week and go home to her family each weekend. However, Havsgaard often punished ALEXANDRA by forbidding her to go home or otherwise see her parents.

103.   For a while, ALEXANDRA and DENIS lived in the same Harvest Home, but Havsgaard later forcibly separated them, which deeply hurt them. The separation allowed Havsgaard to more easily sexually abuse them.

### O.   Plaintiff Ioana Cosmina Pirvu

*Figure 14: Plaintiff Ioana Cosmina Pirvu, circa 2004*



104.   Plaintiff IOANA COSMINA PIRVU ("COSMINA") is a citizen of Romania and a former resident of the Harvest Homes.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

105.    COSMINA was born in 1993 in Bucharest. She grew up with two older sisters, S. GHEORGHITA-BOGDANA TICI ("DANA"), and MARIA GHENCIULESCU ("MARIA"). Their family was poor. Their father was an alcoholic who often beat their mother.

106.    When COSMINA was around three years old, her mother fled home and took the daughters with her. The four of them lived on the streets, begging for food. A man who lived in a tent on the streets offered to help them. COSMINA's mother was only 27 at the time, with three daughters to take care of, so she accepted; this man over time became the sisters' stepfather. They all lived together and spent their days begging, looking for food in the garbage, sleeping under bridges, using drugs, and drinking.

107.    In or around 2000, when COSMINA was seven years old, MARIA met a woman named Mihaela, who worked for Havsgaard at the Harvest Homes and offered to help the family. MIHAELA fed MARIA and her sisters and offered to accept them as Harvest Homes residents on Havsgaard's behalf. Their mother agreed.

108.    Shortly thereafter, Havsgaard visited the family's tent, took pictures, and brought MARIA and DANA to the Harvest Home in Buftea; he returned for COSMINA a few weeks later. In or around 2001 or 2002, Havsgaard expanded Harvest Homes to include a new home in Dămăroaia and moved the sisters there.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1

2 **P.    Plaintiff Gheorghita-Bogdana Tici**

3  *Figure 15: Plaintiff Gheorghita-Bogdana Tici, circa 2004*



14  109.   Plaintiff Gheorghita-Bogdana Tici ("DANA") is a citizen of Romania and

15 a former resident of the Harvest Homes.

16  110.   DANA was born in 1990 in Bucharest. She grew up with two sisters,

17 MARIA and COSMINA. Their family was poor and their father was an alcoholic who

18 often beat their mother.

19  111.   When DANA was around six years old, her mother fled home and took

20 the daughters with her. The four of them lived on the streets, begging for food. A man

21 who lived in a tent on the streets offered to help them. DANA's mother was only 27 at

22 the time, with three daughters to take care of, so she accepted; this man over time

23 became the sisters' stepfather. They all lived together and spent their days begging,

24 looking for food in the garbage, sleeping under bridges, using drugs, and drinking.

25  112.   In or around 2000, when DANA was ten years old, MARIA met a woman

26 named Mihaela, who worked for Havsgaard at the Harvest Homes and offered to help

27

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

the family. Mihaela fed MARIA and her sisters and offered to accept them as Harvest Homes residents on Havsgaard's behalf. Their mother agreed.

113.    Shortly thereafter, Havsgaard visited the family's tent, took pictures, and brought MARIA and DANA to the Harvest Home in Buftea; he returned for COSMINA a few weeks later. In or around 2001 or 2002, Havsgaard expanded Harvest Homes to include a new home in Dămăroaia and moved the sisters there.

### Q.    Plaintiff Maria Ghenciulescu

*Figure 16: Plaintiff Maria Ghenciulescu, circa 2004*



114.    Plaintiff MARIA GHENCIULESCU ("MARIA") is a citizen of Romania and a former resident of the Harvest Homes.

115.    MARIA was born in 1988 in Bucharest. She grew up with two younger sisters, DANA and COSMINA. Their family was poor and their father was an alcoholic who often beat their mother.

116.    When MARIA was around eight years old, her mother fled the home and took her daughters with her. The four of them lived on the streets, begging for food. A man who lived in a tent on the streets offered to help them. MARIA's mother was only 27 at the time, with three daughters to take care of, and she accepted; this man over time became the sisters' stepfather. They all lived together and spent their days

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

begging, looking for food in the garbage, sleeping under bridges, using drugs, and drinking.

117.    In or around 2000, when MARIA was twelve years old, she met a woman named Mihaela, who worked for Havsgaard at the Harvest Homes and offered to help the family. Mihaela gave MARIA and her sisters a meal and offered to accept them as Harvest Homes residents on Havsgaard's behalf. Their mother agreed.

118.    Shortly thereafter, Havsgaard visited the family's tent, took pictures, and brought MARIA and DANA to the Harvest Home in Buftea; he returned for COSMINA a few weeks later. In or around 2001 or 2002, Havsgaard expanded Harvest Homes to include a new home in Dămăroaia and moved the sisters there.

### R.    Plaintiff Denis-Vasile Otcuparu

119.    Plaintiff DENIS-VASILE OTCUPARU ("DENIS") is a citizen of Romania and a former resident of the Harvest Homes.

120.    DENIS was born in 1993 in Bucharest, Romania. He grew up living with his mother, father, and sister, ALEXANDRA, who also lived at the Harvest Homes.

121.    Before DENIS moved to Harvest Homes, his father became paralyzed from a brain tumor and had undergone multiple brain surgeries. His father could not walk properly. DENIS's mother sold candles at a local church to support her family.

122.    In or around 2000, when DENIS was seven years old, his mother heard about Harvest Homes at her church and decided to send DENIS and ALEXANDRA to live there. DENIS first stayed in the Buftea house for a year, after which Havsgaard moved him to the Dămăroaia location.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

**S.    Plaintiff Emilia-Mariana Tudosie**

*Figure 17: Plaintiff Emilia-Mariana Tudosie, circa 2004*



123.    Plaintiff EMILIA-MARIANA TUDOSIE ("EMILIA") is a citizen of Romania and a former resident of the Harvest Homes.

124.    EMILIA was born in 1987 in Bucharest as one of four siblings. Her mother did not have the means to raise them and some of her siblings grew up with various relatives.

125.    As a child, EMILIA began living on the streets for multiple years and also stayed in a Romanian state orphanage, Casa Pinocchio.

126.    At ten years of age, EMILIA met Havsgaard, who invited her to move into Harvest Homes. EMILIA first stayed in the Iancului home; later she moved to the house in Dămăroaia. EMILIA's younger sister, Laura, also lived in the Harvest Homes.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

**T.    Plaintiff Roxana-Maria Turuianu**

*Figure 18: Plaintiff Roxana-Maria Turuianu, circa 2002*



127.    Plaintiff ROXANA-MARIA TURUIANU ("ROXANA") is a citizen of Romania and a former resident of the Harvest Homes.

128.    ROXANA was born in 1986 in Bucharest. She lived with her parents until they divorced, and then lived with an aunt and other family members.

129.    In 2001, when ROXANA was 15, she joined the "Back to School" program run by Sorin, who also taught some of the children living at Harvest Homes. Two years later, ROXANA's aunt told ROXANA to move in with her grandmother in the countryside. ROXANA did not want to leave Bucharest, so she ran away from home and asked Sorin for help. Sorin spoke to Havsgaard, who invited ROXANA to move into the girls' Harvest Home in Dămăroaia.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### U.    Plaintiff Cristina-Bianca Popescu

*Figure 19: Plaintiff Cristina-Bianca Popescu, circa 1999*



130.    Plaintiff CRISTINA-BIANCA POPESCU ("CRISTINA") is a citizen of Romania and a former resident of the Harvest Homes.

131.    CRISTINA was born in 1992 in Buftea. She ran away from home when she was five or six years old because her parents regularly beat her. She boarded a train to Bucharest and eventually ended up in Casa Pinocchio, a Romanian orphanage.

132.    At the orphanage, CRISTINA met BOGDAN. CRISTINA and BOGDAN were often beaten by other children and staff. When CRISTINA was seven and BOGDAN was nine, they ran away. To survive, they stayed at a railway station in Bucharest for two weeks, sleeping on benches.

133.    Eventually, Havsgaard and his wife noticed BOGDAN and CRISTINA, fed them, and invited them to come to the Harvest Homes with promises of better lives. BOGDAN and CRISTINA accepted.

134.    At first, CRISTINA lived in Harvest Homes' Iancului house. After a year and a half, Havsgaard moved her to the house in Buftea. CRISTINA also stayed at the Dămăroaia house during her time at Harvest Homes.

## V.    Plaintiff Alexandru Ionita

*Figure 20: Plaintiff Alexandru Ionia, circa 2002*



135.    Plaintiff ALEXANDRU IONITA ("ALEXANDRU I.") is a citizen of Romania and a former resident of the Harvest Homes.

136.    ALEXANDRU I. was born in 1986 in Bucharest. His family was very poor and his parents separated when he was young. ALEXANDRU I. and his sister lived with their mother who worked night shifts to support the family and slept for much of the day. As a child, ALEXANDRU I. used to spend his days and evenings on the streets, begging for food at a local McDonald's.

137.    ALEXANDRU I. met Havsgaard in or around 2000. Havsgaard visited the McDonald's from time to time and bought ALEXANDRU I. and other children food. The other children at the McDonald's often talked about the Harvest Homes and asked Havsgaard to let them live there.

138.   In or around 2000, Havsgaard took ALEXANDRU I. to stay at Harvest Homes. ALEXANDRU I. first lived in the Iancului house but, in or around 2002, Havsgaard moved him to the Buftea house.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

## W.    Summary Table of Plaintiffs' Names

| Plaintiffs' Names | Defined Term | Original Case No.: |
|---|---|---|
| Marian Barbu | MARIAN B. | 5:25-cv-02428-SSS-MAA |
| Mihai-Constantin Petcu | MIHAI-CONSTANTIN | 5:25-cv-02429-SSS-RAO |
| Cristian Aeroaiei | CRISTIAN | 5:25-cv-02461-SSS-MAA |
| Constantin-Alin Nitu | ALIN | 5:25-cv-02559-SSS-MAA |
| Razvan-Gheorghe Nitu | RAZVAN | 5:25-cv-02560-SSS-MAA |
| George Adrian Vasile | ADRIAN | 5:25-cv-02561-SSS-MAA |
| Aurelian Busca | AURELIAN | 5:25-cv-03048-SSS-MAA |
| Alexandru-Cristian Busca | ALEXANDRU-CRISTIAN | 5:25-cv-03052-SSS-MAA |
| Marian Dragne | MARIAN D. | 5:25-cv-03074-SSS-MAA |
| Florin Cristian Caragea | FLORIN | 5:25-cv-03076-SSS-MAA |
| Alexandru Badaluta | ALEXANDRU B. | 5:25-cv-03092-SSS-MAA |
| Bogdan Ionescu | BOGDAN | 5:25-cv-03093-SSS-MAA |
| Marian Liviu Mihaila | MARIAN LIVIU | 5:25-cv-03488-SSS-MAA |
| Alexandra-Elena Langa | ALEXANDRA | 5:25-cv-03493-SSS-MAA |
| Ioana Cosmina Pirvu | COSMINA | 5:25-cv-03495-SSS-MAA |
| Gheorghita-Bogdana Tici | DANA | 5:25-cv-03496-SSS-SP |
| Maria Ghenciulescu | MARIA | 5:25-cv-03497-SSS-MAA |
| Denis-Vasile Otcuparu | DENIS | 5:25-cv-03499-SSS-MAA |
| Emilia-Mariana Tudosie | EMILIA | 5:25-cv-03501-SSS-MAA |
| Roxana-Maria Turuianu | ROXANA | 5:25-cv-03503-SSS-MAA |
| Cristina-Bianca Popescu | CRISTINA | 5:25-cv-03505-SSS-MAA |
| Alexandru Ionita | ALEXANDRU I. | 5:25-cv-03506-SSS-SP |

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

## II.    DEFENDANTS

### A.    Defendant Greg Laurie

*Figure 21: Laurie preaching*



139.    Laurie was born in 1952.  He currently resides in Newport Beach, California in a home worth an estimated $5,144,100 as of June 2025. At all material times, Laurie has been a resident of California.

140.    Laurie is the co-founder and Senior Pastor of Harvest Riverside. He has supreme authority and makes all important decisions concerning Harvest Riverside.

141.    Energetic and resourceful, Laurie has also become a successful author, podcaster and national figure. With his oratorical skills, books, podcasts, TV broadcasts, and regular crusades, Laurie is often likened to Billy Graham and sits on the Board of Directors of the Billy Graham Evangelical Association. His podcast has been among the top 100 most popular in the United States. He has recently been touring the country as part of Turning Point USA's "Make Heaven Crowded" campaign headlined by Erika Kirk. His daily broadcast "A New Beginning" is heard on over 1,100 radio stations and Sirius XM.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 22: Laurie crusade in Dodger stadium, 2012*



142.   Laurie's crusades typically attract hundreds of thousands of people to the biggest stadiums in the Los Angeles area. From 2012 to 2018, Laurie also simulcast crusade-type appearances into churches and other venues, a campaign titled "Greg Laurie Harvest America." To encourage hosts to sign up, he sent a truck-mounted theater around the country offering shows that explained what would be on offer.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 23: "Greg Laurie Harvest America" tour bus, 2012*



143.   Laurie's wood-paneled office is full of pictures of him in the company of important politicians, religious leaders and actors.

144.   In February 2023, the production company Lionsgate released a movie based on Laurie's autobiography called *Jesus Revolution*,  which grossed over $53 million worldwide in its first year, with revenues continuing to grow.

*(This space is left intentionally blank)*

- 40 -

*Figure 24: Laurie at the Hollywood premiere of Jesus Revolution, with Cathe, and actors Joel Courtney and Anna Grace Barlow who played them in the film*



## B.  Defendant Richard Schutte

145.    Pastor Richard Schutte was Missions Pastor at Harvest Riverside between 1996 and 2013. He is currently an Assistant Pastor at Impact Bible Fellowship in Riverside, California. During the events described in this Complaint, he was a principal deputy to Laurie in charge of supervising Harvest Riverside's mission to Romania, and served on the board of Actively Restoring Kids International ("ARK"), a California charity Havsgaard and Laurie set up to raise money for Romania and other foreign projects.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

146.    Schutte and his wife were ALEXANDRU-CRISTIAN's sponsors and occasionally sent him money, toys, and gifts. Schutte and his wife wanted to adopt ALEXANDRU-CRISTIAN but Havsgaard intervened to block it.

147.    At all material times, Schutte has been a resident of California.

### C.    Defendant Harvest Christian Fellowship

148.    Harvest Christian Fellowship is a nonprofit religious corporation located in Riverside, California. It is duly organized and existing under the laws of California. It was founded in 1976 by Laurie, Havsgaard and three other men as Calvary Chapel of Riverside and reconstituted in 1982 as Harvest Christian Fellowship.

149.    The origins of Harvest Riverside lie in the surfing counterculture of Southern California in the 1960s and 70s. Laurie, a charismatic, motorcycle-riding surfer himself who used marijuana and LSD, described himself in a memoir as "a long-haired liberal hippie—pro-drugs, pro-sex and pro-rock 'n' roll…" At age 17, Laurie heard the charismatic "hippie preacher" Lonnie Frisbee speak at his high school with "such authenticity and power" that he gave his life to Christ. Frisbee was a dynamic force in the "Jesus Movement" that gathered young people into evangelical Christianity in the Los Angeles area and spurred explosive growth in a Calvary church in Newport Beach, Laurie's hometown, from a handful of members to thousands within a few months.

150.    Laurie did not attend college or seminary, but was swept into the Jesus Movement through Frisbee's example. He spent considerable time with Frisbee, eating regularly at his house in a commune of believers and, according to Frisbee's widow, even began to dress and act like him. Frisbee built up a Monday Night Bible Study group to approximately 300 members before Chuck Smith, the founder of Calvary, encouraged Laurie to take it over, which he did around 1971.

151.    Frisbee, himself a victim of child sex abuse, was later excommunicated from the Calvary movement because he was gay, and the story of Harvest Riverside's

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

origins told in *Jesus Revolution* minimizes Frisbee's involvement and arguably amplifies the credit given to Laurie for Harvest Riverside's early success. Frisbee's widow Connie says, "I can testify that Greg Laurie is not a truth teller. He has built his ministry on Lonnie's foundation while erasing Lonnie from the story." The producers of *Jesus Revolution* did not speak to her, she says, after Laurie told them she was dead. Nevertheless, Laurie successfully developed the Bible study group in Newport Beach. He and his wife Cathe (they started dating when she was 15 and he was 18, and married after she graduated from high school) proved a reliable anchor for attracting followers.

152.    Harvest Riverside is now one of the largest churches in the United States, supporting a congregation of approximately 15,000 each Sunday that continues to grow. Harvest Riverside's mission is "to know God and make Him known." It has an active program in Hawaii where Laurie and other ministers maintain luxury homes.

153.    Since 1990, Harvest Riverside has organized regular Harvest Crusades, which have reached millions of people. It is a member of Calvary Chapel, a non-denominational association of evangelical churches, numbering 1,800 in the United States and additional locations abroad.

154.    In 2017, Harvest Riverside joined the Southern Baptist Convention. This was considered a coup for the Southern Baptists because of Laurie's prominence in the evangelical movement.

### D.    Defendant Paul Havsgaard

155.    Havsgaard was born in 1949 and now lives in Forest Falls, California. At all material times, he has been a resident of California.

156.    He is the oldest of seven children. Their father was an alcoholic who was chronically out of work and frequently beat the children, and their mother was a nurse who was often absent because she had to support her struggling family.

157.    Havsgaard grew up in Riverside, California and attended Ramona High School, graduating in 1967, and married his high school girlfriend Kathy Warrick

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

("Kathy") when she was 16. He then joined the Navy, serving on a destroyer off the coast of Vietnam as an aviation electrician's mate. He took some college classes but does not have a degree, and did not attend seminary. He and Kathy divorced in 2007 and have both remarried.

158.    When Havsgaard's marriage to Kathy was in difficulty in 1971, he was advised to attend Laurie's Bible study class. Kathy wanted to end the marriage because she felt no intimacy from Paul and his only sexual interest was in infrequent anal sex. Laurie told her that it was her duty as a Christian wife to make the marriage work, and she ultimately adopted this approach. She was later to say that according to the beliefs prevailing at Harvest, a wife who criticized or contradicted her husband was "lower than a sewer." The Havsgaards moved to be closer to Laurie and the Calvary community, becoming active in outreach and organizational work.

159.    Laurie selected Havsgaard to run Harvest Homes in Romania in part because they had worked closely together for decades running Harvest Riverside.

160.    Havsgaard became Assistant Pastor in charge of Children's Ministry at Harvest Riverside in 1976. In the early 1980s, he left Harvest to become senior pastor at the Calvary Chapel of the High Desert in Victorville, California.

161.    Havsgaard liked running a church of his own, but as Harvest Riverside grew and Laurie began to travel more, Laurie thought Havsgaard would make a suitable senior deputy and asked him to return. Havsgaard accepted because it gave him a chance to operate in a growing organization with larger reach than his isolated desert congregation.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 25: Havsgaard baptizing a young man as pastor of*
*Calvary Chapel of the High Desert, 1982*



**◆ Baptismal**

Paul Havsgaard, pastor of the Calvary Chapel of the High Desert, dips a young man into the water at Lake Silverwood on Saturday to symbolize the man's admission into Christianity. More than 30 church members were baptized by Havsgaard at the mass baptism.

162.   When Havsgaard returned to Harvest Riverside in 1984, many people viewed him as the second most powerful pastor next to Laurie and a possible competitor for the top job. It was a new, entrepreneurial organization, growing rapidly. Neither Laurie nor Havsgaard had worked outside the Calvary movement, which did not have established traditions or specific credentials required for leadership. That

- 45 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

meant personal followings were an important barometer for pastors, and Havsgaard was popular with many at Harvest Riverside as the church was expanding.

*Figure 26: Laurie (front row, center) and Havsgaard (front row, far left, coral shirt) with other Harvest Riverside staff, 1990s*



163.    But Havsgaard also had his problems and detractors. He was known to be volatile, to have a big ego requiring constant praise, and to be badly organized, for example frequently forgetting scheduled meetings.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

# GENERAL ALLEGATIONS

**III.    HARVEST RIVERSIDE ESTABLISHES CHILDREN'S HOMES IN ROMANIA**

   **A.    Origins of the Harvest Homes**

164.    As reported in *Calvary Chapel Magazine*, Havsgaard "first came to Romania on an outreach in 1998 as an assistant to Greg Laurie, who is a nationally known Calvary Chapel evangelist and pastor."[3] Visiting under the auspices of an evangelical charity directed by Franklin Graham known as Samaritan's Purse, Havsgaard distributed shoeboxes of gifts to children in Bucharest on behalf of Harvest Riverside.

165.    The experience induced Havsgaard to suggest, and Laurie to approve, a permanent Harvest Riverside mission in Romania.

166.    Romania was well known in the 1990s for attracting pedophiles, because in addition to the grinding poverty that drove many people, including children, into sex work, the country's institutions were weak and corrupt, and foreigners could easily evade punishment. As a result, Bucharest was widely regarded as the pedophilia capital of Europe.

167.    Later in 1998, Havsgaard returned to Bucharest with Kathy to implement a plan Laurie had approved to build up Harvest Riverside's presence in Romania via Harvest Homes and established a local Romanian entity, the Fundatia Harvest Romanian, also known as Romanian Harvest Foundation ("Local Foundation"), to handle the formalities.

168.    While Defendants delegated much of the day-to-day running of the Harvest Homes to Havsgaard in Romania, key decisions were made in California by Laurie and Schutte in keeping with Laurie's position of supreme authority at Harvest Riverside and Schutte's positions as Missions Pastor, and because an important object

---

[3] Tom Price, *Saving One Child at a Time,* Calvary Chapel Magazine, 2002, at 7.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

of the Romanian venture was to bring financial benefits and prestige to Harvest Riverside and Laurie in California by allowing them to raise money and generate publicity there.

169.    Harvest Riverside's employees and congregants called Harvest Homes "our Romanian orphanage" or "Harvest Romanian orphanage," very much considering Harvest Homes as belonging to Harvest Riverside.

**B.    The Harvest Homes Are a Fundraising Vehicle for Laurie and Harvest Riverside**

170.    The Harvest Homes were designed in part as a fundraising and marketing tool for Harvest Riverside, which was able to attract more money and positive regard for itself and Laurie in the United States by highlighting its charitable efforts in Romania.

171.    Harvest Riverside regularly diverted funds ostensibly raised to support Harvest Homes in Romania to other purposes in California.

172.    Defendants conducted regular and substantial fundraising programs in California based on the Romanian venture.

173.    Harvest Riverside taught congregants in California how to say "Jesus loves you" in Romanian to build connections with the child residents of Harvest Homes, and to encourage donations.

174.    Defendants incorporated a California charity, ARK, to raise money in the United States for the Harvest Homes and other international projects and to promote the Harvest organizations. Harvest Riverside and ARK, in partnership, conducted many fundraising events in California.

175.    The money raised in these joint fundraisers was processed by a group of Harvest Riverside employees in the conference room next to Laurie's office, and was then divided up between Harvest Riverside and other ventures (including ARK and the

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Harvest Homes) by the Harvest Riverside accounting department in whatever proportion Laurie and other pastors demanded.

176.    Harvest Riverside and ARK shared employees and management, including Havsgaard (employee of Harvest Riverside, on the board of ARK) and Schutte (employee and senior pastor at Harvest Riverside, on the board of ARK). Another ARK board member, Wes Denham ("Denham"), was a Calvary minister close to Laurie and Schutte.

177.    Defendants set up ARK in California to be a fundraising vehicle for their activities in Romania and became a conduit for members of Harvest Riverside to donate funds meant for Harvest Riverside's activities in Romania, in addition to funds sent directly by Harvest Riverside to Havsgaard to run the Harvest Homes.

178.    Harvest Riverside and Laurie effectively controlled ARK.

179.    Money from Harvest Riverside and ARK paid employees of the Local Foundation.

180.    ARK used Harvest Riverside's and Laurie's resources and contacts to raise money, including being allowed to use Harvest Riverside's main fundraising telephone number in California.

181.    The Harvest Homes showed many indicators of being an outpost of Harvest Riverside. They were commonly referred to as being part of "Harvest." The children were given Harvest-branded T-shirts and hats to wear. Visitors and volunteers from Harvest Riverside came to help at the Harvest Homes.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 27.a: Kathy and Harvest Homes children wearing*

*Harvest Riverside-branded clothes*



*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1

*Figure 27.b: Kathy and Harvest Homes children wearing*

2

*Harvest Riverside-branded clothes*

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    182.   Havsgaard returned frequently to California, where he remained a legal

19    resident at all relevant times, checking in with Schutte and Laurie, and sometimes

20    bringing children with him as walking advertisements for his Romanian mission (and

21    to sexually abuse in private at his house and elsewhere). They participated in multiple

22    church services and raised money for Harvest Riverside and the Harvest Homes.

23    183.   For years, Harvest Riverside deposited large sums of money supposedly

24    designated for Harvest Homes' operating costs directly into Havsgaard's personal bank

25    account. Havsgaard then used large portions of these funds to buy things for himself

26    as well as abundant presents and alcohol for his child sex victims to keep them pliant,

27    and to buy silence from Harvest staff about his child abuse.

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

184.    Harvest Riverside in California allowed this misdirection of its funds to continue for years.

185.    Thus, Laurie set up a substantial venture in Romania and directed large sums to its support, but required no proper accounts or financial audits, no regular inspections of the Harvest Homes, no child protection policies or training. Instead, Laurie continued to gather the donations that flowed into Harvest Riverside in California based on energetic advertising in the United States about the supposed good works Harvest was doing in Bucharest, and the accompanying prestige.

### C.    Havsgaard Arrives in Romania with a History of Sexual Criminality and Cruelty

#### 1.    *Havsgaard's Sister Makes an Early Report of His Abuse of Children*

186.    Havsgaard is the oldest of seven children, four boys and three girls.

187.    When Havsgaard was twelve to 18 years old, he repeatedly raped his younger sister Mary M. (who was eight to 14 years old at the time), threatening beatings and death if she reported him.

188.    In this same period, Havsgaard similarly and regularly raped another younger sister, Hanna H., also starting when she was eight, also employing similar threats.

189.    When confronted by Hanna H. and another sister, Samantha S., about this sexual abuse in or around 1994, in the presence of Havsgaard's wife Kathy, Havsgaard reluctantly admitted it but told Samantha S. "I don't need this drama; don't bother me with this."

190.    At a later point, Samantha S. concluded she had to make sure Harvest Riverside knew that her brother was a danger to children. She found it strange that Havsgaard's big ego, bullying and volatile temper had not already set back his career. Given what she knew about his voracious sexual interest in children, she thought it

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1    likely he had been abusing them as a minister too, and worried it was all being covered

2    up to protect Laurie and Harvest Riverside.

3        191.    Samantha S. decided to put Havsgaard's pedophilia on the record with the

4    organization. She met with a Harvest Riverside lay leader, Nehemias Quintanilla, who

5    was teaching a Spanish Bible study course. The meeting took place at a coffee shop in

6    the Redlands area.

7        192.    Samantha S. reported to Quintanilla that when Havsgaard was a teenager,

8    he had repeatedly raped his sisters Hanna H. and Mary M. as children.

9        193.    Quintanilla replied, "This happens in a family if they learn it from another

10   generation. That's just what happens." But Quintanilla also told Samantha S. that a

11   letter critical of Havsgaard had been circulated among the Harvest Riverside

12   congregation, implying that he respected her decision to report him, and ended the

13   conversation there.

14       194.    Upon information and belief, shortly after Samantha S.'s report to

15   Quintanilla about Havsgaard's history of sexual abuse, Quintanilla told his superiors

16   at Harvest Riverside about her allegations. On information and belief, they took no

17   action in response.

18           2.    *Havsgaard Molests His Foster Daughter*

19       195.    While a pastor at Harvest Riverside, Havsgaard also molested a foster

20   daughter, Julia J. starting in or around 1986, when he was in his late thirties, and she

21   was 15 or 16.

22       196.    Julia J. reports: "One day I was at the dryer, and Paul came up behind me

23   and pushed himself onto me. His penis was erect. He knew my history and that being

24   molested was what put me in foster care to begin with. I froze. He backed away and

25   left the garage."

26       197.    Shortly thereafter, when Julia J. was in her bedroom, Havsgaard "came

27   in, crouched down, slipped his hand in my underpants, and inserted his finger into my

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

anus. Before he put his finger in my underpants, he put it in his mouth as though he had done it many times before. Every time he did it, it was the same thing. I lived there for over a year and a half. It happened five or six times during that period."

3. *Kathy Havsgaard Arrives in Bucharest Aware of Havsgaard's Unsuitability for the Role*

198.    Kathy's own marriage to Havsgaard was long troubled, in part because of his sexual compulsions. He did not want to have sex with her, and when they did, perhaps two or three times a year, he only wanted anal sex, which she disliked, and also to urinate inside her vagina. Havsgaard had also told Kathy that during his time in the Navy, he had strong sexual feelings for a man, whose name he would shout out during their sporadic sexual interactions. (She believed he had had sex with the man, but Havsgaard denied this.) She had reason to believe he had raped a four-year-old girl and urinated inside her. He was also emotionally distant and domineering.

199.    Despite her unhappiness, Kathy felt a strong duty, one that had been reinforced repeatedly at Harvest Riverside and by Laurie, to stand by her husband as a good Christian wife. She did not at all want to accompany Havsgaard to Romania: she was still grieving the loss of her teenage daughter, caring for her and Havsgaard's elderly parents, and wanted to be close to her children and grandchildren. But Havsgaard wanted to go, and Laurie said it was her obligation to go with her husband.

200.    The fact that Harvest Riverside was able to send an apparently wholesome married couple to Romania was an important reassurance to Romanian authorities that the Harvest Homes would be properly run, and was also a plus for fundraising in California. Kathy joined Havsgaard on the Board of the Local Foundation.

**D.    Daily Operations of the Harvest Homes**

201.    Havsgaard never learned Romanian. Accompanied by a translator, he recruited children off the streets, most commonly by buying them McDonald's meals and promising a better life. Once he recruited a few children who spoke English, he

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1   used them (instead of an adult translator) to recruit more children. The youngest

2   resident he recruited was four years old.

*Figure 28: Havsgaard with street children in Bucharest, 2003*



202.   Funds raised by Defendants in California paid for everything to keep the

Romanian operation afloat: the purchase of the Harvest Homes themselves, their

furniture and equipment, salaries for Havsgaard and local staff, food and supplies, cars,

and Harvest-branded shirts and hats for employees and children.

203.   Laurie, Schutte and Harvest Riverside sent Havsgaard approximately

$17,000 a month, which in Romania at that time had huge purchasing power. These

funds were administered by the Harvest Riverside finance department.

204.   By comparison: Steve Quarles, an American minister working in

Romania at the same time, was able to provide for his family of eight, run three

different churches, and pay an assistant, all for $1,400 per month.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

205.    Defendants sent the funds from California directly into Havsgaard's personal bank account. From there he transferred funds for the Harvest Homes' operation into the Local Foundation's Romanian bank account based on requests from the local Finance Director, Eugen Roman ("Roman"). Roman did not have visibility into what Havsgaard did with the rest of the money.

206.    The Winter 2002 edition of the *Calvary Chapel Magazine* had an eight-page article, "Saving One Child At A Time – Harvest Romania" that displayed many gripping photos of Romanian street children, illustrating the moving story of Harvest Riverside's decision to establish a network of children's homes in Romania under Havsgaard. The article quoted Havsgaard as being "concerned about pedophiles that travel throughout Europe to engage abandoned children in their perverted practices. They find Romania's street children easy prey."[4]

*(This space is left intentionally blank)*

---

[4] Price, *supra,* at 7.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 29.a: Page from* Calvary Chapel Magazine, *Winter 2002 edition, showing Havsgaard, in red shirt, talking to street children in Bucharest*





*Figure 29.b: Zoomed-in extract of Figure 29.a, showing the US phone number for Harvest Homes in Romania*

**Harvest Romania**
Phone 011-40-92-794-766
US Phone **(909) 687-6902**
e-mail: harvestromania@aol.com

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 29.c: Zoomed-in extract from Figure 29.a, discussing Havsgaard's work in Romania*

"Having your own children, and knowing how much you love them, makes it extremely difficult when you see the conditions of the Romanian children in the orphanages," said Bob. He has been to Russia twice on mission outreaches. This was his second trip to Romania. He was able to observe the work of ROCK ministries in the hospital in Bucharest.

"I was grieved by the hopeless situations of the babies where medical solutions are possible but finances prevent intervention." Bob was burdened when he spent time with Alexandra, a seven-month-old girl, suffering from brain damage. The doctors had given up on her recovery.

They also spent time with Paul Havsgaard, who works with street children. "Seeing children as young as eight-years-old begging on the streets, sniffing paint to get high, and being sold into prostitution by older children really breaks your heart," said Bob. "Then you see a man like

Paul Havsgaard, giving his life to these lost children. You can see the love in his eyes. They are drawn to him like you might imagine children being drawn to Jesus."

The senior pastor of CC Modesto, Damian Kyle, had heard about the work in Romania from Bill Welsh. The Modesto team met

*We are troubled on every side, yet not distressed; we are perplexed, but not in despair; persecuted, but not forsaken; cast down, but not destroyed.*

*2 Corinthians 4:8-9*

207.     Page 15 of the Winter 2002 edition of the *Calvary Chapel Magazine* asks for donations to help Havsgaard's work and lists the same phone number that Harvest Riverside used for its day-to-day business in California, (909) 687-6902. This number was also listed on Harvest Riverside's website at the time.

208.     Fundraising materials in the United States for the Harvest Homes also listed Harvest Riverside's California phone numbers as the method of contact.

209.     Defendants sought publicity in other outlets in this period, including the *Christian Science Monitor,* which refers to Havsgaard as "director of the Romanian branch of the California-based Harvest Foundation."[5]

---

[5] Andrea Snyder, *For Romania's dropouts, a fresh start,* The Christian Science Monitor (July 3, 2003, 12:07 PM), https://www.csmonitor.com/2003/0703/p08s01-woeu.html.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

210.    The July 2003 edition of *Prayer Watch*, a monthly publication by Harvest Riverside, lists Havsgaard's and Kathy's work at the Harvest Homes as one of Harvest Riverside's missions. It also asks members of the California congregation to pray each day for the Havsgaards and the financial support of the Harvest Homes.[6]

*Figure 30: Extract from Prayer Watch, July 2003*

[DAILY PRAYER]

● **PASTORS:** Pray for Pastor Greg as he prepares for the 2003 Harvest. Remember the entire pastoral staff and their families as they serve the Lord.

● **NATION:** Pray for the wisdom and guidance of President Bush. Pray for the Pledge of Allegiance to be left in our schools.

● **MISSIONS:** Pray for Paul and Kathy Havsgaard and the financial support of their Romanian orphanages.

● **THE CHURCH:** Pray for Christian families to teach the Word of God to their children; intercede for the unemployed; and pray for teenagers to be obedient to their parents and to live holy lives.

● **HARVEST CRUSADES:** Hawaii, July 19–20; Anaheim, August 8–10; Australia, September 11–14; New Zealand, September 19–20.

211.    After several months at rented premises in Iancului, Havsgaard received funds and authority from Laurie and Harvest Riverside to buy a property in Buftea, a suburb about 25 kilometers northeast of central Bucharest. The children moved there just before Christmas 1998.

212.    Owning the Buftea property allowed Havsgaard to increase recruitment.

213.    By 2000, Laurie authorized the purchase of two more homes to house the growing number of children in Havsgaard's care, one in the Dămăroaia district in north

---

[6] Harvest Christian Fellowship, *Prayer Watch,* Harvestriverside.org (July 2003), http://www.harvestriverside.org/church/images/calendar-0703.pdf,      [https://web.archive.org/web/2005032 5024915/http://www.harvestriverside.org/church/images/calendar-0703.pdf].

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Bucharest for housing girls and young boys, and a smaller one in Strada Bârlogeni, mostly for boys.

*Figure 31: The Buftea home in 2017*



214.    Havsgaard quickly made such a name for himself that police officers would bring him children they found in the streets to put in the homes.

215.    While the children in Havsgaard's care lived across multiple properties, they met frequently and came together for Bible study, prayer and Sunday school, all of which Havsgaard led in English, a language most of the children did not understand.

216.    At first, the children were pleased to be admitted to the Homes. All had come from desperate situations, many sleeping on the street and subsisting by begging. The security of a bed, three meals a day, and the semblance of a normal family life were miracles to them.

217.    Once they had settled in, Havsgaard began to sexually abuse them.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 32: Bible study at Harvest, which Havsgaard typically led*



## IV. HAVSGAARD'S SEXUAL ABUSE OF PLAINTIFFS AND OTHER CHILDREN IS RAMPANT

### A. Havsgaard Uses Defendants' Authority and Resources to Groom Plaintiffs and Scores of Other Children for Sex

218.   Once Havsgaard successfully recruited a child, plucked from destitution and completely reliant on his goodwill to avoid returning to the streets, he started grooming them for sex. He would begin by treating them warmly and gently, showing kindness that was unusual for these children to experience from an adult, particularly a father figure.

219.   Soon he might nuzzle the child, then progress to glancing touches, then lingering ones, on the lower back, then the thighs, buttocks, and groin. Then things got worse.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

220.   At the time Havsgaard was a heavy, powerful man, 5'9", 275-300 pounds, clearly able to physically overpower children and teenagers.

        1.    *Havsgaard's Multiple Forms of Child Sexual Abuse*

221.   Often, under the guise of punishment for infractions both real and invented, Havsgaard stripped off Plaintiffs' and other children's trousers and underwear, bent them over his legs, and hit them. Then, with them naked from the waist down, he would force them over his knee, directly on top of his crotch, and spank them.

222.   He often got erect, which Plaintiffs and other children could feel through his clothes.

223.   At times, Havsgaard would also massage their legs and buttocks, at first rubbing in a way that was not painful, but eventually he would usually probe their anal area with his fingers.

224.   This frequently led to Havsgaard painfully inserting his finger in the child's anus.

225.   Sometimes he would smell or lick his fingers after doing this, even if covered with feces, a signature fetish.

226.   The combination of spanking with digital anal penetration was so common that the children developed a polyglot Romanian-English term for it, which sounded like "spanky" or "spankies."

227.   For boys, he also fondled their penis and scrotum.

228.   Mostly Havsgaard abused the children in this way in private (in a bedroom or the attic), but he also did so in front of other children including at the Sunday church service, which Havsgaard led and where Harvest staff were present.

229.   Havsgaard administered these painful sexual abuse sessions regularly, from multiple times a week to several times a day, depending on the child and Havsgaard's whims.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

230.    Many times, the cries of the victims were widely audible. This prompted Havsgaard to choke children during punishment, additionally terrifying them. One boy remembers being punished, then being asked to touch Havsgaard's erect penis, with Havsgaard choking him to make sure he stayed quiet, saying: "It will all be over soon."

231.    Harvest staff knew of Havsgaard's sexual abuse, and some used it to threaten children when they misbehaved, giving the kids a macabre choice of discipline: either kneel for hours with their bare knees on broken walnut shells, or with their face against the tile wall of a bathroom, arms raised, or "go with Paul"—to be spanked, fondled, masturbated, digitally penetrated, and sometimes anally raped.

232.    Beyond the "spankies" with or without anal digital penetration, for both boys and girls, Havsgaard had multiple ways of sexually abusing the children in his charge, who were as young as four:

    a.    He took shirtless photos of the boys saying they were for their American sponsors but actually used them for his own sexual gratification.

    b.    He showed them pornography on computers and on his phone at the Harvest Homes;

    c.    He made the children join him in watching pornography, both straight and gay, commenting favorably, normalizing sexual activity;

    d.    While walking or sitting with children, he repeatedly touched both boys' and girls' intimate areas, including their inner thighs and groins;

    e.    He fondled the children's thighs and crotch on car trips while they sat in the passenger's seat as he drove;

    f.    He took boys to spend nights in a hotel room alone with him, or on lengthy rides in his car late at night, during which he continued his touching, grooming and other sexual activities;

- 63 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

g.   He watched the children shower and bathe naked, often while masturbating himself;

h.   He masturbated in the boys' bedrooms, sometimes while groping one or more boys;

i.   He forced boys to masturbate him;

j.   He forced boys to accept masturbation from him;

k.   He forced boys to give him oral sex;

l.   He forced boys to accept oral sex from him;

m.   He forced boys to have anal sex with him;

n.   He would remove fecal matter from the children's anuses and lick his fingers; and

o.   He took and kept videos of sexual encounters with boys and girls, which was child pornography.

233.   Havsgaard often accompanied his sexual abuse with a patter professing that he was their "father," that he loved them "as a father," and that they were all part of one loving "family"—with him in control. He told the children "I know what God wants," and "what I want, God wants."

234.   Havsgaard's perverse murmurings added to the harm and upset from Havsgaard's sexual abuse.

235.   Stories circulating about Havsgaard's abuse of the children caused outsiders to deride residents of the homes as gay, a terrible stigma in Romania at that time.

236.   Like other child sex abuse victims, many residents of Harvest Homes, including Plaintiffs, were in complete tumult about their sexual identity.

237.   Beyond Havsgaard's regular sexual conquest of boys, he also assaulted the girls. Havsgaard would undress them and force them on top of his lap. He would

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

then brutally spank their bare bottoms. While he was spanking some of them, he would touch himself.

238.    When he had finished his physical attacks, Havsgaard would then force some of the girls to stand naked in front of him, while he looked them up and down, hugged them, caressed them, and kissed them.

239.    Some educational programs were instituted at first, but these degenerated and the children emerged from the Harvest Homes with little or no schooling, prepared only for manual labor, a return to the streets and/or sex work. Some, including BARBU, remain functionally illiterate.

2.    *Havsgaard Lavishes Rewards on His Favorites, Further Corrupting the Ethos of the Homes*

240.    The children, at sea in this abusive environment, learned that giving into Havsgaard's predation brought rewards.

241.    His favorites received expensive gifts like stereos and PlayStations, branded clothing and sneakers, better food, trips outside the home, overnight trips to hotels with him (where they had to stay in the same room and bed), and sometimes permission to see their families (if they had one).

242.    Some boys were permitted to have girlfriends and have sex with them in the homes starting at age 13 or 14—Havsgaard's way of reassuring the boys that they were "not homosexual" despite regular anal rape from Havsgaard, and a reward for being available to him and keeping silent.

243.    They were allowed to drive Harvest vehicles while underage and without a license. On at least one occasion, a boy caused a serious accident.

244.    Several boys would unlock and open the bathroom door to watch Havsgaard's wife Kathy showering. She asked Havsgaard to intervene to stop them, but he did nothing, and they continued to besiege and ogle her in the bathroom.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

245.   Finally, Kathy took to having a bucket in her bedroom to urinate and used baby wipes to give herself a "shower."

246.   Havsgaard's favorite boys basked in their special status, despite their inner turmoil, and often taunted and beat up other less-favored kids without repercussions from Havsgaard or other Harvest staff.

3.     *Plaintiffs and Other Children Are Terrified of Havsgaard's Abuse of Others*

247.   Havsgaard's flagrant abuse of children meant that everyone, including Plaintiffs, lived on constant high alert, fearing when he might next single them out.

248.   The children often saw Havsgaard sexually abuse others through open doors: "spankies," masturbation, oral sex, digital penetration, anal sex, and more.

249.   One child found shoeboxes and wastebaskets full of feces in the attic of the Buftea home, where Havsgaard engaged in frequent anal sex with boys in his care.

250.   One child who wanted permission to go out for an evening confronted Havsgaard in front of the other children and adults in the Harvest home. He asked Havsgaard directly, "What's the deal? Do I have to stay for you to suck my dick to go out?"

251.   Havsgaard's response was to give a beating and "spankies."

4.     *Children Repeatedly Witness Havsgaard Having Sex with One of the Boys in His Care, Leo L.*

252.   The children often saw evidence that Havsgaard was sexually abusing other children—their friends. For instance, one girl noticed that one of the boys, Leo L., at times left Havsgaard's bedroom with a wet spot on the back of his shorts, which was apparently caused by leftover sexual lubricant or semen. Other times, children spotted dark stains on Leo L.'s trousers.

253.   In or around 2007, when Havsgaard broke his leg, he requested that a resident of the Harvest Homes, ROXANA, tend to him in various ways. On at least

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

one occasion, Havsgaard asked ROXANA to wash him and got an erection. Plaintiff MIHAI-CONSTANTIN walked past and saw Havsgaard masturbating himself while ROXANA washed his feet.

254.    One of the children living at the Buftea home, CRISTIAN, noticed Havsgaard going up to the attic and followed him there after a little while, curious about what was up there after he had seen Havsgaard carrying boxes upstairs. CRISTIAN found Havsgaard with Leo L., both with their pants down. Leo L. was cleaning his buttocks.

255.    Another child, Plaintiff BOGDAN, witnessed Havsgaard perform oral sex on Leo L. In or around 2006, BOGDAN went to the bathroom, which was located near Havsgaard's bedroom upstairs in Buftea. Havsgaard's bedroom door was left slightly ajar, and BOGDAN could see Havsgaard kneeling on the floor, shirtless, while Leo L. sat in front of him on the couch sucking Havsgaard's penis.

256.    Plaintiff ALEXANDRU-CRISTIAN also witnessed Havsgaard perform oral sex on Leo L. One day, Havsgaard had bought Leo L. a stereo, but Leo L. did not like how it sounded. Havsgaard purchased him another one, and he placed the first stereo in the attic of the Buftea house. ALEXANDRU-CRISTIAN told Leo L. that he would like to have the discarded stereo. Leo L. told ALEXANDRU-CRISTIAN that he (Leo L.) would ask Havsgaard if ALEXANDRU-CRISTIAN could have it. Havsgaard and Leo L. went to the attic purportedly to look for the stereo, but they did not come back for several minutes. ALEXANDRU-CRISTIAN went to look for them, but when he opened the door, Havsgaard was kneeling with Leo L. standing naked in front of him. Havsgaard had his mouth on Leo L.'s penis.

257.    Finally, another child resident of Harvest Homes, Plaintiff ADRIAN also once entered a bedroom and saw Leo L. without trousers on with Havsgaard kneeling in front of him, performing oral sex on Leo L. ADRIAN closed the door immediately and left.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

5.    *Plaintiffs and Other Children Repeatedly Witness Havsgaard Having Sex with One of the Boys in His Care, Mark M.*

258.    CRISTIAN also walked in on Havsgaard performing oral sex on another boy, Mark M., in the home. CRISTIAN had been looking for Havsgaard because he was promised money to buy new jeans. Although CRISTIAN was surprised by what he saw, he did not leave; he just asked Mark M. to translate his request for cash so Havsgaard would understand it. Havsgaard then grabbed a handful of money and gave it to CRISTIAN, showing no embarrassment over the sexual crime he was in the act of committing. Havsgaard returned to the blow job as soon as CRISTIAN started to leave the room.

259.    ALEXANDRU also shared a room with Mark M., who would beg ALEXANDRU not to leave the room, telling him, "don't leave, Paul is coming again to suck my dick."

6.    *Havsgaard Installs Video Recording Equipment in the Attic Where He Regularly Abuss Children*

260.    Photography has been a lifetime hobby for Havsgaard.

261.    Havsgaard installed videography equipment in the attic of the Buftea home, some of which was positioned over a hole in the ceiling of the shower. In the attic, Havsgaard kept audio recording devices, a box of video tapes including small format ones, and boxes with significant amounts of Romanian money.

262.    This equipment is consistent with reports that Havsgaard took videos of naked children.

263.    After some of his equipment and tapes were stolen, Havsgaard put all of his tapes in a leather bag carried over his chest that he never parted with.

7.    *A Life-Long Child Sex Abuser, Havsgaard Is Cruel and Perverse*

264.    Havsgaard used his total power over the children not just to gain sexual access, but to express his nasty and dominating personality.

- 68 -

265.   For example, Havsgaard put some siblings, including ADRIAN and his brother, AURELIAN and ALEXANDRU-CRISTIAN, and ALEXANDRA and DENIS, in different homes to keep them isolated and increase his own power over them. Havsgaard put ALEXANDRU B. and other children who displeased him out on the street in the winter, letting them plead in the cold and dark for re-entry.

266.   Havsgaard strangled and smothered children with pillows, letting go just before they lost consciousness, had them tied to beds and radiators, and kept them under "room arrest" for days.

267.   Havsgaard would promise children they could see their families but then never permit it, or he would grant, but then withdraw, permission, to prove he was the boss or make them more pliable.

268.   Havsgaard kicked children out of the homes without notice, without any place to go or funds to tide them over.

269.   Havsgaard took Plaintiffs and other children to use computers at the internet café owned by Cătălin Manescu ("Manescu"), who worked as a Harvest Homes driver and was later promoted by Havsgaard to Finance Director, located on Strada Mitropolit Varlaam. They also used a computer at the Buftea house with internet capability, often to watch porn with Havsgaard's encouragement and participation.

270.   Manescu knew about Havsgaard's sexual abuse of children. Knowing that Havsgaard got away with it, Manescu felt emboldened to abuse children himself. Manescu primarily preyed on minor girls, including by groping their breasts, touching them in a lingering way, and pressuring them to have sex with him. He would force girls out of the homes and into a van, where he then sexually assaulted them. Mimicking Havsgaard, Manescu thereafter gave his victims extra privileges and/or gifts.

271.   Havsgaard knew about Manescu's sexual abuse of some of the Plaintiffs and other children but did not intervene.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

272.    Also, with Havsgaard's encouragement, some of the underage boys accessed online sex forums. The boys then procured customers, sold their naked pictures, and also met for paid sex, with Havsgaard taking a cut of the proceeds.

273.    In the evenings, Havsgaard also took boys to bathhouses where men, usually foreign tourists, would pay to wash and masturbate the boys, or for the boys to masturbate them.

274.    Havsgaard took a cut of their earnings. He picked the boys up late at night after their activities, taking them back after he received his share.

275.    The misery of Havsgaard's regime extended to his wife, Kathy. She saw less and less of him, because "he always had a boy with him." Excluded by Havsgaard from anything significant, and lacking purpose, Kathy "crocheted constantly" and taught this to some of the girls to have something useful to do. Havsgaard remained autocratic and emotionally distant, and she felt lonely and besieged in the acutely dysfunctional homes, to the point where she was constantly taking Valium to feel less awful. Things were so bad that Kathy built up a supply of Valium in case she had to commit suicide—and she was not a powerless child like Plaintiffs, but an adult, an American, the wife of the man in charge, and a director of the Local Foundation.

276.    Kathy returned to the United States and divorced Havsgaard in 2007.

**B.    Havsgaard Exploits Sponsors in California to Abuse Plaintiffs**

1.    *Havsgaard's Fundraising Trips to California*

277.    Defendants in California had an active fundraising program for the Harvest Homes.

278.    One aspect was Havsgaard's regular fundraising trips to California when he spoke at Harvest Riverside during Laurie's services and at other churches. He went for several weeks every Christmas, and at other times too. Laurie enjoyed how the Romanian program reflected well on Harvest Riverside and him in California.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

279.    During the Christmas trips, Havsgaard usually brought children living in the Harvest Homes, including EMILIA, with him to show them off and elicit more sympathy and money from donors in California. The children considered this a great privilege and he mainly picked his favorites, those most inured to acceding to his sexual demands.

*Figure 33: Harvest Homes children in California on the beach with hosts*



280.    Havsgaard required sex from them in California too, keeping the boys upstairs in his house with him and ordering the girls to stay downstairs.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 34: Two Harvest Homes children in California*



281.   On a trip in 2003, Romanian authorities required him to bring along a social worker employed by the Harvest Homes, Carmen Andreosi ("Andreosi"), to ensure that the children were properly treated. She spoke English and was supposed to accompany them on their activities. "In reality, once we arrived in the United States, Paul excluded me from caring for or supervising the children," she says. "He used me as a cover to justify his travel with the children."

282.   Havsgaard left Andreosi alone in his California house for long periods, sometimes for many days, without giving any information about where he was taking the children. International calls were blocked, internet access was infrequent and Andreosi was in practical terms marooned, with a few eggs and leftovers from the children's excursions left in the refrigerator for her to eat.

283.   Several times the group was scheduled to go back to Romania; Havsgaard would leave Andreosi waiting for a pickup at the church, the library or even at the airport but not appear, changing his plans impulsively and without notification.

- 72 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

284.   She observed: "In Romania, Paul frequently took the same group of teenage boys with him on private outings. He showered them with gifts—clothes, sweets and other items—while the younger children were excluded," which made them upset. "The boys who went with him always returned quiet, never explaining where they had been or what had happened. This secrecy, combined with his favoritism, left me deeply uneasy. Although I did not personally witness physical abuse, I came to suspect that Paul might be a pedophile. The staff suspected something was wrong, but no one felt able to act at the time."

2.   _False Promises to and about Sponsors_

285.   Another fundraising program set up by Defendants tried to establish a direct connection between sponsors in California and individual children in Romania.

286.   The families in California sent care packages and money to their sponsored children, sometimes as much as $500 per month.

287.   Havsgaard bragged to the children that the sponsors were putting money aside as nest eggs to launch them when they graduated from the Harvest Homes. In fact, none of the children received any of these funds, either while they stayed at the homes or afterwards. Havsgaard siphoned much of these earmarked funds for himself and his sexual favorites.

288.   The sponsorship program, financed by people in California with its promise of a wholesome future after Harvest Homes, was another lie Havsgaard exploited to win respect and approval from American donors, to line his own pockets, and to entice sex and compliance from Plaintiffs and other children.

289.   Plaintiffs and some other children spoke periodically to their sponsor families and told them they never saw any of this money. The sponsor families reported this back to Harvest Riverside, Laurie and Schutte, but Defendants kept Havsgaard in place nonetheless, ignoring evidence of theft and putting no standard accounting

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

safeguards in place to insure that the money they raised in California by generating sympathy for deprived Romanian children went to its intended proper purpose.

### 3. *Exploiting False Promises of Adoption*

290.    Another form of cruelty and fraud came from Havsgaard's assurances to Plaintiffs and many other children that they were to be adopted by their sponsor families and live in the United States. Some children discussed this possibility with their future California families by video call, and the families were enthusiastic.

291.    In one instance, two children, Plaintiffs BOGDAN and CRISTINA, were told that Harvest Riverside had prepared the documents needed for their adoption and move to America, and all that was required was Havsgaard's signature in front of some officials at the airport.

292.    At around the same time, Havsgaard organized a fundraising trip to Harvest Riverside and intended to bring BOGDAN, CRISTINA and a few other children with him. Havsgaard took BOGDAN and CRISTINA to the airport to process the necessary paperwork.

293.    At the airport, Havsgaard pulled BOGDAN aside to go to the bathroom. Inside, Havsgaard went to grab the boy's penis, but BOGDAN objected.

294.    Havsgaard used this as an excuse to refuse to sign the adoption papers, and forced both BOGDAN and CRISTINA to return to Harvest Homes. They were crushed that Havsgaard had thwarted their near-escape.

295.    Back at Harvest Homes, Havsgaard spanked and sexually assaulted BOGDAN as a further punishment for resisting sexual abuse at the airport.

296.    After refusing to sign the adoption papers, Havsgaard forbade BOGDAN from speaking to his sponsors in California.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

**C.    Children in Harvest Homes Suffer Intense Trauma as a Result of Havsgaard's Abuse**

297.    Being a child at Harvest Homes was the opposite of the settled, supportive home life Defendants advertised: it was a cruel and hypocritical jungle that taught the way to survive was to give sex to Havsgaard, and to lie.

298.    The alternative to submitting to Havsgaard, the children knew, would be awful: back to living in the streeta, sleeping on newspapers, dirty, always hungry, fearful, vulnerable to violence and even death.

299.    Constantly facing the possibility of physical and sexual abuse based on the changing whims of Havsgaard as the price for food and a bed was immensely stressful, indeed traumatic.

300.    If they accused a rich and powerful American pastor of sex abuse, they were sure that poor street kids like themselves would be disbelieved and kicked out.

301.    Some Plaintiffs channeled their stress and misery into self-harm, including cutting their arms, legs and torsos with knives and broken glass; by repeatedly punching walls; by punching through glass windows; by banging their heads against a wall; and by suicide attempts, including by hanging, by cutting their wrists, by drinking chlorine and many by taking pills. Havsgaard did nothing to help. Once they got better, he abused them again.

**D.    Laurie's Cult of Personality and Harvest Riverside's Culture of Fear Enable Havsgaard's Sexual Abuse of Plaintiffs**

302.    Harvest Riverside is an autocracy, with Laurie at the top, and subordinate pastors entirely dependent upon his goodwill for their continued employment. Doing Laurie's bidding, real or perceived, is key to survival, with his authority amplified by his status as Harvest Riverside's founder, a religious leader for many decades, and a wealthy celebrity. Harvest Riverside's employees have even been instructed to not to look Laurie in the eyes if he passes in the hall.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

303.    For employees and church members, fear of ostracism from the Harvest Riverside community is a powerful motivator. Ex-employees call Laurie and his top echelon the "Harvest Mafia." One long-time ex-congregant says "Greg [Laurie] is the biggest narcissist you will ever meet, him and his flying monkeys" i.e., subordinate pastors. Another likens the fear and sycophancy surrounding Laurie to a cult.

304.    Laurie's determination that a well-liked cafeteria worker "looked gay" was enough to get the man fired.

305.    An elderly volunteer who took calls from donors objected when a new policy required her to press callers to include Harvest Riverside in their wills. She was happy to accept money people wanted to offer, but did not think it was right to extract more from their estates. Harvest Riverside immediately suspended her. Senior figures told her she should resign and keep her views to herself. She was even promised a payment in return for cooperation.

306.    Harvest Riverside and Laurie directed secretaries to screen social media accounts of employees and church members, and send screenshots of posts demonstrating untoward opinions to pastors. The pastors would then demand that employees remove the posts or get fired. This included a post as objective and mundane as a photo of the "B" grade the Riverside Health Department had given the Harvest Riverside café.

307.    Harvest Riverside covertly surveils its employees and volunteers via microphones and cameras across its Riverside campus, including in conference rooms and staff's private offices. One ex-employee of Harvest Riverside discovered that his termination was based on covert video footage.

308.    To avoid being caught by Harvest Riverside's surveillance, employees whispered sensitive conversations or took them entirely off campus. One contractor joked: "You have to be careful what you say around Harvest [Riverside]."

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

309.   One employee saw a letter addressed to Laurie in a pile of donations and slipped it under his door. Unbeknownst to the employee, the letter contained criticisms of Laurie, and surveillance equipment allowed Harvest Riverside to identify her. Her boss was furious and told her that her job was now in jeopardy. Laurie was not used to receiving critical material because his secretaries were tasked with screening it out.

310.   Senior Pastors at Harvest Riverside told employees that raising internal complaints or legal claims against Laurie or the organization would result in their termination.

311.   Some ex-employees have struggled to find work in the Riverside area because Harvest Riverside contacted potential employers in the area, badmouthed the ex-employees and effectively blacklisted them.

312.   Many Harvest Riverside employees believe that Laurie is further insulated from normal constraints due to his close relations with the Riverside Police Department and Riverside Sheriff's Department, which maintains a substation on the Riverside campus.

313.   In or around 2010, Franklin Graham, a famous pastor and son of Billy Graham who was also a member of Harvest Riverside's board, pulled Robert Lawless ("Lawless"), Harvest Riverside's Chief Financial Officer, out of a board meeting after Lawless raised concerns about potentially unlawful conduct, telling him: "your job is to protect Greg Laurie at all costs."

314.   Besides fear, Harvest Riverside and Laurie have another powerful tool to induce cooperation and tamp down dissent and scandal: money. The rivers of cash flowing into the organization from weekly collections (at one point this was $70,000 per service for each of three Sunday services), Harvest Crusades, donations, merchandise, books and broadcasting, unregulated by anything except Laurie's decisions, permit easy redirection of funds to help allies and buy silence.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

315.   Because Harvest Riverside is a religious organization, its reporting requirements to the government are minimal. Further, unlike many other evangelical churches which file annual returns to the Evangelical Council for Financial Accountability and distribute them to church members, Harvest Riverside keeps its financial results secret.

316.   Pastors, including Joseph Sabolick, Josh Thompson, Steve Wilburn, and others, who left Harvest Riverside to found new churches, received bridge funding from Harvest Riverside, ensuring lasting gratitude and support.

317.   Pastors who remain at Harvest Riverside also have a strong incentive to toe the party line. Salaries for pastors usually exceed $100,000 and some have made as much as $600,000.

## V.   HAVSGAARD AND MANESCU REPEATEDLY SEXUALLY ABUSE PLAINTIFFS

### A.   Havsgaard's Sexual Abuse of Plaintiff Marian Barbu

#### 1.   *Abuse from Havsgaard at Harvest Homes*

318.   Havsgaard sexually abused MARIAN B. soon after he arrived at Harvest, age 8, in multiple ways.

319.   Havsgaard often sat MARIAN B. on his lap and said he liked when MARIAN B. was a "good boy," while kissing MARIAN B. on his neck and chest. Havsgaard rubbed his hand up and down MARIAN B.'s chest in a sexual way.

320.   Once MARIAN B. was physically capable of getting erections, Havsgaard tried to arouse him.

321.   Havsgaard would take MARIAN B. into his bedroom alone, closed the door, and showed him pornographic videos. Havsgaard proceeded to masturbate as he kissed MARIAN B.'s neck and groped his genitals.

322.   At night while MARIAN B. laid in bed (with other boys in a shared bedroom), Havsgaard would enter, kiss MARIAN B.'s neck, caress his thighs and

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1  touch him all over his body in a sexual manner. MARIAN B. observed Havsgaard
2  similarly kiss and touch the other boys in the room.

3      323.    Havsgaard would also touch MARIAN B.'s penis to get MARIAN B. or
4  himself sexually aroused. Each time, MARIAN B. objected aloud, sometimes loud
5  enough to bother Havsgaard, in which case he would put a pillow over MARIAN B.'s
6  face and press down. MARIAN B. felt that he was going to suffocate.

7      324.    Havsgaard also spanked MARIAN B. at least six times. Havsgaard's true
8  purpose was not discipline but sexual abuse. Havsgaard took MARIAN B. into a room
9  alone and ordered him to get naked, watching while he did so. Sometimes, Havsgaard
10 also undressed himself. Havsgaard then laid MARIAN B. naked across his knees,
11 stroked MARIAN B.'s buttocks, rubbed MARIAN B.'s anus, and spanked him.
12 Havsgaard became sexually aroused and forced MARIAN B. to touch his erect penis.

13     325.    MARIAN B. would shout in pain and out of fear for his safety. To keep
14 MARIAN B.'s shouts from echoing around the house, Havsgaard would choke him
15 and say "it will all be over soon." Nobody ever came to help MARIAN B. and stop
16 Havsgaard's abuse, even when other Harvest staff were present.

17     326.    MARIAN B. told Havsgaard that he did not like his touching and that he
18 was attracted to girls.

19     327.    Havsgaard would come into the shared bathroom while MARIAN B. and
20 other boys were taking baths, watching while the boys bathed together. At times,
21 Havsgaard was holding toilet paper and towels while masturbating.

22     328.    MARIAN B. once entered Havsgaard's office and saw him masturbating.
23 When Havsgaard noticed MARIAN B., he said, "wait, I'll finish and wash my hands,
24 and then I'll talk to you." MARIAN B. felt extremely uncomfortable, but Havsgaard
25 did not seem to be concerned as he finished pleasuring himself.

26     329.    Havsgaard was used to performing sex acts in front of MARIAN B. and
27 the other boys without consent. Havsgaard appeared to find special pleasure in abusing
28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

the children in front of each other. In front of other boys, he would order MARIAN B. to pull down his trousers and then touch his buttocks and spank him under the guise of punishment. He would also force the boys to show their penises to one another during these corporal punishment sessions.

330.   In addition to sexual assault, Havsgaard also physically assaulted MARIAN B. On one occasion, he hit MARIAN B.'s head against a bedframe. Another time, he threw MARIAN B. against a wall so aggressively that his scalp split.

331.   MARIAN B. lived in constant fear that Havsgaard would rape him.

      2.   *Abuse from Havsgaard While on Trips*

332.   Havsgaard took MARIAN B. on several trips to the mountains and seaside in Romania.

333.   Once during these trips, Havsgaard came into the bathroom of MARIAN B.'s room when he was alone, pulled down his own trousers so that his penis was visible, touched MARIAN B.'s buttocks, and masturbated while directing MARIAN B. to shower.

334.   MARIAN B. pleaded "No Paul, please no," worried that Havsgaard might escalate to rape since they were alone.

335.   On another trip, Havsgaard entered MARIAN B.'s bedroom, closed the door, and kissed him on his neck and thighs. Other boys were in the room when this happened, but they were either asleep or pretending to be so that Havsgaard did not do the same to them.

336.   These trips occurred more frequently when members of Harvest Riverside visited the homes because Havsgaard wanted to impress them. Paul and Cathy Cross in particular joined on several trips. Havsgaard still sexually abused MARIAN B. and the other boys while traveling, taking advantage of the greater privacy hotels afforded than the Harvest Homes.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### 3.    *Abuse from Harvest Homes Staff*

337.    For failings real and imagined, staff would force MARIAN B. to stand facing a wall as they beat him with tree branches.

338.    They also forced MARIAN B. to kneel on broken walnut shells for hours while keeping his hands in the air, and hit him if he moved.

339.    When MARIAN B. became nervous or agitated, the staff tied him to his bed.

340.    When he was around 15 years old, the staff handcuffed MARIAN B. to a radiator next to his bed and left him alone for hours. This occurred some four times.

341.    All this was under Havsgaard's control, as he was the unquestioned director of the homes as structured by Laurie, Schutte and Harvest Riverside.

### 4.    *False Promises of Adoption*

342.    At one point, Havsgaard told MARIAN B. that he would be adopted by an American sponsor family and move to the United States.

343.    MARIAN B. believed him. He desperately wanted to leave Harvest for a better life. Nothing ever materialized.

344.    MARIAN B. came to understand that this was just another lie from Havsgaard, another way to procure sex and compliance from the children, and boost Havsgaard's twisted ego as if he were a generous benefactor.

345.    Havsgaard never permitted any child to be adopted because he feared that they could destroy him, Laurie and Harvest Riverside by revealing that Harvest's major program in Romania was actually a madhouse run by a sadistic pedophile.

### 5.    *Awareness of Abuse of Others at Harvest Homes*

346.    MARIAN B. regularly witnessed other children being sexually and physically abused by Havsgaard and occasionally other staff.

347.    MARIAN B. heard and saw Havsgaard spank and fondle other boys including DENIS, BOGDAN, and ADRIAN.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

348.    MARIAN B. was afraid that he would be punished if he spoke up about the sexual abuse, and had no basis to believe that any adult would help him.

349.    He knew that Havsgaard was cruel and violent, and feared he had no effective limits. MARIAN B. believed that Havsgaard would try to kill him if he ever disclosed to adults what was happening.

### 6.    *Harvest Homes Staff's Knowledge of the Abuse*

350.    MARIAN B. knows that the Harvest staff were aware that Havsgaard sexually abused him and the other boys. The staff would frequently threaten to call Havsgaard when MARIAN B. misbehaved because they knew the boys feared Havsgaard would "discipline" them by more sexual abuse.

351.    Havsgaard changed the staff often to avoid them seeing more of his behavior. MARIAN B. remembers Havsgaard firing employees who tried to stand up to him about his abuse.

### 7.    *Plaintiff Marian B.'s Suffering*

352.    MARIAN B. lived in constant fear of sexual abuse by Havsgaard, and believed that at any moment, Havsgaard would escalate the abuse to rape. He felt that he was living in a torture chamber inside a prison.

353.    At one point, MARIAN B. ran away, but soon recognized he had nowhere to go and no way to support himself. He returned to beg Havsgaard to be allowed back.

354.    Havsgaard agreed, but only on the condition that he could continue to sexually abuse MARIAN B.

355.    MARIAN B. did not want to experience more abuse but could not find any other option.

356.    MARIAN B. attempted suicide four times while living at the Harvest homes.

357.    He cut his wrists with a piece of glass, drank chlorine, took pills that he stole from the staff, swallowed coins, and poured boiling water on himself.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

358.   MARIAN B. also cut himself with broken jars, thrust screws into his wrists, and hit his head against a wall.

359.   MARIAN B. still has scars on his hip, feet, and knee from times he self-harmed while living at Harvest.

*Figure 35: Scar from childhood self-harm on Marian B.'s wrist, 2023*



8.   _Circumstances of Leaving Harvest Homes_

360.   In or around 2008, when MARIAN B. was approximately 16 years old, he broke a window by mistake when trying to fix it, and cut the tendons on his wrist.

361.   Havsgaard, believing that MARIAN B. was too troublesome, kicked him out of the homes and threw him onto the streets.

**B.    Havsgaard's Sexual Abuse of Plaintiff Mihai-Constantin Petcu**

1.   _Abuse from Havsgaard at Harvest Homes_

362.   Soon after MIHAI-CONSTANTIN arrived at Harvest, Havsgaard frequently kissed him on the cheek and neck.

363.   When he hugged MIHAI-CONSTANTIN, Havsgaard would caress his lower back, often moving his hands down to caress MIHAI-CONSTANTIN buttocks.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

364.   This unwelcome behavior occurred when Havsgaard visited the home where MIHAI-CONSTANTIN was staying, and the frequency was highest when MIHAI-CONSTANTIN was younger.

365.   Like the other children, MIHAI-CONSTANTIN was subject to Havsgaard's sexually charged "spankies."

366.   Havsgaard would force MIHAI-CONSTANTIN to fully undress. Havsgaard would then caress MIHAI-CONSTANTIN's buttocks, moving his hand close to MIHAI-CONSTANTIN's anus before inserting his finger in his anus.

367.   Almost every time Havsgaard would visit the house that MIHAI-CONSTANTIN stayed in, he would assault MIHAI-CONSTANTIN.

368.   At the swimming pool, Havsgaard stared at the children in a way that made MIHAI-CONSTANTIN uncomfortable, especially because he and the other children were naked or just wearing swim trunks.

369.   Havsgaard would prey on MIHAI-CONSTANTIN, touching his genitals whenever MIHAI-CONSTANTIN would be close by, including when they went swimming.

370.   On one occasion, Havsgaard drove MIHAI-CONSTANTIN and his brother home to see his mother. MIHAI-CONSTANTIN was sitting in the passenger seat, and Havsgaard touched and caressed his upper thigh while he was driving.

371.   As MIHAI-CONSTANTIN became older, he received fewer items from Havsgaard, which he knew was because Havsgaard was finding him less attractive.

372.   MIHAI-CONSTANTIN remembers how he felt lucky that he did not speak English, since Havsgaard would have otherwise wanted to spend more time with him.

2.   *Havsgaard Recruits Plaintiff Mihai-Constantin to Sex Work*

373.   Towards the end of MIHAI-CONSTANTIN's time at Harvest, Havsgaard said he had to work if he was going to stay at the Buftea house.

374.    Havsgaard brought him and other boys to bath houses where clients, usually older rich foreigners, paid to manually stimulate their genitalia or fellate them.

375.    MIHAI-CONSTANTIN and other boys would also use the internet for sex work while at the Buftea house or Manescu's internet café, with Havsgaard's knowledge and permission.

376.    MIHAI-CONSTANTIN met strangers on the internet and charged money for video chats, where he would undress and show the men his genitals.

3.    *Awareness of Abuse of Others at Harvest Homes*

377.    While at Harvest, MIHAI-CONSTANTIN was aware that Havsgaard was sexually abusing other boys.

378.    Peter P. openly joked about how Havsgaard was a pedophile. When Havsgaard sat on the stairs, Peter P. would come up behind him and tap him on the shoulder or head with his penis.

379.    MIHAI-CONSTANTIN shared a room with Mark M., where he witnessed Havsgaard intimately touch Mark M. in bed while MIHAI-CONSTANTIN pretended to be asleep.

380.    Havsgaard would then take Mark M. upstairs to Havsgaard's bedroom, which Havsgaard did not share with Kathy. Havsgaard showered Mark M. with gifts, which confirmed to MIHAI-CONSTANTIN that Havsgaard valued the sexual access Mark M. gave him.

4.    *Circumstances of Leaving Harvest Homes*

381.    MIHAI-CONSTANTIN lived in perpetual fear that Havsgaard would kick him back onto the streets, while also understanding that Havsgaard wanted to keep him and other children close by for easy assault.

382.    This constant tension meant MIHAI-CONSTANTIN found life at Harvest oppressive. At one stage, the right side of his body became paralyzed for a month, which he thinks was a reaction to the stress of living there.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

383.    MIHAI-CONSTANTIN left Harvest when the Buftea house closed in 2008. The conditions there had deteriorated due to a lack of funds. MIHAI-CONSTANTIN left with no money and nowhere to go.

**C.    Havsgaard's Sexual Abuse of Plaintiff Cristian Aeroaiei**

    1.    *Abuse from Havsgaard at Harvest Homes*

384.    Soon after CRISTIAN moved into Harvest, Havsgaard began to sexually exploit him.

385.    Havsgaard spanked CRISTIAN frequently under the pretense of punishing him for misbehaving, even when CRISTIAN did not do anything wrong.

386.    In the bathroom of the home or in CRISTIAN's bedroom, Havsgaard would pull down CRISTIAN's pants and underpants and force him to lay across his knees. Havsgaard alternated between spanking and stroking CRISTIAN's thighs and caressing his buttocks and anus. This made CRISTIAN fearful.

387.    During these sessions, Havsgaard watched CRISTIAN closely, as if enjoying CRISTIAN's fear.

388.    CRISTIAN observed, on several occasions, that Havsgaard would get an erection while spanking him.

389.    During these spanking sessions, Havsgaard sometimes also wrapped his hands around CRISTIAN's neck and choked him.

390.    CRISTIAN thought Havsgaard was trying to keep him quiet so others would not hear his cries.

391.    After the "spankies," Havsgaard would massage CRISTIAN's buttocks and anus. When Havsgaard had finished he would watch CRISTIAN closely as he dressed himself.

392.    Havsgaard used to eye CRISTIAN at other times when he was undressed, such as when CRISTIAN showered or bathed.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

393.    Once when CRISTIAN was sick, he went to take a bath. When he got out, he realized that he did not have a towel to dry himself. He opened the bathroom door to call for one of the other children to bring him a towel from downstairs. CRISTIAN suddenly saw Havsgaard standing in the corridor outside. Havsgaard did not enter the bathroom, but he lingered in the corridor staring at CRISTIAN while he was naked.

394.    This event made CRISTIAN extremely uncomfortable and embarrassed.

395.    CRISTIAN was frightened because Havsgaard's behavior was so unpredictable.

396.    At times, when Havsgaard threatened punishment, CRISTIAN found that instead of a spanking Havsgaard caressed him, kissed his neck, and rubbed his lower back, buttocks, and anal region.

397.    CRISTIAN could not understand why he would kiss a child on the neck like that since it seemed sexual and intimate.

398.    Havsgaard's intimate touching and uninvited kissing occurred often, especially when CRISTIAN was in the Harvest van. Over time, the inappropriate touching escalated and Havsgaard once groped CRISTIAN's crotch over his trousers.

399.    Havsgaard would show CRISTIAN pornography.

400.    When he observed that CRISTIAN felt uncomfortable from the touching or "spanky," he whispered to him that they were "family."

401.    He called CRISTIAN his "son" while he touched him, and CRISTIAN longed for a father-son relationship, since his own relationship with his father was nonexistent due to his father's alcoholism and physical abuse. However, over time, CRISTIAN realized that Havsgaard's treatment of him and the other boys was not normal for a father-son relationship.

402.    It also became clear to CRISTIAN that Havsgaard was grooming him. CRISTIAN knew about, indeed had seen, the sexual abuse of the other boys and Havsgaard's behavior with CRISTIAN mimicked the same pattern.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

403.    CRISTIAN understood that Havsgaard touched and kissed him to gauge his reaction and judge how much farther he could press him sexually.

404.    CRISTIAN was a natural leader of the boys and felt that status made Havsgaard concerned about pushing him too far, in case CRISTIAN might organize the boys against him or report him to the police.

405.    After CRISTIAN had seen this, Havsgaard gave CRISTIAN money whenever he would ask. CRISTIAN understood that Havsgaard was trying to bribe him to keep quiet.

2.    *Abuse from Havsgaard While on Trips*

406.    Havsgaard also abused CRISTIAN while on trips and other outings. Havsgaard, CRISTIAN, and several other boys would occasionally leave Harvest to visit their families. However, if they displeased Havsgaard they were not allowed to see their families.

407.    CRISTIAN would occasionally sit in the passenger seat next to Havsgaard whilst he drove the van.

408.    During these trips, Havsgaard would look at CRISTIAN intensely and say, "I love you so much," as he caressed his inner thigh.

409.    Havsgaard placed blankets on the back seats of the van where CRISTIAN knew he performed sex acts on other children, such as with his friend Julian J.

410.    On one trip in or around 2002, Havsgaard took Mark M. and CRISTIAN to visit CRISTIAN's grandmother. They stayed in a hotel for three days.

411.    Havsgaard sat on the bed in the hotel with intentionally revealing shorts, and CRISTIAN could see his penis.

412.    Havsgaard would often walk around the Harvest house in Buftea intentionally with short, flimsy shorts and no underwear. CRISTIAN and the other boys could see Havsgaard's genitals.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### 3.    *Effects of Abuse while at Harvest Homes*

413.    To escape the sexual abuse, CRISTIAN frequently ran away from Harvest Homes.

414.    One time, he spent several days sleeping directly outside one of the Harvest Homes. Havsgaard could see him sleeping on the ground in the rain, but he did not invite him back inside.

415.    CRISTIAN believed that Havsgaard enjoyed watching him suffer because it gave him a sense of power.

416.    Eventually, several children begged Havsgaard to allow CRISTIAN to come inside, and Havsgaard reluctantly agreed.

### 4.    *Awareness of Abuse of Others at Harvest Homes*

417.    From talking to his friends and from personal observation, CRISTIAN knew that Havsgaard abused most of the boys at Harvest.

418.    CRISTIAN understood "spanky" meant the same for all the boys, and he knew that some boys were "spanked" more often than others, such as DENIS.

419.    The other boys would joke about Havsgaard's sexual abuse in front of CRISTIAN.

420.    For example, when CRISTIAN came back to the Harvest house from McDonald's, KFC, or a trip, the other boys would laugh at him and claim that Havsgaard had anally raped him.

421.    CRISTIAN knows that they said these things because it was generally understood by Harvest residents that they would have to acquiesce in sexual activity with Havsgaard to receive gifts, money, and to go on trips.

422.    CRISTIAN felt that there was significant discord in general among the boys at Harvest Homes because Havsgaard favored some boys. He often pitted the boys against each other, and they were constantly fighting.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

5.    _Awareness of Abuse by Manescu_

423.    CRISTIAN learned that Manescu also abused the young girls in the Harvest homes, specifically Amy A.

424.    She told him that Manescu took her into a car and pulled her head towards his crotch, while he was driving, pushing her to perform oral sex on him.

425.    CRISTIAN heard many other rumors from girls and boys at Harvest Homes that Manescu was preying on young girls and spent most of his time at the girls' house in Dămăroaia.

6.    _Awareness of Abuse of Stefan S._

426.    At one point, Stefan S. and his friend Andrei A. ran away from the Harvest house. When they returned, Havsgaard refused to let them back in.

427.    Stefan S. and Andrei A. stood outside the home and started shouting loudly at the windows for all the children and staff to hear: "We know you are sucking kids, Paul!"

428.    In a panic, Havsgaard rushed to close all the windows so the rest of the children could not hear the shouts, and eventually let Stefan S. and Andrei A. back into the house.

7.    _Awareness of Abuse of Alexandru M._

429.    On one occasion, CRISTIAN observed Havsgaard perform oral sex on Alexandru M. in his bedroom upstairs.

430.    The door was left slightly ajar and CRISTIAN could see, inside from the corridor, Havsgaard sat on the bed while Alexandru M. stood in front of him.

431.    Cristian spent significant time with Kathy. Although he did not tell her directly about Havsgaard's abuse of him and other boys, it was so prevalent and notorious that he believed it was impossible for her not to know.

432.    On trips with Kathy and Havsgaard, CRISTIAN observed Havsgaard taking favorite boys out alone.

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

433.    CRISTIAN saw that Kathy was often unhappy and angry with Havsgaard, who spent so much time with the boys.

### 8.    *Harvest Homes Staff's Knowledge of the Abuse*

434.    CRISTIAN disclosed Havsgaard's abuse to Paul Adrian Crivceac ("Crivceac"), the night caretaker at Harvest Homes.

435.    CRISTIAN recalls that Paul Cross, a Calvary pastor, and his wife, Cathy, visited Harvest. CRISTIAN thought that Paul Cross was scary, because he often hit CRISTIAN and the boys.

436.    Mihai Bundalici ("Mihai"), another boy staying at the home, told Paul Cross that Havsgaard was gay but as he spoke, Paul Cross began to choke him, apparently believing he was disobedient and provocative.

### 9.    *Circumstances of Leaving Harvest Homes*

437.    By the end of CRISTIAN's time at Harvest Homes in or around 2007, the conditions at the homes had deteriorated significantly.

438.    Finally, Manescu kicked CRISTIAN out. CRISTIAN did not receive any money and had nowhere else to live.

## D.    Havsgaard's Sexual Abuse of Plaintiff Constantin-Alin Nitu

### 1.    *Abuse from Havsgaard at Harvest Homes*

439.    Havsgaard started early on to profess love for ALIN, saying "I love you so much, buddy." The love was not fatherly, it was predatory.

440.    Havsgaard showed ALIN—a child aged ten—pornography to groom him for further sexual abuse.

441.    Havsgaard used to walk around the house wearing revealing shorts. His penis was clearly visible, and ALIN and the other boys believed Havsgaard was intentionally making the environment sexual for the child residents.

442.    Havsgaard used to stare at ALIN and the other boys in a clearly sexual way when they were naked or in swim trunks.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

443.    Havsgaard often forced ALIN to sit on his lap, directly on top of his genitals. Sometimes, ALIN felt Havsgaard's erection, a feeling he likened to sitting on a rock.

444.    Havsgaard also touched and kissed ALIN's intimate parts.

445.    When ALIN was in bed or when he was standing in the back of the garage where the bicycles and outside toys were kept, Havsgaard often came and kissed his neck.

446.    Havsgaard groped ALIN's penis over his clothes several times. He often greeted ALIN by tapping his penis and saying, "hey buddy." This made ALIN feel extremely uncomfortable.

447.    Some of the boys told ALIN that they had given or received oral sex from Havsgaard, and ALIN was scared that Havsgaard would abuse him in the same way.

448.    Around a year after he moved to Harvest, ALIN fought with another boy at the house. Havsgaard decided to "punish" ALIN and took him into his bedroom upstairs for "spankies." Havsgaard pulled down ALIN's trousers and underpants, bent him over his leg, spanked him, caressed ALIN's buttocks, and tried to digitally penetrate ALIN's anus with his finger. Afterwards, Havsgaard hugged ALIN, said he was sorry, and kissed him.

449.    Havsgaard spanked ALIN more than five times in a disturbingly sexual way. While spanking him, Havsgaard groped and fondled ALIN's penis.

450.    ALIN feared these "spankies" from Havsgaard, since he had heard from other boys that Havsgaard used punishment as a pretext to perform sexual acts.

451.    Havsgaard also touched ALIN's anus with his fingers and attempted to digitally penetrate him on multiple other occasions.

2.    _Abuse from Havsgaard While on Trips_

452.    ALIN was also abused by Havsgaard while on trips and outings away from the Harvest homes, such as at the mall or at the waterpark.

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

453.   On every trip, Havsgaard, while driving, would kiss ALIN or other boys on the neck, force them to watch pornographic videos, or fondle their inner thighs and genitals. Havsgaard also took some boys into his hotel room.

454.   On one trip to northern Romania, Havsgaard booked ALIN and his brother into a shared room. One night, while they were sleeping, Havsgaard entered the room, pulled down ALIN's trousers and underpants, caressed his buttocks, and attempted to insert his fingers into ALIN's anus. ALIN shrieked and turned away to stop Havsgaard from molesting him.

455.   Havsgaard stood up, backed away, said "I love you" like he was trying to normalize the situation, and offered to pay him 300 RON (Romanian currency) to buy new clothes. ALIN understood that Havsgaard was offering to pay him either to not tell anyone what had happened, or to encourage more cooperation the next time.

3.   _Awareness of Abuse of Other Children at Harvest Homes_

456.   ALIN witnessed Havsgaard drag boys into his room alone for "spankies." He would hear the "spanked" children screaming and crying.

457.   Havsgaard enjoyed showing ALIN and other boys pornographic videos, at times forcing them to watch.

458.   One day, ALIN and Mark M. were playing a PlayStation game. Havsgaard entered the room, Mark M. told ALIN to leave, and Havsgaard shut the door behind ALIN. Moments later, ALIN re-entered the room to ask Havsgaard for money to buy new clothes. Once ALIN opened the door, he saw Havsgaard on his knees and Mark M. quickly pulling his pants up. It was clear to ALIN that he interrupted Havsgaard while performing oral sex on Mark M.

4.   _Harvest Homes Staff's Knowledge of Havsgaard's Abuse; Americans' Visit the Harvest Homes_

459.   Harvest staff were aware that Havsgaard sexually abused him and the other boys. The staff would frequently threaten to call Havsgaard when ALIN

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

1  misbehaved because they knew the boys feared Havsgaard would "discipline" them by
2  more sexual abuse.

3      460.    ALIN remembers that multiple Americans visited Harvest Homes. ALIN
4  particularly recalls Paul and Cathy Cross, and believes they were aware of Havsgaard's
5  sexual assaults on the children.

6      461.    ALIN also had an American sponsor. He does not recall her name but
7  recalls that she worked at Harley-Davidson. They spoke from time to time and she
8  visited Harvest Homes on at least one occasion.

9      462.    ALIN never received any money or gifts from his sponsor. Instead,
10  Havsgaard kept the funds donated for ALIN for himself and/or gave the funds to the
11  other boys who were his favorites.

12          5.    _Abuse from Harvest Homes Staff_

13      463.    For failings real and imagined, staff would force ALIN to kneel with his
14  hands up in the air, towards a wall, for hours. If ALIN moved, he was beaten.

15      464.    One staff member often beat ALIN with a ruler.

16      465.    Other staff members would also choke ALIN by putting their knees on
17  his neck.

18      466.    The staff often threatened to kick ALIN out of the homes if he
19  misbehaved.

20      467.    Havsgaard sanctioned this abuse.

21          6.    _Plaintiff Alin's Suffering_

22      468.    Throughout ALIN's time at Harvest, he was constantly afraid of
23  Havsgaard and that his sexual abuse would escalate.

24      469.    Havsgaard was unpredictable and often violent towards ALIN. He
25  shouted at ALIN and sometimes grabbed ALIN by the throat and choked him.

26      470.    ALIN turned to smoking marijuana and gambling to dull Havsgaard's
27  sexual, physical and psychological abuse.

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

471.    ALIN also self-harmed while he was at Harvest Homes by cutting himself behind his knee.

### 7.    *Circumstances of Leaving Harvest Homes*

472.    In 2007, the conditions in the Harvest Homes became much worse because money was clearly tighter. The staff needed to ration food due to insufficient funds.

473.    In or around 2008, ALIN and his brother resolved to leave Harvest Homes together. The two brothers and their two sisters lived together with their mother in one small room. She could not support them and so ALIN found a job to help support the family. After several years, ALIN's mother became ill with leukemia.

474.    ALIN turned to sex work as a means to survive. He feels that his traumatic experience at Harvest Homes is still chasing him today; he feels cursed.

### E.    **Havsgaard's Sexual Abuse of Plaintiff Razvan-Gheorghe Nitu**

### 1.    *Abuse from Havsgaard at Harvest Homes*

475.    Havsgaard sexually abused RAZVAN in multiple ways.

476.    Havsgaard visited the Harvest home in Bârlogeni almost daily and abused RAZVAN or other boys during every visit.

477.    Very often, Havsgaard "spanked" RAZVAN often under the guise of punishment. Havsgaard grabbed him, pulled down his trousers and underpants, and forced him over his lap. As he "spanked" RAZVAN, Havsgaard would sometimes wrap his hands around his neck and choke him.

478.    After the spanking, Havsgaard would forcibly insert his finger into RAZVAN's anus. He would cry out from the intense pain.

479.    Havsgaard's sexual abuse was frequent and unpredictable. When the other kids were at school or playing outside, Havsgaard would come into RAZVAN's room and try to undress him. Havsgaard then forcibly touched RAZVAN all over his body. At times, Havsgaard ejaculated while touching RAZVAN.

480.  These encounters led RAZVAN to try to avoid being alone with Havsgaard. The longer he stayed at Harvest, the more afraid of Havsgaard he became.

481.  RAZVAN saw that Havsgaard gave gifts to some boys. At one point, he gave RAZVAN a bicycle. However, RAZVAN learned that this was part of his grooming technique. A gift was supposed to buy Havsgaard sexual access.

482.  One day while he was a child resident at Harvest Homes, RAZVAN had taken a large number of pills in an attempt to kill himself—he saw no other way to escape Havsgaard's abuse.

2.  *Abuse from Havsgaard While on Trips*

483.  Havsgaard took selected boys on outings, which sometimes included RAZVAN. Havsgaard abused RAZVAN and other boys on these trips. Havsgaard often fondled boys' genitals while driving. Once, Havsgaard forced RAZVAN to sit next to him and watch Havsgaard masturbate.

484.  Havsgaard frequently forced RAZVAN to watch Havsgaard ejaculate.

485.  Kathy and Manescu usually came with them, but they would travel in a separate car. RAZVAN remembers that Paul Cross came on several trips when he was visiting from the United States.

486.  RAZVAN recalls a trip to Lasi in Romania when he was around 14 years old. Havsgaard organized a hotel room for RAZVAN. One day, Havsgaard entered RAZVAN's room, pulled Răzvan's pants and underpants down and began touching RAZVAN all over his body, including his genitals. He kissed RAZVAN on the neck and tried to kiss other intimate parts of his body.

487.  Havsgaard then attempted to put his finger in RAZVAN's anus.

488.  Terrified and disgusted, RAZVAN ran out of the hotel room. Havsgaard chased after RAZVAN. He told him that he was treating him as a father treats his son, and everything he was doing was part of a normal father-son relationship. Eventually,

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

RAZVAN had no option but to go back to the hotel room. He felt trapped, and remained on guard all night.

489.    After the incident in Lasi, whenever RAZVAN travelled somewhere with Havsgaard such as the mall or somewhere in Bucharest, Havsgaard made RAZVAN sit next to him. While he was driving, Havsgaard would touch RAZVAN intimately on his upper thighs and genitals.

490.    On one trip, Havsgaard took RAZVAN to visit his mother, who was in a hospital at the time. While in the van, Havsgaard took out his phone and showed RAZVAN a video of adult men having sex.

491.    Havsgaard told RAZVAN to watch the pornographic video to see if he liked it, and reminded him that sex does not have to be between a man and a woman.

492.    RAZVAN responded saying that he did not like it, and he turned his head away.

### 3.    *Abuse from Harvest Homes Staff*

493.    Harvest staff members often beat RAZVAN with a belt. He still has a scar on his hand from being hit with a belt buckle.

494.    At one point, a staff member restrained RAZVAN by tying him to the bed with rope.

495.    Staff also made RAZVAN and the other kids kneel with their faces to the wall. They were forced to keep their hands in the air for several hours, and would be beaten if they moved.

496.    RAZVAN felt constant fear while at Harvest. He was particularly worried that if he spoke up about the abuse, Havsgaard would kick his little brother out of the home.

### 4.    *Awareness of Abuse of Other Children at Harvest Homes*

497.    RAZVAN heard from the other children about Havsgaard's behavior before he experienced any sexual abuse himself. Julian J., who was one of RAZVAN's

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

roommates, told him that Havsgaard anally raped him. Another boy, Peter P., told RAZVAN that Havsgaard frequently attempted to and performed forced fellatio.

498.    RAZVAN noticed early on that Havsgaard would give gifts and special privileges to boys who would endure sexual abuse from him, including Leo L. and Peter P. In exchange for the abuse, Havsgaard gave them generous gifts.

499.    RAZVAN also observed Havsgaard abuse other children while in the van, including touching Stefan S. and Julian J. on the upper thigh and genitals while he was driving.

500.    One day, RAZVAN directly witnessed Havsgaard perform oral sex on Peter P. Havsgaard had taken Peter P. into his bedroom upstairs, but he left the door slightly ajar. RAZVAN could see what was happening inside the room from the corridor.

501.    RAZVAN also recalls seeing Paul Cross notice Havsgaard taking boys to Havsgaard's room several times. Sometimes, Cross rushed upstairs to follow Havsgaard, as if to intervene. Further, on at least one occasion, Cross witnessed Havsgaard spank Peter P.

502.    RAZVAN also saw Cross hit ALEXANDRU, another child at the Harvest Homes.

5.    *Harvest Homes Staff's Knowledge of the Abuse*

503.    At one point, RAZVAN told the cook at Harvest, Tina Radu Floarea, who was known to the boys as Mami Tina ("Mami Tina"), about Havsgaard's sexual abuse. He told her that Havsgaard used to undress him and the boys, spank them, and touch their anus and genitals.

504.    Mami Tina said she did not want to get involved because she was afraid she would be fired if she spoke out, even though she knew Havsgaard's conduct was wrong.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

505.   In fact, RAZVAN noticed that most of the staff at Harvest changed regularly. Either they could not stand it, or Havsgaard hoped to keep them ignorant by getting rid of them, or needed to get rid of them once they knew.

6.   *False Promises of Adoption*

506.   Stefan S., who had recruited RAZVAN and his brother into Harvest Homes, was one of Havsgaard's favorites. Havsgaard regularly showered Stefan S. with gifts and gave him special privileges. Because Stefan S. spoke better English than most of the other residents, he translated for American visitors to Harvest Homes and became privy to information about how Harvest Riverside and Havsgaard interacted with various sponsors in the United States.

507.   For example, Stefan S. learned that a female musician in the United States sponsored RAZVAN and frequently made donations to support his care. Stefan S. relayed this information to RAZVAN, who was surprised to learn this because he never received any money or gifts.

508.   Instead, Havsgaard kept the funds donated for RAZVAN for himself and/or gave the funds to the other boys who were his favorites.

509.   Although RAZVAN did not speak directly with any American sponsors, Havsgaard used to film him and other kids to elicit further donations and gifts.

510.   Havsgaard also promised RAZVAN that he would be taken to the United States and adopted by new parents there. The promised adoption never materialized.

7.   *Circumstances of Leaving Harvest Homes*

511.   In 2007, the conditions in the Harvest Homes became much worse because money was clearly tighter. The staff needed to ration food due to insufficient funds.

512.   In or around 2008, RAZVAN and his brother resolved to leave Harvest Homes together. The two brothers and their two sisters lived together with their mother

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

in one small room. She could not support them and so RAZVAN quit school and found a job to help support the family.

513.    After several years, RAZVAN's mother became ill with leukemia. RAZVAN worked in a car wash to pay for her treatment and even donated his bone marrow in an attempt to save her life. She died in 2018 and RAZVAN subsequently moved to the United Kingdom to live and work there.

### F.    Havsgaard's Sexual Abuse of Plaintiff George Adrian Vasile

#### 1.    *Abuse from Havsgaard at Harvest Homes*

514.    Havsgaard paid ADRIAN special attention when he arrived at the Harvest Homes. Havsgaard spoke with him frequently, brought him sweets, and fed him better food than fed some of the other children.

515.    ADRIAN's happiness in being singled out for special treatment changed when Havsgaard began to make sexual advances towards him. These made ADRIAN feel confused, frightened, stressed, and dirty.

516.    Soon, Havsgaard started to find reasons to spank ADRIAN, saying that it was punishment for mistakes ADRIAN had made. Havsgaard would force ADRIAN to undress and then painfully spank him between ten and twenty times. After spanking ADRIAN, Havsgaard would stop and smell his own hand, seemingly finding pleasure from the smell.

517.    Afterwards, Havsgaard put ADRIAN on his lap. Havsgaard would play with ADRIAN's genitals and forcibly penetrate ADRIAN's anus with his finger. Havsgaard would then tell ADRIAN how much he loved him and that he would get a reward if he kept quiet.

518.    ADRIAN would scream from the pain. Havsgaard would become red in his face and start to shake. As a child, ADRIAN was confused but now understand that Havsgaard was sexually gratifying himself.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

519.   After the first sexual assault, ADRIAN spent four days hiding from Havsgaard—under his bed, in the wardrobe, and in the water tank behind the house. Still, Havsgaard's "spankies" continued to happen, often in Havsgaard's bedroom.

520.   On many occasions, Havsgaard forcibly masturbated ADRIAN. Havsgaard found special pleasure in squeezing ADRIAN's penis in a brutal manner and rotating it. It was painful, and ADRIAN screamed for help. Havsgaard tried to convince ADRIAN this was a positive experience that he should want by saying that ADRIAN "wanted to get wet," and that he "should not be shy."

521.   On multiple occasions, Havsgaard also attempted to anally rape ADRIAN.

522.   When ADRIAN was in fifth grade, he received a bad mark in school. Havsgaard was notified and once ADRIAN returned from school, they had an intense argument about the grade. Havsgaard took ADRIAN to his room, pulled his trousers down and spanked him even more heavily than usual, to the point of making his bottom numb. Still, moments later, ADRIAN felt a sharp pain in his anus as Havsgaard forcibly penetrated him.

523.   At that moment, ADRIAN tried to fight Havsgaard off. In the struggle to be free from Havsgaard, ADRIAN hit his head on a radiator and started to bleed. He started to feel dizzy and fell to the ground. Eventually, staff came to the room to help him. Havsgaard lied and told the staff that ADRIAN tried to escape routine spanking.

524.   ADRIAN still has a scar on his head from this injury.

525.   The same evening, ADRIAN ran away from Harvest Homes. After two days in the streets, he reached his parents' home. That same evening, Havsgaard arrived to bring ADRIAN back. ADRIAN's mother was hospitalized at the time, and his father said that he had to go with Havsgaard because they did not have money to feed him. ADRIAN started screaming with fear and begging to not be taken back, but Havsgaard prevailed. ADRIAN spent the entire car ride with Havsgaard focusing on

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

the car door, biding his time to escape but never got the opportunity. Havsgaard forced him to return to Harvest Homes.

### 2.    *Abuse from Harvest Homes Staff*

526.    ADRIAN remembers that the Harvest staff were cruel and often physically abusive towards him. They asked the children to call them "Mom" and "Dad," but still punished them regularly.

527.    If ADRIAN refused a "spanky" from Havsgaard as punishment, the staff forced him to spend two to three hours kneeling on walnut shells, in the attic, in the dark, which made his legs bleed.

528.    Other times when the staff thought ADRIAN was misbehaving, they would lock him in his room for up to a week. He was only allowed to leave for school or to use the bathroom; at all other times he was locked in his room. Staff occasionally brought him food as if he were in prison. He spent much of his time reading the Bible and hoping to be saved from his misery. His roommates were not allowed to enter the room while ADRIAN was locked in it, except at 10 p.m. to go to sleep.

529.    Havsgaard and staff at Harvest Homes forbade ADRIAN from visiting his mother, even when she was hospitalized. ADRIAN tried to run away a few times but was caught, then locked in a room again for up to a week. A few times, Havsgaard promised ADRIAN to take him to see his mother, but only if ADRIAN agreed to being sexually abused by Havsgaard.

### 3.    *False Promises of Adoption*

530.    Another sinister form of manipulation that Havsgaard employed was telling ADRIAN that he had a sponsor family in the United States, who would like to adopt him. This promise, like many others of Havsgaard's, never materialized.

### 4.    *Harvest Homes Staff's Knowledge About Havsgaard's Abuse*

531.    It is obvious to ADRIAN that the staff at Harvest Homes were aware of Havsgaard's sexual abuse. ADRIAN told a woman staffer, Mihaela Mustata, about the

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

abuse, including the attempted rape by Havsgaard. She seemed to believe him but said she could not protect ADRIAN because Havsgaard was the pastor and her boss.

### 5. *Circumstances of Leaving Harvest Homes*

532. ADRIAN ran away from Harvest in around 2006, when he was 14 years old, as he could no longer stand it. Harvest failed to provide him with any meaningful education or life skills.

533. ADRIAN subsequently found work in construction and as a chef in a restaurant.

### G. Havsgaard's Sexual Abuse of Plaintiff Aurelian Busca

#### 1. *Abuse from Havsgaard at Harvest Homes*

534. Havsgaard sexually and physically abused AURELIAN in multiple ways.

535. Havsgaard visited the Bârlogeni Harvest Home where AURELIAN lived almost daily.

536. Havsgaard placed AURELIAN in a different house than ALEXANDRU-CRISTIAN, despite AURELIAN's pleas to be reunited with his brother. Havsgaard only allowed AURELIAN to see his brother during the Sunday church services, in school, and, occasionally, for visits lasting a few hours. Havsgaard also frequently forbade AURELIAN from seeing his mother, particularly when AURELIAN resisted Havsgaard.

537. When Havsgaard drove AURELIAN to church services or elsewhere around town, he often made AURELIAN sit in the front seat. While driving, Havsgaard touched AURELIAN and fondled his genitals. When another boy sat in the front seat instead, AURELIAN observed Havsgaard abusing him similarly.

538. On nearly daily basis, Havsgaard spanked AURELIAN in punishment for infractions both real and imagined, such as not being good enough student. Havsgaard grabbed AURELIAN by the neck, took him into the bathroom, undressed him,

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

massaged his buttocks and then spanked him. AURELIAN knew that if he wanted any freedom, like playing soccer, he needed to endure a spanking from Havsgaard.

539.    When AURELIAN resisted, Havsgaard tied him to a sofa and instructed staff to keep him tied until Havsgaard left for the day.

540.    On at least two occasions, Havsgaard spanked AURELIAN publicly, in front of the other children. The first time, AURELIAN had run away from Harvest Homes to a nearby school, wanting to play soccer. Havsgaard found him there and told him he would receive a "special punishment" at church the following day. After the customary service and prayer, Havsgaard announced to all children that a "sad moment" was about to happen. Havsgaard then instructed AURELIAN to come to the front of the crowd, stripped him naked, and spanked him over his knees for everybody to see.

541.    The second time Havsgaard spanked AURELIAN in public happened after AURELIAN got into a fight with Mark M. in the garden of the Buftea house prior to a Sunday church service. After church, Havsgaard again spanked AURELIAN in front of all the children (though not Mark M.).

542.    Havsgaard occasionally publicly spanked other children too.

543.    One time when AURELIAN was showering, Havsgaard forced himself into the bathroom and tried to touch AURELIAN's penis. AURELIAN screamed out of fear and tried to fight Havsgaard off. Havsgaard started to choke AURELIAN to subdue and silence him. After a while, a staff member heard the struggle, came in and asked Havsgaard to stop strangling AURELIAN.

544.    AURELIAN was so affected by Havsgaard's physical and sexual abuse that he once ran into the kitchen, grabbed a knife, and screamed that he would kill himself if Havsgaard did not stop hurting him.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

545.   AURELIAN tried to run away from Harvest Homes on multiple occasions. Each time, Havsgaard found AURELIAN, brought him back, and put him on house arrest for as long as a month.

546.   With no practical means of escape, AURELIAN turned to drugs and got addicted to heroin as a teenager.

### 2. *False Promises of Adoption*

547.   AURELIAN recalls that Americans often visited Harvest Homes, some multiple times like Cathy and Paul Cross, and Rowan and Monique Smith.

548.   Havsgaard told AURELIAN that there was a sponsor family in America who wanted to adopt him. AURELIAN recalls that one of his sponsors, Flavius, promised to give AURELIAN a cassette recorder, which he never received. AURELIAN wanted to be adopted but Havsgaard ultimately did not allow it to happen.

### 3. *Circumstances of Leaving Harvest Homes*

549.   In 2005, AURELIAN received a rare permission to visit his mother. When AURELIAN returned from his visit, Havsgaard told him that his time at the Harvest Homes was over, and he could no longer live there.

550.   AURELIAN then lived on the streets until his mother came and found him.

### H. Havsgaard's Sexual Abuse of Plaintiff Alexandru-Cristian Busca

### 1. *Abuse from Havsgaard at Harvest Homes*

551.   Havsgaard sexually and physically abused ALEXANDRU-CRISTIAN in multiple ways.

552.   Havsgaard kept ALEXANDRU-CRISTIAN and his brother separate at most times. ALEXANDRU-CRISTIAN frequently asked Havsgaard if he could see his brother, but Havsgaard generally said no. They would see each other at Sunday church service and at times in school. Only very occasionally, Havsgaard allowed

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

ALEXANDRU-CRISTIAN and AURELIAN to spend a few hours together at other times.

553.    When ALEXANDRU-CRISTIAN arrived at the Harvest Homes, Havsgaard sat down with him and caressed his leg. ALEXANDRU-CRISTIAN did not speak good English; Havsgaard had one of the other boys translate for him when he told ALEXANDRU-CRISTIAN to "be a good boy and learn English."

554.    Havsgaard would often intentionally walk around the Harvest Homes with short, flimsy shorts, and no underwear. ALEXANDRU-CRISTIAN and the other boys could see Havsgaard's genitals.

555.    Havsgaard's intimate touching escalated quickly. Anytime ALEXANDRU-CRISTIAN did not want to go to church or to wake up, Havsgaard entered his bedroom, stroked ALEXANDRU-CRISTIAN's buttocks and groped his penis, while convincing ALEXANDRU-CRISTIAN "come on, let's go."

556.    Havsgaard frequently sexually abused ALEXANDRU-CRISTIAN in ALEXANDRU-CRISTIAN's bed. This included Havsgaard rubbing his face (nose, in particular) on ALEXANDRU-CRISTIAN's genitals. Havsgaard did this even when ALEXANDRU-CRISTIAN's roommates were in the room; he would sometimes rub his face in their genitals too. At times, Havsgaard pinned ALEXANDRU-CRISTIAN down to his bed by sitting on ALEXANDRU-CRISTIAN's crotch.

557.    Additionally, Havsgaard would often go into ALEXANDRU-CRISTIAN's room early in the morning, checking if ALEXANDRU-CRISTIAN or any of the other boys had morning erections.

558.    Havsgaard often tried to sexually arouse ALEXANDRU-CRISTIAN and get him erect. When Havsgaard succeeded, he would excitedly comment on ALEXANDRU-CRISTIAN's penis, saying "big, oh my God."

559.    When Havsgaard drove ALEXANDRU-CRISTIAN to school, ALEXANDRU-CRISTIAN sat in the front seat next to Havsgaard to ease his car

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

sickness. Havsgaard took advantage of this and groped ALEXANDRU-CRISTIAN's genitals.

560. Havsgaard frequently performed "spankies" on ALEXANDRU-CRISTIAN. Havsgaard would take ALEXANDRU-CRISTIAN to the bathroom, undress him fully, and spank him. At the end, Havsgaard rubbed ALEXANDRU-CRISTIAN's anus with his finger.

561. Havsgaard also abused ALEXANDRU-CRISTIAN physically. One time, Havsgaard slapped ALEXANDRU-CRISTIAN so forcefully that ALEXANDRU-CRISTIAN's eardrum tore. ALEXANDRU-CRISTIAN screamed with pain. The eardrum never healed fully; to this day, ALEXANDRU-CRISTIAN suffers from vertigo and must avoid letting water inside his ear.

562. ALEXANDRU-CRISTIAN observed another child, Mihai, trying to stand up to Havsgaard. Once when Mihai wanted to go to a movie, he asked Havsgaard directly, "What's the deal? Do I have to stay for you to suck my dick to go out?" Havsgaard's response was to beat and spank Mihai.

563. ALEXANDRU-CRISTIAN self-harmed while he lived at Harvest Homes; he cut himself with glass and needed stitches.

### 2. *Havsgaard Recruits Plaintiff Alexandru-Cristian to Sex Work*

564. Havsgaard often showed pornography to ALEXANDRU-CRISTIAN and other children at Harvest Homes.

565. Havsgaard permitted ALEXANDRU-CRISTIAN and other boys to use the computer in their residence or the internet café owned by Manescu for online sex work. With Havsgaard's knowledge and consent, ALEXANDRU-CRISTIAN and the boys procured customers on online dating sites and performed paid sex acts in front of web cameras. ALEXANDRU-CRISTIAN started this at age 16.

566. ALEXANDRU-CRISTIAN had sex with men for money three times while he was an underage resident of Harvest Homes. One time, ALEXANDRU-

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

CRISTIAN and another boy from the Harvest Homes were picked up from the Homes by a French man, who paid them €50 to perform oral sex on them.

3.    *Schutte Was Plaintiff Alexandru-Cristian's Sponsor and Wanted to Adopt Him*

567.    Havsgaard paired ALEXANDRU-CRISTIAN with sponsors in California—Defendant Schutte and his wife. The Schuttes sent ALEXANDRU-CRISTIAN money, toys and gifts, but Havsgaard kept all of them. The Schuttes sent a picture of themselves which ALEXANDRU-CRISTIAN has kept. Schutte and his wife visited ALEXANDRU-CRISTIAN at Harvest Homes.

568.    Schutte and his wife wanted to adopt ALEXANDRU-CRISTIAN, but Havsgaard cut off all communications between ALEXANDRU-CRISTIAN and the Schuttes before the adoption could materialize.

*Figure 36: Family photograph the Schuttes sent Alexandru-Cristian*



CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1        4.    *Circumstances of Leaving Harvest Homes*

2        569.    In or around 2007, Havsgaard kicked ALEXANDRU-CRISTIAN out of

3   Harvest Homes.

4        570.    ALEXANDRU-CRISTIAN struggled to survive afterwards. He turned to

5   stealing to buy food.

6   **I.    Havsgaard's Sexual Abuse of Plaintiff Marian Dragne**

7        1.    *Abuse from Havsgaard at Harvest Homes*

8        571.    Havsgaard sexually abused MARIAN D. in multiple ways.

9        572.    Havsgaard was an angry man with a short temper, who beat MARIAN D.

10  with sticks or rulers whenever he acted in a way that displeased Havsgaard. As another

11  form of punishment, Havsgaard also made MARIAN D. kneel on broken walnut shells

12  until his knees bled. MARIAN D. experienced extreme pain when forced to do so.

13       573.    On one occasion, Havsgaard punished MARIAN D. by forbidding him

14  from leaving the Harvest Homes for two weeks. MARIAN D. tried to sneak out but

15  Havsgaard found him, grabbed him by the throat, and physically assaulted him.

16       574.    At one point when MARIAN D. misbehaved, Havsgaard beat MARIAN

17  D. and forced him to drink chlorine as punishment, which made MARIAN D. feel very

18  sick.

19       575.    When Havsgaard spanked MARIAN D., Havsgaard usually took

20  MARIAN D. took to an empty room, forced MARIAN D. to undress, and then beat

21  and spanked him. Once he was done, Havsgaard hugged and kissed MARIAN D. and

22  groped his penis.

23       576.    On occasions, while spanking MARIAN D., Havsgaard digitally

24  penetrated MARIAN D.'s anus and made MARIAN D. masturbate Havsgaard's penis.

25       577.    On at least one occasion when MARIAN D. was bathing, Havsgaard

26  entered the bathroom, stared at MARIAN D., and masturbated himself.

27

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

578.   MARIAN D. lived in constant fear from Havsgaard's beatings, and sexual assaults. MARIAN D. was also petrified that Havsgaard would kick him out of the home as he had nowhere to go.

2.   *Abuse from Harvest Homes Staff*

579.   The Harvest Homes were a brutal place for MARIAN D. In the infrequent windows of reprieve from Havsgaard's abuse, the Romanian staff physically assaulted him. On one occasion, some of the Romanian staff forcibly washed MARIAN D.'s mouth with soap.

3.   *Awareness of Abuse of Other Children at Harvest Homes*

580.   MARIAN D. saw how Havsgaard sexually abused other children. One time MARIAN D. was walking down the hallway in the Buftea house when he heard a boy scream from a nearby room. The door to the room was open and so MARIAN D. looked inside. He saw Havsgaard hitting the boy while touching the boy's genitals.

581.   One evening, Havsgaard's absolute favorite boy, Leo L., was crying a lot. MARIAN D. saw Leo L. self-harm; it seemed that Leo L. wanted to kill himself. MARIAN D. and other boys in the room jumped on Leo L. to stop him from further self-harm.

4.   *Circumstances of Leaving Harvest Homes*

582.   In 2006, when MARIAN D. was 18, he left Harvest Homes. He started to drink excessive amounts of alcohol to numb his pain and erase his memories. He also developed a gambling addiction.

**J.    Havsgaard's Sexual Abuse of Plaintiff Florin Cristian Caragea**

1.   *Abuse from Havsgaard at Harvest Homes*

583.   Havsgaard sexually abused FLORIN in multiple ways.

584.   A few months after FLORIN moved into Harvest Homes, Havsgaard forced him to sit on his lap as he caressed his inner thighs.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

585.    Havsgaard often wore flimsy shorts, without underwear, exposing his genitals. At times, Havsgaard asked FLORIN to sit on his lap while revealing his penis.

586.    One time, Havsgaard stared at FLORIN through a window in the bathroom while FLORIN was showering. FLORIN noticed that Havsgaard's face looked strained and sweaty, and understood that Havsgaard was masturbating. On another occasion, FLORIN saw Havsgaard masturbate behind the house.

587.    Havsgaard spanked FLORIN regularly. Havsgaard undressed FLORIN, forcefully held him down over his lap, caressed his buttocks and spanked him. FLORIN cried from the significant pain. Havsgaard finished the abuse session by digitally penetrating FLORIN's anus and fondling his penis. FLORIN yelled about the pain but learned early on that any resistance only led to a more severe spanking from Havsgaard. Havsgaard often masturbated while he administered the "spankies" on FLORIN.

588.    FLORIN sometimes self-harmed by cutting his hands after being spanked. He once tried to commit suicide after being spanked by throwing himself down a well, but one of his friends stopped him. FLORIN was so affected by the abuse that he cried himself to sleep almost every night.

589.    The children in the Harvest Homes slept in bunkbeds and FLORIN had the top bed of his bunkbed. One night FLORIN fell down from his bunkbed and seriously fractured his hip and leg. FLORIN required surgery and was then confined to a wheelchair with a cast on his leg for nine months. FLORIN was unable to wash or use the bathroom by himself, yet no Harvest staff were assigned to help him. He was forced to ask other children for help.

2.    _Awareness of Abuse of Other Children at Harvest Homes_

590.    FLORIN and other children discussed Havsgaard's rampant sexual abuse.

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

591.    FLORIN saw Havsgaard touch other boys intimately on their thighs and genitals, even in public settings in front of other adults. FLORIN learned that some of the children were engaging in sex work on Havsgaard's request.

### 3.    *False Promises of Adoption*

592.    FLORIN knew that many children were sponsored by donors in America. FLORIN was told that the sponsors sent money and gifts for them, but the only item FLORIN received was a football. Havsgaard promised FLORIN that his sponsors wanted to adopt him, but this never happened.

593.     Havsgaard took photos of the boys, often shirtless, on the grounds that he would send them to the sponsors.

### 4.    *Circumstances of Leaving Harvest Homes*

594.    FLORIN left Harvest Homes in 2008. He knew the only way to escape Havsgaard's abuse was to leave. The conditions at the homes had also worsened. The children lacked food, clothing, and were told that funding from America had ended.

595.    Upon leaving, FLORIN returned to live with his father, who soon moved to Spain, and his grandparents took care of him until he turned 18. To assist his grandparents financially, FLORIN turned to sex work, as that is what he had learned from his time at Harvest Homes. He engaged in sex work until he turned 17.

### K.    **Havsgaard's Sexual Abuse of Plaintiff Alexandru Badaluta**

### 1.    *Abuse from Havsgaard at Harvest Homes*

596.    Havsgaard started to sexually abuse ALEXANDRU B. around three months after he arrived at Harvest Homes.

597.    Havsgaard frequently walked around the Harvest Homes with flimsy shorts, without underwear, and his penis was visible to the children, including ALEXANDRU B. At times, Havsgaard had his hand inside his shorts, apparently masturbating.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

598.   Havsgaard found reasons to "punish" ALEXANDRU B. for infractions both real and invented. These punishments were Havsgaard's opportunity to sexually assault him.

599.   On multiple occasions, Havsgaard took ALEXANDRU B. into the bathroom and undressed him, put ALEXANDRU B. on his lap, and violently "spanked" his buttocks. Havsgaard also forcibly rubbed his finger on ALEXANDRU B.'s anus. ALEXANDRU B. felt Havsgaard's erection through his trousers when Havsgaard was abusing him.

600.   Havsgaard ended these instances of abuse by kissing and hugging ALEXANDRU B. The "spankies" occurred often, sometimes three times a day. ALEXANDRU B. was frequently in pain from the abuse.

601.   ALEXANDRU B. often ran away from Harvest Homes but eventually returned because he needed food and shelter. Upon each return, Havsgaard punished him.

602.   One form of punishment was to put ALEXANDRU B. into solitary confinement (in ALEXANDRU B.'s room) for a few days.

603.   Before being reaccepted to "normal" status, there was a final hurdle: Havsgaard would again administer "spanky," fondle ALEXANDRU B.'s anus, and violently strike him.

604.   A second form of punishment was to kick ALEXANDRU B. out of the homes. Havsgaard seemed to like this route particularly in the winter when outside temperatures were well below freezing. One such time, when ALEXANDRU B. was twelve, Havsgaard forced him to sleep outside in the snow. ALEXANDRU B. developed frostbite on one of his legs, for which he was hospitalized. ALEXANDRU B. has pain in that leg to this day.

605.   As another form of punishment, Havsgaard often forced ALEXANDRU B. to stand naked in the bathroom and then stare at him in a sexual manner. Havsgaard

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1  also masturbated while watching ALEXANDRU B. take a bath. ALEXANDRU B.
2  saw Havsgaard walk around with his hands inside of his trousers, masturbating, while
3  ALEXANDRU B. was naked having a bath.

4      606.   On some occasions, as if in a frenzy, Havsgaard choked ALEXANDRU
5  B. and forcefully rubbed his fingers on ALEXANDRU B.'s anus.

6      607.   When ALEXANDRU B. was 14, Havsgaard entered ALEXANDRU B.'s
7  bedroom, locked the door, and started another "spanky" abuse session. ALEXANDRU
8  B. tried to flee the room but Havsgaard stopped him. Despairing, ALEXANDRU B.
9  punched his hand through one of the windows, jumped through the gap, and ran away.
10  For days, ALEXANDRU B. lived in the streets, struggling with the trauma from
11  Havsgaard's abuse. He drank large amounts of alcohol and slashed his arm with a sharp
12  object, causing substantial bleeding. Police found him and took him to the hospital,
13  where they saved his life. ALEXANDRU B. still has visible scars from this suicide
14  attempt.

15      608.   ALEXANDRU B. still recalls how he wanted to slash his whole body
16  open that day. He attempted suicide several more times while he was a child resident
17  of the Harvest Homes. ALEXANDRU B. saw no other possible escape from
18  Havsgaard's abuse.

19          2.   _Awareness of Abuse of Other Children at Harvest Homes_

20      609.   ALEXANDRU B. learned from the other boys at Harvest Homes that
21  Havsgaard often masturbated in front of them.

22      610.   ALEXANDRU B. also heard other boys' cries throughout the house.

23          3.   _Circumstances of Leaving Harvest Homes_

24      611.   In or around 2005, Havsgaard forced ALEXANDRU B. to watch a
25  pornographic video together with him in the attic. Havsgaard told ALEXANDRU B.
26  that it was a learning experience for when he grew up. But ALEXANDRU B. felt
27  ashamed and scared and so ran away for a final time.

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

612.    For a while, ALEXANDRU B. lived at a state orphanage. Although many of the physical conditions in the orphanage were worse than at Harvest Homes, ALEXANDRU B. was content because he finally escaped Havsgaard's abuse.

**L.    Havsgaard's Sexual Abuse of Plaintiff Bogdan Ionescu**

1.    *Abuse from Havsgaard at Harvest Homes*

613.    Havsgaard sexually abused BOGDAN in multiple ways.

614.    Within two weeks of BOGDAN's arrival at the Harvest Homes, Havsgaard began touching his legs, arms and inner thighs in a sexual manner.

615.    About a month later, Havsgaard started to repeatedly fondle BOGDAN's penis over his clothes. BOGDAN was nine years old at the time.

616.    Soon after, Havsgaard frequently "spanked" BOGDAN under the guise of punishment. Havsgaard would grab BOGDAN, take him to the bathroom, pull down his trousers and underpants, force him over his lap, and spank him. As Havsgaard "spanked" him, he would often fondle BOGDAN's exposed genitals. After the spanking, Havsgaard would stroke BOGDAN's bare legs, buttocks, as well as kiss him on his cheek, as if expressing a perverse affection.

617.    At least once while BOGDAN was showering, Havsgaard entered the bathroom uninvited, stared at BOGDAN's body and masturbated himself.

618.    Over time, Havsgaard's "spankings" of BOGDAN become more sexually abusive. On at least one occasion Havsgaard inserted his finger into BOGDAN's anus at the end of "spanky." BOGDAN screamed out, "what are you doing? It's not right!" Havsgaard kept going and insisted: "It's right, it's right!"

2.    *Awareness of Abuse of Other Children at Harvest Homes*

619.    BOGDAN often heard children scream and cry when they were alone with Havsgaard. BOGDAN understood that Havsgaard was sexually abusing them in a similar manner.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

620.    BOGDAN also witnessed Havsgaard perform oral sex on Leo L. as set out above

### 3.    *False Promises of Adoption*

621.    When BOGDAN was around 14 years old, Havsgaard introduced him to a sponsor family who were members of Harvest Riverside's congregation and ran a private school near Riverside. BOGDAN spoke to them via video call on at least three occasions. On one of these calls, they told BOGDAN that they had been sending him $500 a month to allow him to go swimming and to play basketball. BOGDAN told them he received any of this money; the sponsor family was shocked to learn this.

622.    As detailed above, Havsgaard refused to sign BOGDAN's adoption papers after BOGDAN objected to Havsgaard's sexual abuse.

### 4.    *Harvest Homes Staff's Knowledge of the Abuse*

623.    After Havsgaard thwarted BOGDAN's chances of being adopted in America, BOGDAN felt increasingly lonely and depressed. Eventually, he confided in one of the women working at the Harvest Homes and told her that Havsgaard was sexually abusing him. She was shocked and offered to adopt BOGDAN herself but Havsgaard again refused it.

### 5.    *Plaintiff Bogdan's Suffering*

624.    Throughout his time at the Harvest Homes, BOGDAN suffered deeply from the abuse inflicted by Havsgaard. He lived in constant shame and fear of Havsgaard.

625.    BOGDAN's suffering intensified after Havsgaard's sexual assault at the airport, when BOGDAN realized Havsgaard would never let him leave. BOGDAN became withdrawn and self-harmed many times. Once, he punched a wall for half an hour and banged his head against it, suffering injuries in the process.

626.    BOGDAN has attempted suicide at least three times. He also saw another child, MARIAN, attempt suicide by cutting.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

6. *Circumstances of Leaving Harvest Homes*

627. BOGDAN was forced out of the Harvest Homes in 2008 when Harvest Riverside closed them. He returned to living in the streets. With no meaningful life skills, BOGDAN turned to sex work to earn a living.

628. BOGDAN soon attempted suicide by overdosing on pills.

629. BOGDAN self-medicated to repress his memories of Havsgaard's sexual abuse. For many years, he managed to block his memories of Havsgaard completely. However, they eventually returned, in the form of recurring nightmares.

630. Around five years ago, BOGDAN planned to end his life again, this time by drowning himself. He did not go through with the plan.

**M.    Havsgaard's Sexual Abuse of Plaintiff Marian Liviu Mihaila**

1. *Abuse from Havsgaard at Harvest Homes*

631. Havsgaard sexually abused MARIAN LIVIU in multiple ways.

632. Havsgaard frequently embraced MARIAN LIVIU, touched his buttocks and kissed him. The intimate touching made MARIAN LIVIU uncomfortable.

633. MARIAN LIVIU often saw Havsgaard walking around the Harvest Homes in flimsy shorts. MARIAN LIVIU could see Havsgaard's genitals through the shorts.

634. At times, MARIAN LIVIU saw Havsgaard looking sexually aroused when being around the boys. MARIAN LIVIU also saw Havsgaard erect on multiple occasions.

635. Havsgaard often stripped MARIAN LIVIU's clothes off, bent him over his knees and spanked his naked bottom. MARIAN LIVIU felt Havsgaard become erect during these "spankies." Afterwards he asked MARIAN LIVIU to leave the room. A few minutes later Havsgaard also left the room, with a look of sexual satisfaction; often, Havsgaard masturbated himself after administering "spankies."

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

636.   One day, MARIAN LIVIU asked Havsgaard for money to buy new shoes because his were torn. Havsgaard got angry, grabbed MARIAN LIVIU and hustled him out of the room and began to strangle him. Through gritted teeth, MARIAN LIVIU saw Havsgaard's eyes widen; Havsgaard's tongue was sticking out of his mouth and he became visibly erect. Havsgaard derived sexual pleasure from strangling MARIAN LIVIU; MARIAN LIVIU feared he was going to die. MARIAN LIVIU tried to fight Havsgaard, who overpowered MARIAN LIVIU and beat him.

637.   Physical dominance over MARIAN LIVIU was important to Havsgaard. When MARIAN LIVIU moved into Harvest Homes, he was a talented young wrestler; a Romanian-American sponsor was supporting his training. If MARIAN LIVIU continued to train, the sponsor had agreed to help him turn professional.

638.   Havsgaard frequently forbade MARIAN LIVIU from entering into wrestling tournaments, particularly when MARIAN LIVIU tried to resist Havsgaard's sexual advances. This ruined MARIAN LIVIU's prospects of turning professional.

639.   On other occasions, Havsgaard punished MARIAN LIVIU with lengthy solitary confinement in MARIAN LIVIU's room.

640.   MARIAN LIVIU self-harmed by cutting himself while living in Harvest Homes.

2.   *Awareness of Abuse of Other Children at Harvest Homes*

641.   MARIAN LIVIU often visited Manescu's internet café and saw other boy residents of Harvest Homes accessing online sex forums and webcam sex websites; they were exposing themselves to strangers for money, with Havsgaard's encouragement.

642.   MARIAN LIVIU occasionally also accessed online sex forums and talked to men online but he never met one in person.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### 3. *Circumstances of Leaving Harvest Homes*

643. In or around 2005, MARIAN LIVIU noticed how Harvest Homes began to run out of money for necessities, including food and MARIAN LIVIU left.

644. For years afterwards, MARIAN LIVIU struggled with drug addiction, including to heroin.

## N. Havsgaard's Sexual Abuse of Plaintiff Alexandra-Elena Langa

### 1. *Abuse from Havsgaard at Harvest Homes*

645. Havsgaard sexually abused ALEXANDRA in multiple ways.

646. Havsgaard sexually spanked ALEXANDRA on several occasions. Each time, Havsgaard took off ALEXANDRA's pants and underwear, bent her over his knee, and spanked her bare bottom violently and painfully. While he was spanking her, Havsgaard was touching his erect penis over his pants.

647. Then Havsgaard stopped her from putting her clothes back on. Instead, he would stand her upright, take her in his arms, and touch her naked body. He told ALEXANDRA that she was his daughter.

648. ALEXANDRA was scared of Havsgaard, who often threatened to kick her out of Harvest Homes if she misbehaved. He would also forbid her from seeing her brother or the rest of her family whenever he deemed her disobedient.

### 2. *Abuse from Harvest Homes Staff*

649. Many staff members at Harvest Homes were abusive towards ALEXANDRA. One named Mihaela would often beat ALEXANDRA with a ruler; other staff beat her with a stick, often in front of other children.

650. The staff, with Havsgaard's knowledge and sometimes at his direction, forced ALEXANDRA to kneel on broken walnut shells for extended periods. ALEXANDRA often bled as a result. If she tried to move or escape this cruel punishment, staff would hit her.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### 3. _Awareness of Abuse of Other Children at Harvest Homes_

651.    ALEXANDRA remembers hearing about Havsgaard's sexual abuse of the other Harvest children. It was common knowledge as the boys made frequent comments about the sexual acts Havsgaard forced them to perform.

652.    When the children were together for church service on Sundays, Alexandra overheard the boys talking to each other about how Havsgaard would enter the bathroom while they were taking showers.

653.    The boys would often joke about it, saying things like, "watch out for Paul [Havsgaard], he might follow you into the bathroom."

654.    ALEXANDRA was also aware that Manescu was sexually abusing underage girls. She also heard that Manescu was stealing money from Harvest.

655.    ALEXANDRA had no doubt that the staff knew about Havsgaard's regime of abuse. It was impossible not to hear the children yelling in the houses while they were alone with him.

656.    Havsgaard would also directly ask the staff members to leave the room so he could be alone with a child.

657.    ALEXANDRA lived in constant fear of the sexual environment at Harvest and that she would be sexually assaulted, as well as, physically assaulted.

### 4. _Circumstances of Leaving Harvest Homes_

658.    In or around 2006, when ALEXANDRA was nine years old, her mother withdrew her from Harvest Homes to beg on the street with her father, who was paralyzed and in a wheelchair.

659.    When ALEXANDRA was a teenager, she lived at the train station and became addicted to drugs. She met a boy who would bring her drugs in exchange for sex.

660.    She became pregnant at age 16 and moved into a different home. She gave up her son to her mother's care, afterwards falling into a deep depression.

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

1    ALEXANDRA attempted suicide twice in a span of several months and had to be
2    hospitalized.

3        **O.**    **Havsgaard's Sexual Abuse of Plaintiff Ioana Cosmina Pirvu**

4            1.   *Abuse from Havsgaard at Harvest Homes*

5    661.    Havsgaard sexually abused COSMINA in multiple ways.

6    662.    Havsgaard repeatedly kissed COSMINA.

7    663.    Havsgaard spanked COSMINA frequently for infractions both real and
8    imagined. Havsgaard would remove COSMINA's pants and underwear, bend her over
9    his knee, and spank her bare buttocks until they were bright red. COSMINA was in
10    intense pain and cried profusely. Once Havsgaard stopped, he fondled and squeezed
11    her buttocks. Havsgaard would tell COSMINA: "Oh, I don't want to do this, I don't
12    want to spank you." At the end, he kissed her.

13    664.    At times, Havsgaard abused COSMINA on the spot. Other times, he
14    scheduled "appointments" to spank and abuse COSMINA later in the day.

15    665.    While living at Harvest Homes, Havsgaard's abuse and her fear it would
16    never stop prompted COSMINA to self-harm by cutting her arms.

17            2.   *Awareness of Abuse of Other Children at Harvest Homes*

18    666.    COSMINA saw Havsgaard abuse many of her friends, which was deeply
19    upsetting to her.

20    667.    At age 13, COSMINA started to date Anthony A., a 19-year-old fellow
21    resident. Havsgaard repeatedly sexually abused Anthony A. and was obviously jealous
22    of Anthony A.'s relationship with COSMINA. Havsgaard frequently pushed, shoved
23    and hit COSMINA. One time, in an odd bout of anger, Havsgaard threw a toilet paper
24    roll at her when she was with Anthony A.

25    668.    Havsgaard also groomed Anthony A. for online sex work: Anthony A.
26    frequently accessed online sex forums, spoke to men online, and met them for paid
27    sex.

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

669.   COSMINA also heard Manescu threaten many girls at Harvest Home to do as he wished or he would kick them out.

3.   *Circumstances of Leaving Harvest Homes*

670.   COSMINA left Harvest at 14. She first moved back with her mother, who was living with her partner and younger sister in a small, rented room.

671.   When COSMINA was 17, she moved in with Anthony A. who took care of her but asked that she help him find sex customers—the only way he learned to make a living at Harvest Homes.

672.   Around the same time, COSMINA got a job working at a bar with her sister DANA. Five years later, COSMINA moved to the United Kingdom, working as a nanny and home cleaner.

**P.    Manescu's Sexual Abuse of Plaintiff Gheorghita-Bogdana Tici**

1.   *Abuse from Manescu at Harvest Homes*

673.   When DANA was around 13 years old, Manescu began to groom her for sex. He gave her significantly more attention than other children. For example, when DANA and other children went to play computer games at Manescu's house or at his internet cafe, Manescu focused on DANA, spoke to her frequently and expressed interest in what she was doing and saying. Manescu also granted DANA special privileges: other children had strict time limits on being at his internet café but DANA was exempt. Manescu also frequently bought DANA gifts.

674.   Manescu told DANA not to tell anyone that she was one of his favorites, which made DANA feel uncomfortable.

675.   Manescu quickly escalated his grooming to sexual abuse.

676.   Manescu frequently took DANA to clean Havsgaard's apartment and then took her to a restaurant. In the car on the way to Harvest Homes, Manescu fondled her thighs and kissed her. DANA was deeply uncomfortable with Manescu's sexual advances.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

677.    When DANA was around 16, she started going out with a boy who lived at a different children's home nearby. Manescu demanded that DANA keep his sexual abuse a secret from her new boyfriend. After Manescu touched her sexually or gave her a gift, he would threaten her, "don't you dare tell your boyfriend."

678.    DANA was frightened and stayed quiet. Nevertheless, she tried to cut back seeing Manescu as much as she could get away with. When Manescu suggested spending time together, DANA made up excuses. Eventually, Manescu moved on and abused a different young girl.

679.    Manescu's sexual abuse of DANA and other underage girls at Harvest Homes was overt and well-known to Havsgaard, Kathy and the staff. Neither Havsgaard nor any other adult did anything to stop Manescu's sexual abuse of girls.

2.      *Awareness of Abuse of Others at Harvest Homes*

680.    DANA was aware of other children's abuse. She saw Havsgaard take her sister, COSMINA, into the bathroom at Buftea and close the door. DANA heard Havsgaard violently spank her sister from outside the room and COSMINA's cries. DANA decided to rescue COSMINA and knocked on the door. Havsgaard opened it and told DANA, "this is what happens when you swear."

681.    DANA learned from COSMINA that COSMINA's boyfriend, Anthony A., and other boys, had been sexually abused by Havsgaard.

682.    When DANA lived at the Buftea house, she observed Leo L. and other young boys enter and leave Havsgaard's bedroom. The boys told her that Havsgaard was sexually abusing them.

3.      *False Promises of Adoption*

683.    Havsgaard made false promises of adoption to DANA. Havsgaard said that her American sponsor family was interested in adopting her and her sisters. She met with her sponsor family on multiple occasions.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

684.    DANA understood her American sponsors wanted to adopt her but Havsgaard did not allow the adoption to go through.

4.    *Circumstances of Leaving Harvest Homes*

685.    In or around 2007, the living conditions at Harvest Homes deteriorated. DANA was told that the house in Dămăroaia was closing, and the girls would have to move back to Buftea. In 2008, when Havsgaard left Romania, DANA and the other children were told that they had one month to move out of the houses.

686.    Without any financial resources or support, DANA, COSMINA, and MARIA moved back in with their mother. After several months, DANA and MARIA moved into a home for adults who were ill-equipped to live independently.

687.    To support herself, DANA left school and got a job at KFC and later at a wine bar. In or around 2011, DANA and her partner moved to England where she worked as a cleaner.

## Q.    Havsgaard's and Manescu's Sexual Abuse of Plaintiff Maria Ghenciulescu

1.    *Abuse from Havsgaard at Harvest Homes*

688.    Havsgaard sexually abused MARIA in multiple ways.

689.    Havsgaard painfully spanked MARIA on a weekly basis, always drawing evident sexual pleasure from doing so. Havsgaard usually removed MARIA's pants and underwear, bent her over his knees, and then forcefully spanked her bare buttocks. On one occasion, Havsgaard instead lifted MARIA upside down, pulled down her pants and underwear, and spanked her while he held her upside down in the air.

690.    Havsgaard administered these "spankies" both in private and in front of other children. At times, MARIA saw that Havsgaard got an erection and became sexually aroused.

691.    After "spankies," Havsgaard often put MARIA into solitary confinement for the rest of the day without access to food or water.

- 124 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

692.   MARIA was frightened by Havsgaard. She often self-harmed by cutting herself and made three serious suicide attempts while she was a child living at Harvest Homes, first by overdosing on pills, then by deeply cutting her wrists, and finally by spending hours outside in the winter, naked, planning to freeze to death.

693.   Once Havsgaard found out about her suicide attempts, he became enraged and administered brutal "spankies."

2. _Abuse from Manescu at Harvest Homes_

694.   Manescu also sexually abused MARIA.

695.   Manescu took MARIA to his van and touched her up and down her legs in a sexual manner.

696.   Manescu then instructed MARIA to masturbate him. MARIA refused, at which point Manescu violently grabbed her, threw her out of the van and ordered her not to tell anybody about this. Manescu added that even if MARIA did tell anybody, nobody would believe her because she was young and he had Havsgaard's backing.

697.   MARIA saw Manescu sexually pursue other young girl residents of Harvest Homes.

3. _Awareness of Abuse of Other Children at Harvest Homes_

698.   MARIA was particularly close to Leo L. They were friends at first but eventually started to date. MARIA quickly noticed that Havsgaard paid an extraordinary amount of attention to Leo L., often showering him with gifts and taking him on trips around Romania.

699.   On countless occasions, MARIA saw Havsgaard touch Leo L. in a sexual manner. Havsgaard touched Leo L. all over his body, particularly Leo L.'s inner thighs.

700.   On one occasion, MARIA saw Havsgaard take Leo L. to his bedroom, alone. Later that day, MARIA saw Leo L. come out of the bedroom with a wet spot on the back of his shorts, which was apparently caused by leftover sexual lubricant or semen.

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

701.    MARIA witnessed several boy residents at Harvest Homes sexually abuse a young girl. Havsgaard was nearby and able to intervene but chose not to.

### 4.    *Circumstances of Leaving Harvest Homes*

702.    In or around 2007, when MARIA was 19, she saw conditions at Harvest Homes rapidly worsening. Havsgaard told all the children that Harvest Riverside was no longer sending funds to support the homes. Soon after, Havsgaard shut the house in Dămăroaia and moved MARIA back to the house in Buftea.

703.    Havsgaard closed the Buftea house in 2008 and MARIA and her sisters to once again live on the streets and fend for themselves. Eventually, MARIA moved to a charitable foundation for adults, where she stayed for two years.

704.    MARIA struggled with the effects of Havsgaard's abuse of her and other children and quickly became an alcoholic.

### R.    **Havsgaard's Sexual Abuse of Plaintiff Denis-Vasile Otcuparu**

### 1.    *Abuse from Havsgaard at Harvest Homes*

705.    Havsgaard sexually abused DENIS in multiple ways.

706.    Havsgaard did not allow DENIS to see his parents for the first year after he moved to Harvest Homes. DENIS believes Havsgaard did this to isolate him and make him more submissive to Havsgaard's whims.

707.    Havsgaard physically assaulted DENIS. Havsgaard frequently knelt on DENIS's neck, asphyxiating him. DENIS tried to stop Havsgaard but could not overpower him.

708.    Often, Havsgaard intensely stared at DENIS when DENIS was naked. Havsgaard was full of sexual desire for DENIS and arousal, causing DENIS to fear Havsgaard would sexually assault him.

709.    On several occasions, Havsgaard abused DENIS through "spankies" by fully undressing DENIS, forcing DENIS onto Havsgaard's lap, spanking DENIS's bottom, and groping DENIS's testicles. Havsgaard also caressed DENIS's buttocks

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

and thighs, and forced his finger into DENIS's anus. On some occasions, Havsgaard extracted fecal matter from DENIS's anus and then licked his (Havsgaard's) own fingers, drawing sexual gratification.

710. At other times, Havsgaard pinned DENIS down and performed oral sex on him. Havsgaard groped and fondled DENIS's genitals and forced DENIS to reciprocate.

711. After Havsgaard finished sexually abusing DENIS, he kissed DENIS and caressed his neck and hands. Havsgaard frequently apologized to DENIS and said that he was like his son but that he needed to punish him.

712. Havsgaard drew sexual pleasure from abusing DENIS. Havsgaard was visibly aroused and erect and frequently groaned with pleasure when he looked at DENIS lustfully.

713. DENIS self-harmed because of Havsgaard's sexual abuse by cutting himself with glass while he was a child resident of Harvest Homes. DENIS did not care about his life or whether he would die.

   2.   *Abuse From Harvest Homes Staff and Visitors*

714. Paul Cross, an American that visited the Harvest Homes for extended times, frequently hit DENIS and the other boys with a table tennis paddle.

715. Staff at Harvest Homes forced DENIS to kneel on his knees on broken walnut shells for two hours while keeping his hands raised above his head. If DENIS faltered, they beat him with sticks and other objects.

716. On multiple occasions, Manescu threatened DENIS and other child residents of Harvest Homes that Havsgaard planned to kick them out onto the streets.

717. When DENIS complained to Havsgaard about how poorly Harvest Homes staff were treating him and other children, Havsgaard told DENIS, "I do not care, they can treat you however they want."

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1

### 3. Awareness of Abuse of Other Children at Harvest Homes

718. DENIS and the other boys discussed Havsgaard's abuse. The boys talked among themselves on Sundays after the church service led by Havsgaard, when the different houses came together.

719. DENIS learned that Havsgaard performed oral sex on Leo L. and Peter P. When DENIS went on trips with Havsgaard and other staff from Dămăroaia, he noticed that Havsgaard disappeared with some boys. Havsgaard took the boys out alone to sexually abuse them.

### 4. Circumstances of Leaving Harvest Homes

720. In or around 2007, when DENIS was 14 years old, he left Harvest Homes as he could no longer stand the abusive environment. DENIS also dropped out of school at the same time. He left Harvest Homes with no foundation for a productive adult life.

## S. Havsgaard's and Manescu's Sexual Abuse of Plaintiff Emilia-Mariana Tudosie

### 1. Abuse from Havsgaard at Harvest Homes

721. Havsgaard was an angry and cruel man with a short temper, who frequently beat and shook EMILIA for no logical reason.

722. Havsgaard isolated EMILIA from her family. He only allowed her to visit them once or twice a year. EMILIA begged to see her family more often but Havsgaard did not allow it.

723. One day, when EMILIA was around eleven years old, she was particularly upset at his mistreatment and abuse. EMILIA and her roommate wrote that Havsgaard was a pedophile on a piece of paper and stuck it on his bedroom door for all to see. Once Havsgaard saw the note, he got furious and locked EMILIA and her roommate in their bedroom for the rest of the day. A few hours into their confinement, Havsgaard entered the room, undressed and violently spanked both of them. Once he was finished,

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Havsgaard hugged EMILIA and told her that he and Jesus loved her. EMILIA then begged to be allowed to use the bathroom, but Havsgaard refused, forcing her to urinate in a cup.

724.    Havsgaard locked EMILIA in her room as a form of punishment on other occasions too.

### 2.    *Awareness of Abuse of Other Children at Harvest Homes*

725.    EMILIA often heard Havsgaard beat other children at Harvest Homes. She also witnessed Havsgaard choke and strangle children on a near-weekly basis.

726.    Havsgaard meted out this violent punishment for slight transgressions. One time, Victor V. and EMILIA were playing when Victor V. should have been doing chores. This provoked Havsgaard to choke Victor V. in front of EMILIA, relenting only when the boy was clearly terrified.

### 3.    *Havsgaard Takes Emilia to California to Visit Harvest Riverside and a Prospective Adopter*

727.    In or around 2000, Havsgaard took EMILIA, Mark M., Stefan S., and Victor V. to California to visit Harvest Riverside. They stayed at Havsgaard's house with his son, daughter-in-law, and grandchildren. The boys slept upstairs and EMILIA slept downstairs on a sofa, alone. Havsgaard told her that he did not have a free room for her and did not allow her to see the boys' upstairs room.

728.    EMILIA spent much of her time in California with Kathy and a Harvest Riverside congregant, Mioara Cojocnean ("Mioara"), who was originally from Romania and immigrated to California together with her husband, Dan Cojocnean. Mioara told EMILIA that she wanted to adopt her. Havsgaard later vetoed this, without explanation.

729.    Havsgaard raped Stefan S. and Mark M. on this trip to California.

730.    EMILIA, Stefan S., Mark M., and Victor V. met Laurie during a church service at Harvest Riverside. Laurie introduced them to other senior members of the

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

church and the congregation at large. Laurie invited the children to stand next to him for everyone in the congregation to see. Placing EMILIA and the other children in front of the congregation, next to a clearly supportive and approving Laurie, was an important part of Harvest Riverside's effort to use the Harvest Homes as a fundraising tool in California for Harvest Riverside.

### 4. *Abuse from Manescu at Harvest Homes*

731. EMILIA was deeply affected by the sexual abuse she suffered at Harvest Homes. When she returned from the California trip, around 13 years old, she began to take drugs and drink heavily. Havsgaard, the staff and other children were aware of EMILIA's troubles but did not help her.

732. EMILIA once ran away from the Homes and lived on the streets. Havsgaard instructed Manescu to bring her back. When Manescu found EMILIA, she was incoherent because someone on the streets had given her drugs. Manescu put EMILIA in his van and drove her back to Buftea.

733. EMILIA fell asleep on the drive back. When she woke up, the van was stationary, EMILIA was in the back and Manescu was groping her breasts.

734. EMILIA tried to stop Manescu, but he threatened to tell her then-boyfriend about her having been incapacitated with drugs. EMILIA did not want her boyfriend to know and so did not resist Manescu further.

735. Manescu's sexual abuse of EMILIA and other underage girls at Harvest Homes was overt and well-known to Havsgaard, Kathy and the staff. Neither Havsgaard nor any other adult did anything to stop Manescu's sexual abuse of girls.

### 5. *Circumstances of Leaving Harvest Homes*

736. In or around 2002, when EMILIA was 15 years old, she left Harvest Homes to live with her boyfriend, who is now her husband.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

**T.    Havsgaard's Sexual Abuse of Plaintiff Roxana-Maria Turuianu**

1.    *Abuse from Havsgaard at Harvest Homes*

737.    Havsgaard often touched ROXANA's lower back, waist, and upper thighs.

738.    Havsgaard administered "spankies" to ROXANA twice while she was a minor. On one of the occasions, ROXANA had been arguing with another girl in the Harvest Homes. Havsgaard saw the argument and told ROXANA to go upstairs and wait for him to come and punish her. Havsgaard removed her pants and underwear and heavily spanked her bare bottom. Havsgaard derived sexual pleasure from abusing ROXANA in this way.

739.    ROXANA became so traumatized from that spanking that she has tried to block any memory of it.

740.    Havsgaard ordered ROXANA to care for him after he broke his leg in 2007. Her tasks included bringing Havsgaard food, cleaning him up, and washing his feet. When ROXANA washed Havsgaard, he put his hands down his pants, got erect, and masturbated himself.

2.    *Awareness of Abuse of Other Children at Harvest Homes*

741.    ROXANA often heard other children at Harvest Homes crying and yelling when they were alone with Havsgaard.

742.    At Sunday church services which Havsgaard led, ROXANA saw him hugging and touching boys all over their bodies, including their inner thighs, crotch and genitals.

743.    ROXANA heard several children call Havsgaard a pedophile in front of Harvest Homes staff and other children.

744.    ROXANA frequently saw Havsgaard physically fight with boys in his care, on occasion hurting them.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### 3. _Awareness of Manescu's abuse of girls at Harvest Homes_

745. ROXANA worked at Manescu's internet café. He required that she work twelve-hour shifts for less than minimum wage

746. ROXANA saw Manescu interact with many other Harvest residents who frequented his café. She saw him repeatedly sexually proposition a minor girl, Amy A. ROXANA saw Manescu isolate Amy A. from the rest of the children and drive away with her in the Harvest Homes van.

747. One of Manescu's grooming techniques was to offer his target protection from other children and Havsgaard.

748. Manescu told ROXANA that he was having sex with a 17-year-old girl.

749. When ROXANA told Havsgaard that she feared Manescu would sexually abuse her too, Havsgaard said he could not do anything to help and that that ROXANA had to accept Manescu for who he was and continue working for him.

750. Manescu told ROXANA's then-boyfriend that he had tricked Kathy into believing that he was in love with her, hoping she would convince Havsgaard to promote him.

### 4. _Circumstances of Leaving Harvest Homes_

751. In or around 2007, Havsgaard shut the Harvest Home in Dămăroaia due to lack of funds. ROXANA and the rest of the girls were moved to Buftea.

752. Because Havsgaard and Harvest Homes were running out of money, Havsgaard fired most of the staff and the standard of care suffered. Havsgaard demanded that ROXANA give him a cut from her earnings so he could buy food for Homes.

753. In 2008, ROXANA learned that Harvest Homes were closing. ROXANA was afraid she would have nowhere to go and attempted to kill herself by overdosing on pills stored in the bathroom. She needed hospitalization and was in a coma for three days. Two months after she recovered, Havsgaard kicked her out of the Homes. Having

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

nowhere else to go, ROXANA knocked on doors around the neighborhood hoping to find someplace to live.

### U.    Havsgaard's Sexual Abuse of Plaintiff Cristina-Bianca Popescu

#### 1.    *Abuse from Havsgaard at Harvest Homes*

754.    Havsgaard sexually abused CRISTINA in multiple ways.

755.    Havsgaard frequently spanked CRISTINA under the guise of punishment. He took off her pants and underwear, bent her over his knee and then spanked her bare bottom. When CRISTINA lived at the Dămăroaia house, Havsgaard spanked her around weekly.

756.    CRISTINA was also assaulted in other ways by Havsgaard and his staff. They washed her mouth with soap, made her stay in her room without food, beat her with a table tennis racket, and tied her to a radiator until her skin burned. Around monthly, Harvest Homes staff punished her by making her kneel on broken walnut shells while simultaneously holding her arms above her head, for up to an hour at a time.

#### 2.    *Havsgaard Let Boys Living at Harvest Homes Rape Cristina*

757.    When CRISTINA was between eight and ten years old, boys living at Harvest Homes assaulted and raped her three times. The first rape occurred in a field behind the Buftea house. The second happened in the attic.

758.    The third incident of rape occurred in the changing room of a swimming pool where Havsgaard regularly brought the children. After their swim, some of the boys trapped CRISTINA in one of the changing rooms. They then took turns in raping CRISTINA, who was under ten years old. CRISTINA tried to resist and her cries for help echoed through the venue. Even though Havsgaard was close by and heard CRISTINA, he did not intervene. CRISTINA was terrified for her life.

759.    Havsgaard never punished the boys who raped CRISTINA, did not report the rape to the police, and did not do anything to help CRISTINA recover.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

760.    CRISTINA confided in one of the women working at Harvest Homes, but she was desensitized to the many sexual assaults and rapes that happened there regularly and laughed CRISTINA off.

### 3.    *False Promises of Adoption*

761.    Havsgaard introduced CRISTINA to a sponsor family belonging to Harvest Riverside's congregation. CRISTINA spoke to them regularly. They told her that they were sending her money but she never received any of it.

762.    CRISTINA understood that her sponsors wished to adopt her, but Havsgaard intervened and did not allow the adoption to go through. At one point, Havsgaard said that he would bring CRISTINA to California to meet them but later decided against this, preferring to instead take some of the boys.

### 4.    *Circumstances of leaving Harvest Homes*

763.    CRISTINA stayed at Harvest Homes until the Buftea house closed in 2008, when she was 16. She was transferred back to the Casa Pinocchio orphanage.

## V.    Havsgaard's Sexual Abuse of Plaintiff Alexandru Ionita

764.    Havsgaard sexually abused ALEXANDRU I. in multiple ways.

765.    On multiple occasions, Havsgaard punished ALEXANDRU I. for infractions real or imagined by violently and painfully "spanking" his naked bottom. Havsgaard then fondled ALEXANDRU I.'s genitals and tried to digitally penetrate his anus. Havsgaard drew sexual satisfaction from abusing ALEXANDRU I.

766.    Havsgaard also regularly abused ALEXANDRU I. by fondling his body and genitals while ALEXANDRU I. was in his bed, ready to sleep. ALEXANDRU I. begged Havsgaard to stop touching him but Havsgaard did not relent.

### 1.    *Havsgaard Attempted to Anally Penetrate Alexandru I.*

767.    One evening, Havsgaard came into ALEXANDRU I.'s bedroom, touched ALEXANDRU I.'s inner thigh for around 20 minutes, and then fondled his penis.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

ALEXANDRU I. again told Havsgaard to stop. Eventually, Havsgaard turned to ALEXANDRU I.'s roommate and abused him instead.

768.    Later that evening, Havsgaard brought ALEXANDRU I. to the living room. Havsgaard closed the door, took off his trousers to reveal his erect penis, and demanded to anally penetrate ALEXANDRU I., who refused and so Havsgaard changed roles and told ALEXANDRU I. to anally penetrate him. Havsgaard said, "if you do not want me to have sex with you, you have sex with me." ALEXANDRU I. again refused but this time Havsgaard did not take no for an answer.

769.    Havsgaard grabbed ALEXANDRU I., pushed him against the wall, forcefully removed ALEXANDRU I.'s trousers and started to anally penetrate ALEXANDRU I.

770.    ALEXANDRU I. then heard a door open downstairs and told Havsgaard that this had to be Kathy, Havsgaard's wife, coming home. This startled Havsgaard and allowed ALEXANDRU I. to run back to his bedroom.

### 2.    _Awareness of Abuse of Other Children at Harvest Homes_

771.    ALEXANDRU I. and other children knew that Havsgaard was sexually abusing many of the other children in the Harvest Homes.

772.    ALEXANDRU I. saw Havsgaard administer "spankies" to many other fellow residents.

### 3.    _Circumstances of Leaving Harvest Homes_

773.    Havsgaard quickly punished ALEXANDRU I. for escaping the attempted anal rape. He used the pretext of an argument ALEXANDRU I. had had with some other children to administer a "spanky." Havsgaard undressed ALEXANDRU I., spanked his buttocks, and digitally penetrated ALEXANDRU I.'s anus.

774.    ALEXANDRU I. ran away from Harvest soon after and moved back in with his mother.

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

**VI.** **HARVEST RIVERSIDE IS GIVEN REPEATED NOTICE THAT HAVSGAARD IS SEXUALLY ABUSING PLAINTIFFS AND OTHER CHILDREN AT THE HARVEST HOMES**

**A.**    **Romanian Staff Quickly Recognize Havsgaard as a Pedophile**

775.    Employees of the Local Foundation, Directors of the Local Foundation, and visitors from Harvest Riverside (including employed ministers) all quickly developed suspicions that Havsgaard was a child abuser, and word of this got back to Harvest Riverside in California.

776.    Children at the Harvest homes repeatedly complained about being sexually abused, both to each other and to responsible adults, including the cook "Mami Tina" Radu Florea, the night watchman Crivceac, and the Finance Director Roman.

777.    Mami Tina, who was consistently warm and supportive to the children and won the trust of many, heard and observed enough about Havsgaard that she felt obliged to report her suspicion that he was a pedophile to Schutte when Schutte visited, two or three years after the Homes opened. When Schutte returned to California, he escalated Mami Tina's report to Pastor John Collins ("Collins"), Laurie's principal deputy at Harvest Riverside, who told other pastors, but no one took any further steps to investigate or intervene.

778.    Kathy, Havsgaard's wife and a Director of the Local Foundation, had known Havsgaard was a pedophile since at least 1994, when she was present for a family discussion convened by his sisters to get his apology for raping them when they were little girls. In Romania, she also suspected Havsgaard's abuse but did not believe she should or could act on it. She was entirely dependent on Havsgaard in an unwelcoming foreign country for her entire existence—income, food, shelter, and adult conversation in English (she did not speak Romanian)—and subordinated any worries that arose about what he was doing to children in the Harvest Homes to her duties of

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

devotion and obedience as a wife as taught by Laurie and the doctrine at Harvest Riverside, which had been her lodestar for 30 years. To oppose or publicly rebuke him was actually inconceivable.

**B.     Peter P. Reports Havsgaard's Sexual Abuse to Harvest Homes Staff**

779.    Peter P. was a homeless child when he met Havsgaard. He moved into one of the Harvest Homes in or around 1998. He was an early source of reports to Local Foundation officials about Havsgaard's sexual abuse. As is typical of sex abuse survivors, he tried different routes to get help from responsible adults, escalating over time as he kept being ignored.

780.    Havsgaard's abuse of Peter P. was consistent with that of other children. Havsgaard regularly pulled down Peter P.'s trousers and underwear and spanked his bare bottom; sometimes Havsgaard would let his hand linger, massage Peter P.'s buttocks, kiss them, or put his finger in Peter P.'s anus, which was painful and shocking.

781.    Peter P. noticed that Havsgaard had favorites, on whom he would lavish gifts and special trips. Peter P. was not a favorite and complained to Havsgaard about getting less than the others. To console him, Havsgaard invited Peter P. for a trip into town.

782.    After the trip, when Peter P. was sleeping on the top bunk of his room, Havsgaard came in and began to caress and massage him. Havsgaard put his hands under Peter P.'s clothes and around his buttocks. Because it was difficult to reach him on the top bunk, Havsgaard asked the boy in the bottom bunk to switch with Peter P. The boy did, giving Havsgaard greater access to Peter P.'s body. Havsgaard massaged and caressed Peter P.'s buttocks for half an hour. Peter P. understood this was the price he paid for his special outing that day.

783.    When Peter P. was twelve or 13 years old, he broke his leg. With Peter P. especially vulnerable, Havsgaard insisted on washing Peter P. with his own hands.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1    Havsgaard would caress Peter P.'s back and chest, and then move on to his buttocks
2    and penis. Havsgaard would massage Peter P.'s genitals for 25 minutes or more. When
3    Peter P. asked him to stop, Havsgaard told him that he was "like a son" to him, and to
4    relax.

5        784.    Another time, Havsgaard and Peter P. were in the garden for a "father-
6    son" talk. During the conversation, Havsgaard proceeded to perform manual sex on
7    Peter P.

8        785.    On another occasion, Peter P. recalled Havsgaard having a heart-to-heart
9    with him about how proud he was of Peter P. Once again, Havsgaard put his hands
10    down Peter P.'s trousers and began performing manual sex on him.

11        786.    Havsgaard asked Peter P., "Do you mind if you get a little bit wet?" Then,
12    standing behind Peter P., Havsgaard began to masturbate so that he could ejaculate on
13    Peter P.'s buttocks.

14        787.    Havsgaard then rubbed his erect penis against Peter P.'s buttocks and
15    attempted to rape him anally, aggressively asserting his authority by violently biting
16    Peter P. Peter P. was terrified and managed to flee, a memory that still haunts him.

17        788.    Peter P. felt confused and trapped. He could not reconcile Havsgaard's
18    abuse with the man he was supposed to trust as father figure and pastor. He knew he
19    could not question the abuse without risking eviction and further assaults.

20        789.    Peter P.'s response to this dilemma was to become more defiant.

21        790.    Peter P. told staff members about the abuse, including the cook, Mami
22    Tina, and Crivceac. Nothing changed.

23        791.    Peter P. wanted to provide more definitive proof so the adults at Harvest
24    could no longer pretend everything was normal.

25        792.    One night in 2002, Peter P. invited a group of boys and Crivceac into the
26    living room and phoned Havsgaard on speakerphone without telling him.

27
28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

793.   In Peter P.'s words, this is what followed:

> I asked [Havsgaard] what he would do if I came to his apartment. He said we would play. I asked him if he would give me a blow job. He said he wouldn't force and would only do it if I liked it. I said no, I didn't like it. I asked him if he liked it. Paul said he'd like to "suck me." Paul had made a full confession to the room, including the staff assembled there, without realizing it. Then Paul said he would have one of his favorites the next night anyway.

**C.    A Couple from Harvest Riverside Encounters Signs of Child Abuse by Havsgaard and Reports Back to California**

794.   Another Harvest Riverside congregant, Randi Douthitt ("Douthitt"), visited the Harvest Homes in approximately 2002. She recalls that Havsgaard was always asking for money for the children, and she had raised $10,000 to help. When she arrived, she could see the children needed winter coats and suggested using the money for this purpose. Havsgaard refused. He also refused to let her give the children Bibles. Both of these refusals surprised her.

795.   She was also surprised at the dilapidated state of the Harvest Homes. The walls were dirty and there was a big pile of broken bicycles.

796.   She noticed that Havsgaard spent excessive amounts of time with Mark M., including late at night, and not with his wife. She also saw that Havsgaard showered Mark M. and another favorite, Stefan S., with gifts.

797.   Douthitt knew that Havsgaard had rented a separate apartment for Stefan S., so he could stay there at age 17 with his girlfriend, who then had a baby at age 16, which she did not think taught proper Christian values.

798.   At the same time, Havsgaard was very harsh with other children; he always had at least one child on lockdown.

799.   Douthitt had gone to Bucharest with a friend, Sheryl, who was supposed to check the books. Havsgaard gave her only very limited access to financial

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1  information. Sheryl suspected that Havsgaard was running two sets of accounting

2  books.

3      800.    All this disturbed Douthitt sufficiently that she returned to the Harvest

4  homes two weeks later with her husband John, a minister employed by Harvest

5  Riverside.

6      801.    The Douthitts offered to paint the dirty walls and to fix the bicycles, but

7  Havsgaard would not let them. They offered to stay in Bucharest to help him for several

8  months, but Havsgaard refused that too. The Douthitts got the impression that

9  Havsgaard did not want them to know what was going on in the Harvest Homes. They

10 did not see direct evidence of pedophilia, but they suspected it.

11     802.    When the Douthitts returned to California, they heard from an official at

12 Harvest Riverside who wanted to know what they had seen at the Homes. They gave

13 a full report of what they had witnessed and their impressions of Havsgaard.

14     **D.    Roman Triggers Investigation by Harvest Riverside**

15         1.    _Roman Learns of Havsgaard's Sexual Abuse of Children_

16     803.    As early as 2001, a woman Havsgaard hired as an educator told Roman,

17 the Finance Director and board member of the Local Foundation, that there was

18 something suspicious happening between Stefan S. and Havsgaard. She suspected that

19 Havsgaard was a pedophile.

20     804.    Roman then asked Stefan S. if Havsgaard had been abusing him. Stefan

21 S. denied this, but told the other boys that Roman had "figured it out."

22     805.    The news of Roman's discussion with Stefan S. reached Havsgaard, who

23 summoned Roman to an urgent meeting with Kathy also present.

24     806.    Havsgaard tried to gaslight Roman, asking "How could you think I would

25 harm [the children]?"

26     807.    Roman remained suspicious. He made a friend at Harvest Riverside, Dan

27 Cojocnean ("Cojocnean"), who was originally from Romania and emigrated to

28

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

California. Cojocnean was in charge of assembling contributions to the Harvest Homes from members of Harvest Riverside in California, and then arranging their transport to Romania as an agent of Harvest Riverside and ARK. On their behalf, he visited the Harvest Homes three times. No later than 1999, Roman told Cojocnean that he feared Havsgaard was a pedophile.

808.   Cojocnean told Roman that when Havsgaard went back to California for his fundraising trips, he badmouthed Roman as dishonest, apparently seeking to "prebut" any possible criticisms of his own behavior.

809.   Havsgaard apparently suspected that Roman had told Cojocnean about his pedophilia, so Havsgaard then badmouthed Cojocnean to people at Harvest Riverside too.

810.   On information and belief, Cojocnean told his supervisors at Harvest Riverside about his suspicions of Havsgaard's pedophilia. Cojocnean eventually became disgusted that Harvest Riverside was leaving Havsgaard in place and taking advantage of the people whose donations he was canvassing for Romania, so he left the church.

811.   Roman felt intimidated by Havsgaard but continued to collect evidence about his illicit behavior.

812.   In 2003, Roman went to the Buftea home and asked the staff if Havsgaard was doing anything unusual at night. The night staff told him that Havsgaard was often out with a boy named Julian J.

813.   Roman learned that Havsgaard had ordered the night watchman, Crivceac, not to log his nocturnal travels with boys. Crivceac said to Roman it seemed evident Havsgaard was having sex with Julian J.

814.   Roman found receipts that corroborated Havsgaard's late-night trips with Julian J. and other boys, showing repeated purchases of snacks for two people after midnight at gas stations on the Bucharest ring road including purchases of alcohol.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

815.    Armed with this new evidence, Roman confronted Havsgaard, who claimed he was taking Julian J. out "to evangelize him." Roman did not believe this.

816.    Roman then discovered that Havsgaard was paying his driver, Marcel Musceleanu, $600 per month, compared to the $400 per month Roman was earning as Finance Director—a huge salary for a driver, much more than the Local Foundation needed to pay at standard rates.

817.    This suggested to Roman that Havsgaard was using Harvest money to buy silence from his driver about where he was taking him, who was with him, and what he was doing.

818.    Roman also learned that Havsgaard was paying Manescu, another driver who also ran an internet café Havsgaard liked to go to, directly in cash and without receipts, which also signaled Havsgaard was trying to hide something.

819.    Finally, Julian J. disclosed to Roman that Havsgaard had committed sexual acts with another child. Mami Tina, the cook, also told Roman that Peter P. had come into the kitchen very upset and asked Mami Tina if she knew what Havsgaard "did to the children."

820.    While stopping Havsgaard was important to Roman, Roman did not want to destroy the Harvest Homes and force the children back into the streets.

821.    By October 2004, Roman thought he had enough evidence confirming Havsgaard's pedophilia and confronted him again. Roman then gave Havsgaard 30 days to have Laurie choose and announce Havsgaard's replacement.

2.    _Harvest Riverside Investigates Havsgaard in 2004_

822.    Havsgaard did contact Laurie and Schutte about Roman's ultimatum, but, on information and belief, he falsely accused Roman of stealing money and of trying to obscure that theft by accusing Havsgaard of child abuse.

823.    At about this same time, Quarles, a Calvary minister working in Romania, heard reports that Havsgaard was abusing the children in the homes. He left a phone

CONSOLIDATED AMENDED COMPLAINT
_Barbu, et al. v. Harvest Christian Fellowship, et al._

1    message at Harvest Riverside laying this out in a way he expected would generate a
2    rapid response. No one called him back.

3        824.    Disturbed by the strange silence, he asked the pastor from his home
4    church in California, John Dunkan of Calvary Chapel Lake Elsinore, to call on his
5    behalf and implore Harvest Riverside to investigate.

6        825.    Some weeks later, Quarles was home in California and happened to be in
7    the Lake Elsinore church office when he took a phone call in the absence of Pastor
8    Dunkan. A person he believes to be Schutte said, "We have a problem. One of your
9    missionary pastors has made an awful accusation about Paul Havsgaard." Schutte was
10    angry. Quarles told Schutte that in fact he was the source of the accusation, and a tense
11    conversation ensued.

12        826.    Several days later, as he was being driven to the airport to go back to
13    Romania, Quarles received another call from Schutte, who was much more amiable.
14    Schutte asked Quarles if he would replace Havsgaard and run the Harvest Homes

15        827.    Quarles did not want the job but agreed to perform an audit of the Harvest
16    Homes. Anticipating that Havsgaard would be fighting for his professional life,
17    Quarles said he would run the audit only if he could have the help of two other Calvary
18    pastors working in Romania, Shane Herman ("Herman") and Bob Keenan ("Keenan").
19    Schutte agreed.

20        828.    The three performed the audit in October 2004.

21        829.    Quarles, Herman and Keenan interviewed staff at all the houses being run
22    by Havsgaard and discovered turmoil.

23        830.    Crivceac, the night caretaker, provided a statement to the audit team,
24    stating that his wife, a cleaner at the homes, had told him that things there were "not
25    right," so he had kept his eyes open and began seeing suspicious behavior by
26    Havsgaard.

27
28

- 143 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

831. Crivceac reported that Havsgaard was "overly touchy" with the kids, looking to cuddle them much too often. He gave some boys large amounts of attention and would go out at night with a single boy at a time, not returning until well past midnight.

832. Crivceac also reported that Havsgaard took one particular favorite, Leo L., on trips and gave him many gifts. When Crivceac asked Leo L. where Havsgaard took him, Leo L. refused to answer.

833. Havsgaard would also regularly take individual boys into the attic for extended periods.

834. Three boys—Alexandru M., Peter P. and Mark M.—had told Crivceac that Havsgaard had sexually abused them, and Peter P. often loudly and publicly proclaimed this.

835. Quarles was so alarmed by what he learned from Crivceac and others that he insisted to Schutte that he come see the Harvest Homes for himself.

836. On information and belief, Schutte discussed this brewing crisis in Harvest Riverside's Romanian mission with Laurie in California, who kept his distance by sending Schutte rather than going to see for himself.

837. In November 2004, Schutte, accompanied by Denham (another senior Calvary pastor on the board of ARK), arrived in Bucharest to see the Harvest Homes on behalf of Harvest Riverside and Laurie. They met with the audit team of Quarles, Herman and Keenan, who told the visiting chiefs from headquarters the following findings from their survey of the homes:

      a. Ample money was arriving from Harvest Riverside, some $17,000 a month, but Havsgaard was spending some $5,000 of it without receipts or other records. Because dollars went a long way in Romania at that time, these were substantial sums, particularly as the siphoning accumulated over the years.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

b. They had seen receipts gathered by Roman which showed Havsgaard taking boys to hotels hours away from Bucharest, and going on trips with them in Bucharest where they would buy snacks and alcohol after midnight.

c. Roman had told the audit team that he had heard multiple accounts of sexual abuse by Havsgaard from both staff and children in the homes.

d. Roman had told them that he also understood that Havsgaard had been arrested for child abuse in Romania.

838.    Schutte and Denham then met with Roman directly. Their line of questioning surprised Roman, who was worried about Havsgaard's sexual abuse, because the visitors avoided that topic to focus on Havsgaard's misuse of Harvest Riverside money.

839.    Roman answered their questions, telling them how suppliers were not being paid because Havsgaard was not providing him with enough funds despite the regular payments from Harvest Riverside. Roman also produced detailed accountings over many months. Schutte was shocked and asked for a copy, which Roman provided. Schutte then promised that Harvest Riverside would pay the shortfall and send it directly to the Local Foundation's account, bypassing Havsgaard to whom Harvest Riverside had previously sent all California funds directly.

840.    Roman also raised his worries about Havsgaard as a pedophile. He gave the visitors an account of Havsgaard's inappropriate spending on late-night excursions with the boys, and relayed reports from other staff about Havsgaard's abuse.

841.    At the end of the meeting, Schutte took him aside and directed him to stop talking about any child abuse by Havsgaard. Schutte then returned to California.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

842.    Even so, Quarles was now persuaded that Havsgaard was a pedophile. He was based in Romania and called Roman to say he was thinking of reporting Havsgaard to the police.

843.    Roman worried that the homes might collapse and told Quarles that replacing Havsgaard would be better than abruptly getting him sent to jail and leaving the Harvest Homes leaderless.

844.    Quarles pursued the idea of replacing Havsgaard quickly by speaking with his contacts at Harvest Riverside in California.

845.    Several weeks later, Schutte returned to Romania.

846.    Quarles believed the overwhelming evidence that Havsgaard was a pedophile and thought firing him from Harvest was essential. He told Schutte and Denham, "Paul [Havsgaard] needs to be on that plane with you when you leave tomorrow. He doesn't need to be another day in Romania. He is an embarrassment to every single missionary and Christian worker. Get him out of here and into counselling."

847.    That started out as the plan. Schutte, Pastor Shane Herman and a Romanian businessman, Robert Dinca, met with Roman and told him that Havsgaard would be on a plane to California in the next few days, but Roman also had to resign.

848.    Apparently, Defendants wanted a "clean sweep" of the old regime and no one in power left to reveal their failings to authorities in Romania or California. Quarles and Herman were going to take over for Havsgaard, and Dinca was going to take over for Roman.

849.    But Havsgaard refused to leave, and Defendants acquiesced. When the time came for Havsgaard to go, Schutte and Denham told Quarles that Havsgaard "is very important because he is the face of the ministry. He's the one who goes and talks to the churches and raises the money. We can't not have him be part of things."

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

850.    This answer reflected the views of Laurie, the ultimate authority at Harvest Riverside who had set the entire Romanian enterprise in motion and had taken credit for it. This was an acutely sensitive matter, Havsgaard was Laurie's long-time collaborator, and the idea that Schutte decided this independently of Laurie is not credible.

851.    This reply was so shocking that Quarles told Harvest leaders he "wanted to have nothing to do with them after this."

852.    The result was that Havsgaard was not replaced. Schutte and Denham went back to California leaving Havsgaard in command in Romania, the same as before—except with added powers. Instead of appointing Dinca as Finance Director as Schutte had arranged, Laurie and Schutte let Havsgaard appoint Manescu, his driver who ran the internet café where he often took boys, including Plaintiffs MARIAN LIVIU, ALEXANDRU-CRISTIAN, and MIHAI-CONSTANTIN, for webcam sex work. Havsgaard paid Manescu a highly inflated salary.

853.    Manescu had no background for the position and had good reason to go on protecting Havsgaard.

## VII.    HARVEST RIVERSIDE AND LAURIE COVER UP HAVSGAARD'S CHILD SEX ABUSE

854.    Schutte and/or Denham reported the disturbing results of their inquiry mission to Laurie at Harvest Riverside when they returned to California.

855.    The scale of Havsgaard's crimes and his rank incompetence in running the Harvest Homes should have been anticipated by Laurie and were easily discoverable by all Defendants from the start of Havsgaard's time in Bucharest.

856.    Nevertheless, the clear notice of Havsgaard's pedophilia, theft, and chaotic management that Schutte brought back with him from Bucharest in 2004 obliged Harvest Riverside and Laurie to take immediate corrective action.

857.    Instead, they did nothing.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

858.   Defendants did not recall Havsgaard for questioning.

859.   Defendants did not put Havsgaard on leave.

860.   Defendants did not discipline Havsgaard.

861.   Defendants did not require Havsgaard to attend counselling.

862.   Defendants did not induce Havsgaard to retire.

863.   Defendants did not fire Havsgaard.

864.   Defendants did not shut down the Harvest homes.

865.   Defendants did not send competent administrators to replace or supervise Havsgaard.

866.   Defendants did not introduce any guard rails to prevent Havsgaard from further abusing Plaintiffs and other children in Romania or California.

867.   Defendants did not institute mechanisms for Plaintiffs, other children or staff at Harvest Homes to report future abuse by Havsgaard.

868.   Defendants did not arrange for medical or psychological help for the affected boys and girls, including Plaintiffs.

869.   Defendants did not order any more inspection trips or other inquiries, nor did Laurie or Schutte visit themselves.

870.   Defendants did not immediately report Havsgaard to the police or child protection authorities in Romania or the United States, although Schutte, Denham, and Laurie were at all material times "mandatory reporters" of child sex abuse under California law, and this obligation extended to abuse committed outside of California, especially by one of their employees.

## A.   The Playbook Harvest Riverside Used to Cover Up Havsgaard Is a Copy of Its Approach to Other Scandals and Breaches of Legal Duty

871.   The following examples demonstrate that Harvest Riverside's, Laurie's and Schutte's conspiracy to cover up Havsgaard's abuse of children was consistent with cover-ups of related misconduct of other Harvest Riverside employees.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1.    *Harvest Riverside Recommends U-Turn for Christ Programs to its Congregation Despite Their Physical and Sexual Abuse of Children*

872.   At the same time Havsgaard was running Harvest Homes in Romania, Harvest Riverside was associated with U-Turn for Christ Youth Ranch ("Ranch"), an unlicensed camp for children needing special discipline in Baja, Mexico. Calvary pastors Gerry Brown and Chuck Smith founded the Ranch and Harvest Riverside routinely recommended it to parents who struggled with their children's behavior.

873.   The Ranch was staffed in substantial part by former drug addicts with violent criminal convictions but no professional training in youth rehabilitation, medicine, or mental health.

874.   Children from Harvest Riverside who attended the Ranch recount being subjected to daily beatings by its staff, forced labor, dire sanitation and medical care, psychological coercion, and child sex abuse.

875.   Similar to how Havsgaard treated children at the Harvest Homes, staff at the Ranch inflicted severe punishments for the slightest acts of disobedience. Even if a "counselor" was simply in a bad mood or wanted to throw his weight around, the standard punishment was to force children to dig 5-by-5-by-5-foot holes—roughly the volume of an elevator car—in the hard soil. The children had to complete the task without food, water, or rest until the holes were finished, whether in the blazing sun or through the night.

876.   Due to dirty water, substandard food and overwork, children at the Ranch often suffered from malnutrition and serious sickness without medical assistance.

877.   In 2005, after one child escaped and reported the Ranch to the Mexican police, 65 agents and inspectors from an interagency Mexican task force raided the ranch, finding: "There was evidence of physical and mental mistreatment of minors, improper medical attention, lack of responsible physicians, and the lack of workers

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1    trained in rehabilitation" and that the camp employed "disciplinary methods similar to

2    those of a youth correctional facility."[7]

3    878.   Four American "counselors" were expelled from the Ranch and the

4    country, with a ban on re-entry for at least five years. Thirteen American teenage

5    campers were returned to the US. Representatives of U-Turn for Christ met them at the

6    border and downplayed the situation to their parents.

7    879.   On information and belief, Harvest Riverside had notice of the illegal

8    conditions at the Ranch. Still, despite recommending the Ranch to parents for years,

9    Harvest Riverside never inspected it or took seriously any complaints from children

10   who endured it. After the raid, Harvest Riverside offered no public criticism of the

11   program or apology. Harvest Riverside continued to recommend the U-Turn for Christ

12   program to other parents.

13        2.   *Harvest Riverside Covers Up Cyberflashing to Teenagers at a*

14             *Harvest Youth Event*

15   880.   At a 2018 Harvest Riverside youth event for children in grades six to

16   twelve, someone transmitted a pornographic image via AirDrop to all the iPhones at

17   the event, including those belonging to underage children, causing a stir in the room.

18   Harvest Riverside did not investigate this serious incident and did not notify parents to

19   avoid public embarrassment and scrutiny.

20        3.   *A Child at Harvest Riverside Summer Camp is Hogtied*

21   881.   In 2019, a boy attending Harvest Riverside's summer camp was hog-tied,

22   wrapped tightly in plastic wrap from the neck to the ankles, and dragged across the

23   grounds on his stomach. He was badly hurt and traumatized.

24

25

---

26   [7] Sandra Dibble, *Center for Troubled U.S. Teens Shut Down by Mexican Officials*,
     SignOnSanDiego.com (Dec. 6, 2005), http://www.signonsandiego.com/news/mexico/tijuana/

27   20051206-9999-1m6rehab.html, [https://web.archive.org/web/200805240912 48/http://www.

28   signonsandiego.com/news/mexico/tijuana/20051206-9999-1m6rehab.html]

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

882.   Many people witnessed the incident and some captured it on video. They reported this violent incident to Harvest Riverside's senior leadership, who again covered it up and did nothing to help the victim.

883.   Harvest Riverside did not punish the perpetrators because their leader was the son of Laurie's secretary.

4.   *Harvest Riverside Covers Up Pastors' Extramarital Affairs*

884.   Jeff Lasseigne ("Lasseigne") affiliated with Harvest Riverside in 1980 and became Assistant Pastor in 1989. He was an important and powerful figure in the church. During a period when his wife was suffering from Alzheimer's disease, Lasseigne engaged in extramarital affairs with multiple women at the same time including church employees, regularly using a janitor's closet in the area reserved for pastoral leadership. Many Harvest Riverside employees complained, including to Laurie and his wife, but nothing was done—Lasseigne faced no disciplinary process despite making employees of Harvest Riverside uncomfortable.

885.   Finally, in 2021, Lasseigne was relieved of his duties. Seeking to avoid scandal, Harvest Riverside offered no explanation to its employees or congregants. Instead, it gave Lasseigne a severance package worth a reported $4 million in exchange for a non-disclosure agreement.

886.   Harvest Riverside followed the same playbook when faced with similar allegations against another pastor, Brad Ormonde, who had a multi-year extramarital affair with Laurie's personal secretary.

887.   As with Havsgaard, Harvest Riverside did not disclose to donors that their charitable contributions were being spent to cover up Lasseigne's and Ormonde's misconduct.

888.   As with Havsgaard, Harvest Riverside also erased mentions of Lasseigne's and Ormonde's long history with the church from its website.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

889.    Ormonde continues to serve as a senior pastor at another Calvary church 30 minutes' drive from Harvest Riverside.

5.    *Harvest Riverside Covers Up Sex Offenses by Its Volunteers*

890.    In the late 1990s, William Walrath ("Walrath") served as a volunteer in Harvest Riverside's "Rock the World" children's ministry. In approximately 2000, he was arrested and subsequently convicted of multiple felony sexual offenses involving minors and sentenced to twelve years in prison.

891.    Harvest Riverside removed Walrath from his volunteer position but did not make any public announcement or conduct an internal investigation to determine if he had abused children at Harvest Riverside.

892.    Harvest Riverside similarly mishandled accusations of child sex abuse against Jose Cruz Martinez, who was a volunteer at Harvest Riverside between 2016 and 2023.

**B.    After Harvest Riverside's Cover-Up of Havsgaard's Crimes, Harvest Homes Get Poorer While Child Sex Abuse Remains Rampant**

893.    Havsgaard benefitted from Harvest Riverside's practice, as set out in the preceding section, of ignoring its pastors' misconduct and covering up potential scandals. Once Havsgaard weathered Defendants' consequence-free investigation, he retaliated against Roman for blowing the whistle and fired him.

894.    Despite Havsgaard's pedophilia and long misuse of Harvest funds, he was given authority over Harvest's Romanian bank accounts, appointing his poorly educated driver Manescu to be Finance Director, at a highly inflated salary he knew depended on Havsgaard's continued good standing with Harvest Riverside.

895.    Manescu sometimes refused to pay the staff, likely pocketing their wages.

896.    As Finance Director, Manescu required that some of the children living in the Harvest Homes work 12-hour shifts in his internet café at less than minimum

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1   wage. When they protested, he threatened to throw them out. When the children

2   complained to Havsgaard, he did nothing to protect them.

3   **C.    Once Defendants Finally Close Harvest Homes, Its Children Have**

4   **Nowhere to Go; Many Turn to Sex Work**

5   897.   Under the joint leadership of Havsgaard and Manescu, with much of the

6   shrinking money still coming from California being diverted to their personal use, the

7   Harvest Homes became even more dangerous. Food and heat were sporadic, and the

8   danger of more abuse by Havsgaard was constant.

9       1.   *Havsgaard's Supervisors Fail in Their Duties Under California*

10      *Law to Restrain Him*

11  898.   Constantin, a social worker, inspected the Harvest Homes for the

12  Romanian government between 2004 and 2005, among many other facilities on her

13  roster. Her assignment was to check only for adequate food and living conditions and

14  she did not have time to interview any children. In 2005, Harvest advertised a job for

15  a resident teacher in the Buftea home, which she thought would be more interesting

16  and a shorter commute, and got the job. Constantin was surprised because Havsgaard

17  hired evangelical Christians only, and Constantin is Orthodox. She concluded that he

18  thought her presence would reassure the next social worker who would not feel a need

19  to look deeply into his operation.

20  899.   Constantin says she "realized that something strange was definitely

21  happening to the boys." She asked Mami Tina, the cook, who said "don't ask, bad

22  things are happening" and started crying. Mami Tina told Constantin that she had lots

23  of children at home, so she had to keep her mouth shut or lose her job.

24  900.   Constantin saw that Havsgaard had favorites and regularly took them

25  away for one-on-one expeditions, after which the boys would come back subdued and

26  not disclose where they had gone or what they had done. When she remonstrated with

27

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Havsgaard and said the boys should be in school, he would say they needed some extra attention because they had had a bad day.

901.    After Constantin developed a good relationship with the boys, they told her that Havsgaard had ordered them not to talk about he was doing with them and that they were scared of being kicked out if they did. She told them that together they could figure out a better path, but the boys were too scared.

902.    Unable to get any direct confessions, Constantin looked for physical evidence like photos when she moved around the house but never found any. She came to feel impotent and guilty, and ultimately quit, convinced that Havsgaard was an active pedophile at the Harvest Homes.

903.    Monique Smith, an American visitor who spent several months a year in the homes starting in 2002, noticed that as early as 2005, conditions had deteriorated significantly, particularly at the girls' home in Dămăroaia.

904.    The children did not have regular meals and were often fed bread sandwiches and cabbage.

905.    There was no running hot water in the bathroom for at least a month, and the staff boiled water to mix with cold water to bathe.

906.    As the money ran out, Harvest Riverside and Laurie made no provision for the children's further housing, safety, welfare or education.

907.    When the Harvest Homes finally closed, Defendants dumped sthe children on the street and gave them no exit money, no plan, not even a number to call in an emergency.

908.    Few had any education that would help them survive safely, let alone prosper; some were not even literate.

909.    Many roamed the streets hungry, homeless, in despair and fear, and were routinely assaulted. Laurie and Harvest abandoned them.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

910.   Having learned from Havsgaard that the route to survival was to sell their bodies to him and others, many turned to sex work.

911.   Harvest Riverside deliberately did not inform its congregation in California that it had closed down the Harvest Homes in 2008.

912.   In 2009, a congregant donated a large sum of money to Harvest Riverside to support the Harvest Homes in Romania, not knowing that Harvest Riverside had closed them.

913.   Harvest Riverside improperly accepted the donation and never returned it.

## VIII.   AFTER HARVEST HOMES CLOSE, PLAINTIFFS STRUGGLE WHILE DEFENDANTS THRIVE

### A.   Plaintiff Marian Barbu

*Figure 37: Marian B., 2023*



914.   MARIAN B. has struggled since his experiences at Harvest Homes. He lived in constant fear of sexual abuse by Havsgaard, and believed that at any moment,

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Havsgaard would escalate the abuse to rape. He felt that he was living in a torture chamber inside a prison.

915.   MARIAN B. is functionally illiterate, as he was not educated at the Harvest Homes. Due to Havsgaard's scheme to persistently assault and terrorize him and other children, he suffers from severe, complex Post-Traumatic Stress Disorder, anxiety disorders, substance abuse disorders, and Major Depressive Disorder. MARIAN B. has not yet been able to travel to a country where he could be examined by a neuroscience professional, but his behaviors and apparent cognitive difficulties indicate he has suffered frontal lobe damage due to his exposure to severe violence, trauma and sexual abuse.

916.   Also because of Defendants' scheme to abuse the Romanian children, MARIAN B. has remained in abject poverty his entire adult life. He has not been able to stay employed or sober and has been intermittently homeless throughout his adulthood.

917.   Without any meaningful education, MARIAN B. had no means to support himself after he was kicked out at 16.

918.   To survive, MARIAN B. broke into cars, stole cars, and sold drugs for which he was arrested.

919.   MARIAN B. also had paid sex with men to buy food even though he identifies as heterosexual. MARIAN B. understands that because of his experience at Harvest, he became conditioned to selling his body to survive.

920.   MARIAN B. has life-long medical conditions as a result of Defendants' actions. He takes medication as a result but suffers from serious side effects that prevent him from working.

921.   MARIAN B. lives off disability benefits. He receives approximately $216 per month which is not enough to support himself and his family, so he goes to a charity for food.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

922.    MARIAN B. continues to exhibit symptoms from his time at Harvest. He struggles with chronic depression, severe anxiety, hallucinations, beliefs of being persecuted, and severe Post-Traumatic Stress Disorder. MARIAN B. struggles to sleep at night and takes Depakine (sodium valproate), a mood stabilizer, and Trittico (trazadone), an antidepressant, day and night.

**B.    Plaintiff Mihai-Constantin Petcu**

*Figure 38: Mihai-Constantin, 2023*



923.    With only six years of schooling, no qualifications, and a minimal understanding of English, MIHAI-CONSTANTIN's best way to make money after he left the Harvest Homes was to continue doing sex work to obtain drugs and food.

924.    MIHAI-CONSTANTIN currently works as a security guard.

925.    He continues to exhibit symptoms from his time at Harvest. He used to sniff paint. He struggles with depression and has attempted suicide.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

926.    MIHAI-CONSTANTIN suffers from severe, complex Post-Traumatic Stress Disorder, anxiety disorders, substance abuse disorders, and Major Depressive Disorder.

927.    While MIHAI-CONSTANTIN has not yet been able to travel to a country where he could be examined by a neuroscience professional, his behaviors and apparent cognitive difficulties indicate he has suffered frontal lobe damage due to his exposure to severe violence, trauma and sexual abuse.

928.    Also because of Defendants' scheme to abuse the Romanian children, MIHAI-CONSTANTIN has remained in abject poverty his entire adult life. He has not been able to maintain employment or sobriety and has been intermittently homeless throughout his adulthood.

### C.    Plaintiff Cristian Aeroaiei

*Figure 39: Cristian, 2023*



929.    Since leaving Harvest, CRISTIAN has had a hard time supporting himself. He received no significant education at Harvest and left without the necessary skills to obtain adequate employment.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

930.   For some years, CRISTIAN was forced into sex work to make a living, including having sex with men even though he identifies as heterosexual.

931.   This was in keeping with his education at Harvest, which taught him that the way to survive in life was to exchange his body for money, food, and shelter.

932.   To cope with the memories of the abuse, CRISTIAN self-harmed by cutting his skin with pieces of broken glass.

933.   He also fell into alcoholism and drug use, such as sniffing glue.

934.   Due to his time at Harvest, CRISTIAN has lost faith in Jesus, God, and all religion.

935.   CRISTIAN continues to exhibit symptoms from his time at Harvest. He struggles with significant depression, and severe Post-Traumatic Stress Disorder. He struggles to sleep at night and has recurring nightmares. At times, he wakes up shaking with fear because of anxiety.

936.   In August 2017, CRISTIAN reached out to Havsgaard and Kathy's granddaughter through Facebook Messenger. He asked whether or not she was aware that her grandfather was a pedophile and molested children at Harvest Homes. She told CRISTIAN that her mother knew, and that she has "known for a while too."

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

**D.    Plaintiff Constantin-Alin Nitu**

*Figure 40: Alin, 2023*



937.    ALIN has struggled since his experiences at the Harvest Homes. He suffers from severe, chronic Post-Traumatic Stress Disorder, suicidal thoughts, anxiety, substance abuse, and depression. ALIN has not yet been able to travel to a country where he could be examined by a neuroscience professional, but his behaviors and apparent cognitive difficulties indicate he has suffered frontal lobe damage due to his exposure to severe violence, trauma and sexual abuse.

938.    Because of Defendants' scheme of abuse, ALIN has remained in abject poverty his entire adult life. He has not been able to stay employed or sober and has been intermittently homeless throughout his adulthood.

939.    ALIN also resorted to sex work in order to be able to buy food.

940.    ALIN still finds it difficult to trust people in relationships. He and his wife have fought often over intimacy issues, and she thought that ALIN might be homosexual until ALIN finally told her about his experiences at Harvest.

941.    ALIN no longer believes in organized religion.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

942.   As an adult, ALIN attempted to commit suicide because of the compounded struggles he experienced as a result of Havsgaard's abuse.

**E.     Plaintiff Razvan-Gheorghe Nitu**

*Figure 41: Razvan, 2022*



943.   RAZVAN did not do well at school as a child. This was in large part due to the chaotic life at Harvest and its apathy towards his education.

944.   RAZVAN, now 38, lives in Wolverhampton, England with his wife and young son.

945.   Until recently, RAZVAN had great difficulty starting and maintaining healthy relationships. He met his wife in 2020, when he was 33 years old. Before that, he did not feel comfortable trusting people intimately. The commitment of marriage was also very frightening to RAZVAN because he did not feel he deserved a good partner, and it took him a long time to be ready to have children.

946.   He still feels angry and ashamed about the abuse he suffered at Harvest Homes. Havsgaard and other staff members made him feel as though he was responsible for his own sexual abuse, which they called "punishment" and tried to

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

normalize as a customary way of disciplining boys. This feeling of being fundamentally dirty has never left RAZVAN, and he thinks it never will.

947. RAZVAN suffers from severe Post-Traumatic Stress Disorder, depression, and suicidal ideations including prior attempts. He experiences himself detached from other people and suffers from hyper-vigilance and an overall inability to experience positive emotions.

### F.    Plaintiff George Adrian Vasile

*Figure 42: Adrian, 2025*



948. ADRIAN has struggled since his experiences at Harvest Homes. He is constantly scared, and easily frightened. He is afraid of the dark and suffers from low self-confidence. He feels alienated from others due to the abuse he has suffered and finds it difficult to create meaningful relationships, although he now has a girlfriend and two children.

949. Due to Havsgaard's scheme to persistently assault and terrorize him and other children, ADRIAN suffers from moderately severe, Post-Traumatic Stress

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

Disorder, anxiety, depression, flashbacks, nightmares, daily shame, guilt, and hypervigilance. ADRIAN has not yet been able to travel to a country where he could be examined by a neuroscience professional, but his behaviors and apparent cognitive difficulties indicate he has suffered frontal lobe damage due to his exposure to severe violence, trauma and sexual abuse.

950.   Also because of Defendants' scheme to abuse the Romanian children, ADRIAN has remained in abject poverty his entire adult life. He has not been able to stay durably employed or sober and has been intermittently homeless throughout his adulthood.

951.   After ADRIAN ran away from the Harvest Homes, he struggled. He often resorted to stealing food and valuables to survive. He has been arrested and imprisoned several times.

952.   ADRIAN started using heroin after he ran away from the Harvest Homes, partly as a way to numb his memories of the abuse. He has used other drugs too. He has managed to stay sober for the last three years.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### G.    Plaintiff Aurelian Busca

*Figure 43: Aurelian, 2022*



953.    AURELIAN still struggles with the heroin addiction that started when he stayed in the Harvest Homes.

954.    He also has trouble forming healthy relationships and separated from his wife six years ago. AURELIAN has two young children from that relationship; he has custody of one of them but they live in poverty.

955.    AURELIAN suffers from Post-Traumatic Stress Disorder, chronic depression, anxiety, and flashbacks which leads to him crying at inappropriate times. He also struggles from intrusive memories, and is scared that his daughter will be kidnapped.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### H.    Plaintiff Alexandru-Cristian Busca

*Figure 44: Alexandru-Cristian, 2023*



956.    Since leaving the Harvest Homes, ALEXANDRU-CRISTIAN has struggled to maintain healthy relationships. His relationship with his brother, who also stayed there, was severely crippled by his brother's drug addiction, which developed while he lived at Harvest Homes.

957.    ALEXANDRU-CRISTIAN still feels fear and shame about the abuse he suffered at Harvest Homes. He feels like he does not belong, and often that he does not want to exist anymore; he believes it would have been better had he not been born at all.

958.    ALEXANDRU-CRISTIAN suffers from severe Post-Traumatic Stress Disorder, depression, anxiety, and suicidal thoughts. He also suffers from hyper-vigilance and negative thoughts.

959.    ALEXANDRU-CRISTIAN was convicted for theft as an adult. His original sentence was cut by a third for good behavior. ALEXANDRU-CRISTIAN was struggling to survive and urgently needed money. To survive, he and two other

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

individuals stole an electricity generator. ALEXANDRU-CRISTIAN was waiting in the car while the two other individuals stole the generator. The police arrived at the scene and decided to prosecute all three of them. Daily, ALEXANDRU-CRISTIAN regrets that he partook in the theft and wish that he never had done it.

### I.    Plaintiff Marian Dragne

*Figure 45: Marian D., 2023*



960.    MARIAN D. did not do well at school. This was in large part due to the chaotic life at Harvest Homes and its apathy towards his education. Teachers would also beat the students. As a result of this, MARIAN D. never learned to read or write.

961.    MARIAN D. suffers from severe chronic depression, severe complex Post-Traumatic Stress Disorder, suicidal ideation, crippling shame, a lack of confidence, and often feels angry due to the abuse he suffered. MARIAN D. is still in a fight or flight response and when someone shouts at him, he experiences shock and becomes upset. MARIAN D. shuts himself off from the outside world, internalizes his traumas, and suffers from almost daily nightmares.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1

**J.    Plaintiff Florin Cristian Caragea**

2

*Figure 46: Florin, 2021*

3



22    962.    Since living in the Harvest Homes, FLORIN has been scared to be around

23    other people because he thinks they will know what Havsgaard did and hold it against

24    him. As a result of this pervasive sense of shame, FLORIN did not return to school

25    after leaving Harvest. He only completed four years of schooling in total.

26    963.    FLORIN, now 33, lives together with his family in Spain where he has

27    been working for the last several years picking fruits and vegetables for €35 ($46)

28

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

daily. This sum is barely enough to support his family—he has two young children and a daughter from his wife's previous relationship.

964.    FLORIN has never told anyone about the abuse he suffered at Harvest, not even his wife.

965.    FLORIN still feels ashamed about his mistreatment at Harvest Homes. Havsgaard made him feel as though he was responsible for his own sexual abuse, which he called "punishment" and tried to normalize as a customary way of disciplining boys.

966.    FLORIN suffers from severe Post-Traumatic Stress Disorder, persistent dysthymic depression, sleeping problems, and a constant fear for something happening to his children.

967.    In some ways, FLORIN remains a ten-year-old boy forever searching for the bicycle he was promised and never received.

**K.    Plaintiff Alexandru Badaluta**

*Figure 47: Alexandru B., 2023*



968.    ALEXANDRU B. has struggled with trauma caused by Havsgaard's sexual abuse. He suffers from severe, chronic Post-Traumatic Stress Disorder, suicidal

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

thoughts, disordered eating, alcohol abuse, substance abuse, and severe depression. ALEXANDRU B. has not yet been able to travel to a country where he could be examined by a neuroscience professional, but his behaviors and apparent cognitive difficulties indicate he has suffered frontal lobe damage due to his exposure to severe violence, trauma and sexual abuse.

969.    Because of Defendants' scheme of abuse, ALEXANDRU B. has remained in abject poverty his entire adult life. He has not been able to stay sober and has been intermittently homeless throughout his adulthood. He works in a car wash.

970.    ALEXANDRU B. no longer believes in God.

**L.    Plaintiff Bogdan Ionescu**

*Figure 48: Bogdan, 2022*



971.    BOGDAN, now 35, lives in Bucharest, Romania. He currently works at a car wash, where he makes barely enough to survive.

972.    BOGDAN has great difficulties in starting and maintaining healthy relationships, He has never been married, has no children, and would prefer to die alone.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

973.   BOGDAN suffers from severe Post-Traumatic Stress Disorder, severe depression, and suicidal ideations including prior attempts.

**M.     Plaintiff Marian Liviu Mihaila**

*Figure 49: Marian Liviu, 2023*



974.   Havsgaard did not encourage MARIAN LIVIU to study and he completed only five years of formal schooling. MARIAN LIVIU is ashamed of his lack of education.

975.   Because of his paltry education, MARIAN LIVIU could not complete the necessary training to become a wrestling teacher, which was his dream job after Havsgaard thwarted MARIAN LIVIU's chances to be a professional competitor himself.

976.   MARIAN LIVIU managed to gain employment as a security guard and has worked in that industry for about eleven years.

977.   He now lives in an apartment with his wife and two sons. MARIAN LIVIU also cares for a daughter from an earlier relationship.

978.   MARIAN LIVIU often thinks about his experience at the Harvest Homes and feels like it eats away at him. He often suffers from intrusive memories, flashbacks, and anger. MARIAN LIVIU feels like he is constantly in survival mode, hypervigilant about any sign of danger.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

979.   MARIAN LIVIU suffers from severe Post-Traumatic Stress Disorder, moderately severe chronic depression, and anger issues.

**N.    Plaintiff Alexandra-Elena Langa**

*Figure 50: Alexandra, 2023*



980.   ALEXANDRA has four sons from three relationships. Three of them live with her, and the fourth lives with his father. Many of ALEXANDRA's relationships have been abusive due to what she learned at Harvest Homes.

981.   ALEXANDRA has low self-esteem, anxiety, insomnia, and depression stemming from the trauma she endured at the Harvest Homes. She has flashbacks when she least expects them, and terrible nightmares. ALEXANDRA suffers from chronic depression, moderately severe Post-Traumatic Stress Disorder, and panic disorder.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### O.    Plaintiff Ioana Cosmina Pirvu

*Figure 51: Cosmina (center) and her sisters, 2023*



982.    COSMINA now works as a subcontractor for an airline, arranging transport for crew and pilots. She tries to avoid thinking about Havsgaard and Harvest Homes because of her many traumatic memories, which she actively suppresses to avoid having a breakdown.

983.    After leaving Harvest Homes, two American men wanted COSMINA to share intimate pictures of herself. She did as they asked but now regrets doing so. COSMINA believes she did it because of the sexual environment and conditioning she received from Havsgaard at Harvest Homes.

984.    COSMINA suffers from symptoms of Post-Traumatic Stress Disorder.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

### P.     Plaintiff Gheorghita-Bogdana Tici

*Figure 52: Dana, 2023*



985.    DANA lives in Andover, England with her husband and works at an embroidery company.

986.    Due to the abuse that she suffered from Manescu, DANA does not want to have any children; she is afraid that they too might be sexually abused.

987.    DANA suffers from several significant criteria of Post-Traumatic Stress Disorder. She has intrusive memories, especially when she is around children; she worries that they too could be sexually abused.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

**Q.    Plaintiff Maria Ghenciulescu**

*Figure 53: Maria (left) with her sister Cosmina, 2023*



988.    MARIA put herself through high school after Havsgaard closed down Harvest Homes; she graduated when she was 24. MARIA worked for KFC in Romania for over six years and then moved to the United Kingdom, where she now studies Business and Tourism Management.

989.    MARIA continues to struggle with deep shame and self-esteem issues from Havsgaard's abuse. She suffers from severe complex PTSD and major depressive disorder. She has trouble forming meaningful relationships with others and frequently disassociates from her surroundings as a defensive mechanism.

990.    MARIA attempted suicide after she left Harvest Homes.

**R.    Plaintiff Denis-Vasile Otcuparu**

991.    Shortly after leaving Harvest, DENIS turned to drugs, including heroin and marijuana, and further developed an alcohol addiction. DENIS also became addicted to gambling.

992.    After leaving Harvest Homes, DENIS lived on the streets, begging and stealing to support himself and his sister, who had left Harvest Homes before DENIS.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

993.   DENIS could not find a steady job until he was 19 years old when he started working at a factory. DENIS also found a second job a funeral home, where he worked for eight years. To make ends meet, DENIS at times engaged in sex work, which has filled him with shame. He now works as a taxi driver.

994.   DENIS is in a long-term relationship and has two children.

995.   DENIS suffers from chronic PTSD with dissociation, auditory hallucinations, dissociation, extreme hypervigilance, derealization, and paranoia that Havsgaard or someone else from Harvest Homes or Harvest Riverside is following him.

**S.    Plaintiff Emilia-Mariana Tudosie**

*Figure 54: Emilia, 2023*



996.   EMILIA is now married with four children. She did not do well at school. This was in large part due to the chaotic life at Harvest Homes and its apathy towards her education. She works as a cleaner.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

997.   EMILIA continues to struggle with the lingering effects of Havsgaard's and Manescu's sexual abuse. She cries every time she thinks back to it. EMILIA suffers from moderately severe Post-Traumatic Stress Disorder, difficulties with regulating emotions, and suicidal ideation. She is particularly worried that her children may similarly be sexually abused by other adults.

**T.    Plaintiff Roxana-Maria Turuianu**

*Figure 55: Roxana, 2023*



998.   ROXANA has struggled since leaving Harvest Homes. She has difficulties trusting others and finds physical intimacy upsetting, due to the conflict between Havsgaard's teachings and the sexual depravity that pervaded the Harvest Homes. She is married and has a daughter but still finds it hard to undress in front of her husband. She also feels she does not deserve her family and is not good enough for them.

999.   ROXANA struggles from moderately severe PTSD and significant symptoms of complex PTSD, including anxiety, chronic moderate to severe depression, suicidal ideation, eating disorders, a gambling addiction, and nightmares.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

She requires multiple years of trauma informed therapy, a psychiatric review, and appropriate medication.

### U.    Plaintiff Cristina-Bianca Popescu

*Figure 56: Cristina, 2023*



1000. CRISTINA's traumatic memories from Harvest Homes still overwhelm her. She regularly thinks about suicide; she self-harmed before by cutting herself with glass.

1001. CRISTINA also struggles with alcohol and gambling addictions. She has trouble being intimate with others. To this day, CRISTINA traumatically relives the rapes on a regular basis. CRISTINA rarely trusts other people because Havsgaard, whom she had trusted like a father, took advantage of her.

1002. CRISTINA suffers from severe Post-Traumatic Stress Disorder, chronic moderate to severe depression and suicidal ideations.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

## V.    Plaintiff Alexandru Ionita

*Figure 57: Alexandru I., 2023*



1003. ALEXANDRU I. did not complete his education and has been unable to obtain stable employment.

1004. ALEXANDRU I. struggles with forming healthy relationships with others. He only trusts a handful of people, primarily his mother and sister. He still feels ashamed about Havsgaard's sexual abuse.

1005. ALEXANDRU I. suffers from symptoms of Post-Traumatic Stress Disorder due to Havsgaard's sexual abuse. Memories of it are very difficult for him to process, and he tries to suppress them.

## IX.    AFTER CLOSING THE HARVEST HOMES, HARVEST RIVERSIDE AND LAURIE PERFECT THEIR COVER-UP AND PROSPER

1006. The cover-up strategy chosen by Laurie and Harvest Riverside was to turn down their fundraising featuring Romanian homeless children slowly so people in California would not see any abrupt change of direction and would continue to donate, while also slowly shutting off the money spigot to Bucharest, causing the Harvest Homes to slowly wither and finally die for lack of funds.

1007. That process of quiet extrication, delicately orchestrated by Defendants, took four more years, until 2008, during which Harvest Riverside and Laurie left Havsgaard in charge, free to sexually abuse scores of children thousands of more times.

**A.     Protecting Havsgaard Has Been Key to Keeping the Laurie Juggernaut Rolling**

1008. After 2004, Harvest Riverside's accounting department no longer processed Havsgaard's salary along with those of other employees. Instead, Jeff Jackson, Harvest Riverside's Head of Accounting, who reported to Lawless, processed Havsgaard's salary without sharing the details with the rest of the department. Havsgaard was the only person whose salary payments were handled this way and this method continued until Havsgaard's return to the United States in 2008.

1009. Havsgaard came back to Riverside with an unblemished record and no restrictions—a noble missionary returning home. He went often to the Harvest Riverside campus. He ate in the café and is described by church members as having been "highly visible" there in 2009-10.

1010. In 2009—a year after the closure of the Harvest Homes and five years after Schutte had found evidence of Havsgaard's theft and industrial-grade pedophilia—Laurie praised Havsgaard publicly, describing him as "a pastor who faithfully served the Lord for many years at Harvest Christian Fellowship, the church where I pastor," and compared his work in Romania to that of Moses with the Israelites, because his "life demonstrates the power that just one godly person can have."[8]

1011. Havsgaard played along with the charade, talking fondly about his time in Romania and the children he supervised. He referred to them as "his boys" and showed their pictures. He described them as "fragile." When asked if they had anger issues, he said: "No, not my kids."

---

[8] Laurie, *supra.*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1012.  After his return from Romania, Havsgaard was permitted to take up duties in the Calvary Chapel network.

1013.  Laurie, Schutte and Harvest Riverside did not warn anyone at Harvest Riverside or any of these other churches about Havsgaard's compulsive pedophilia and violence.

1014.  Laurie and Schutte (and other pastors at Harvest Riverside who had received evidence of Havsgaard's child abuse) were mandatory reporters of suspected child abuse in California, but made no such report.

1015.  Throughout his post-Bucharest pastoral work in California, Havsgaard has continued to have unsupervised access to children.

1016.  In 2012, Havsgaard became a pastor at Calvary the Cross in Riverside, a 15-minute drive from Laurie's office.

1017.  On May 7, 2016, Havsgaard officiated a wedding at Harvest Riverside. Only pastors in good standing with Laurie are permitted to do this.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 59: Havsgaard officiating a wedding at Harvest Riverside, May 7, 2016*



1018. On September 2, 2023, Havsgaard led a senior adults' Bible study at the Packinghouse Christian Fellowship, run by Probert, who was also one of the original incorporators of Calvary Chapel Riverside, the precursor to Harvest Riverside.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

*Figure 60: Ad in a Packinghouse Facebook post showing Havsgaard as a respected religious figure in circles close to Harvest Riverside, August 17, 2023*



1019.  Havsgaard has periodically visited Tijuana, Mexico with Probert. The two ministers reportedly help women living in shelters by giving a few hours' care to their children while the women attend Bible study.

1020.  As recently as March 6, 2026, Havsgaard advertised himself on LinkedIn as "Open to Work" as a bereavement coordinator seeking a position of "Director."

1021.  Havsgaard now leads a quiet life in retirement close to Riverside, spending hours a day online. Topics in which Havsgaard has expressed public online interest in the past three years include: "Feeling awkward after his last Google search on his phone and how to delete it," "Removing his personal information from Google searches," "How to screen record someone with an Android phone," "Banks watching him move large sums of money in his bank account," "How to quickly remove your

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

browsing history with a short keystroke," "Wiping data from phones and computers before selling them," "Deleting his Google drive cache," and "Converting VHS tapes to digital." The collection of pornography Havsgaard showed to children in Bucharest was on VHS, as were the tapes used in the cameras set up in the attic rooms where he had sex with children.

1022. Other topics he searched include "The deep cost of his sin" and "Can we forgive when an offender won't repent?"

1023. In 2014, Havsgaard married Susan Marlowe. Between them, Havsgaard and Susan Marlowe have at least ten grandchildren. They moved to Forest Falls, California. Havsgaard has an office in a remote section of the house, close to the guest bedroom where the grandchildren stay.

## B.    Schutte Is Fired to Protect the Cover-Up

1024. Schutte left Harvest Riverside in 2013 in good standing to serve as pastor at Calvary Chapel Cincinnati. He returned to Harvest Riverside in 2018.

1025. Later that year, Schutte was called into the Harvest Riverside boardroom by Pastors Lasseigne and Collins, fired on the spot, taken to his office to collect his things, and escorted out of the building by security. Harvest Riverside and Laurie had reportedly become concerned that the story of Havsgaard's abuse and their own multi-year cover-up might soon come to light and had decided to make Schutte the "fall guy."

1026. Harvest Riverside and Laurie made no public announcement about why Schutte, a recently returned and popular senior pastor, had to leave. They did not tell the congregation or donors about Havsgaard's child sex abuse or their long cover-up. They did not offer any redress to Plaintiffs.

1027. The scandal stayed covered up.

## C.    Videos of Havsgaard at Harvest Riverside Are Purged

1028. Also in 2018, Harvest Riverside Pastor Paul Eaton and Lawless systematically scoured Harvest Riverside's substantial video archive to remove any

- 183 -

footage of Havsgaard. When Harvest Riverside's director of videography asked if the material would be returned, he was told "no."

1029. The purging of the record erased many years of evidence of Havsgaard's high standing at Harvest Riverside, his close relations with Laurie, and Harvest Riverside's fundraising for the Harvest Homes in California.

1030. Several years earlier, Harvest Riverside instructed one of its employees, Brandon Stark, to scrub any mention of Havsgaard from its website.

### D.    The Cover-Up Works for Harvest Riverside and Laurie

1031. In the years since the cover-up, Harvest Riverside has flourished. Its estimated annual revenues are at least $52 million, generating at least $13 million in free cash flow. Harvest Riverside and Laurie together own and lease properties conservatively valued at over $100 million, including a 30-acre campus in Riverside, and luxury homes in California and Hawaii, the latter with a hot tub on a cliff overlooking the ocean. Laurie has written over 70 books, has a television show and a highly successful podcast. His national prominence continues to grow.

## X.    CONCLUSION

1032. Plaintiffs and many others came to the Harvest Homes as discarded, deprived children seeking dignity and stability. They were promised care and compassion, but were sexually, physically and emotionally abused over many years, then dumped back out onto the streets. Nearly 20 years later, it is time for their suffering to end.

1033. Plaintiffs spent an average of 6.5 years in the Harvest Homes. Havsgaard was able to keep them there so long because, as he cynically calculated, they were desperate to stay off the streets, would not want to make waves, and anyway no one would take their word over his if they did complain.

1034. Worst of all, Havsgaard's cynicism was precisely right. His prediction that no one would do much to stop him was correct.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1035. Laurie sent Havsgaard to Romania, chose him to run Harvest Riverside's mission there, and thereafter acted as if he and Harvest Riverside had no obligation—moral, religious or legal—to make sure the Homes were properly run. There were no regular inspections, no policies, no staff training, no hotlines, no safeguarding protocols, no follow up when disturbing stories got back to California, and no effective supervision as Havsgaard energetically abused Plaintiffs and scores of other children. Yet Harvest Riverside, Laurie, and Schutte happily reaped praise and donations in California as they refused to admit the grim reality of their Romanian mission.

1036. When Laurie finally sent an inspection team in 2004 headed by Schutte to dig into the details after receiving dreadful reports that could not be ignored, Schutte came back to California with conclusive proof that Havsgaard was an active pedophile presiding over bedlam.

1037. Even then, Laurie did nothing to help the children. Instead, he let Havsgaard remain in control for another four years of inflicting sexual abuse on the powerless, and then welcomed him back to a life of comfort and esteem in California with a generous gift of severance payments and public praise.

1038. In 2018, after reports of sexual misconduct by other senior Calvary ministers became widely reported, Laurie said:

> It is a great disappointment to me when a pastor fails. A pastor needs to be a good example. He is a spiritual leader. People expect pastors to live morally and to be honest. That is a realistic expectation. They expect it of Christians, certainly they have that expectation of a Christian leader.

1039. One might expect Laurie's commendable determination to live morally and honestly to be reflected in his stance toward the terrible results of Defendants' misconduct in Romania, but so far that has not been evident.

1040. Havsgaard is an unrepentant lawbreaker, but he has ample company in the ugly saga of the Harvest Homes. Laurie, Schutte and Harvest Riverside also continue

- 185 -

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

to deny and cover up the suffering they have caused Plaintiffs and other children for the last two decades. They knowingly created the conditions that posed a substantial risk of child sexual abuse, let them run unchecked for years, and then, once the dreadful consequences could no longer be ignored, conspired to cover up those crimes. They continued to take money from unsuspecting church members, none of whom were ever told what Harvest Riverside leaders knew about Havsgaard's pedophilia, even after there were no Homes left.

1041. Defendants are properly subject to the power of the State of California and United States to punish this long record of misconduct, and to the power of the public to abhor it. Plaintiffs thus turn to this Court for redress.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

# CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### NEGLIGENCE

*All Plaintiffs Against Harvest Riverside, Laurie and Schutte*

*GENERAL NEGLIGENCE*

1042. Plaintiffs restate the allegations set forth in the preceding paragraphs.

1043. The conduct and actions of Harvest Riverside, Laurie and Schutte created an environment in which Havsgaard and Manescu abused minor children, including Plaintiffs, who were minors at the time of Havsgaard's sexual assaults.

1044. Harvest Riverside, Laurie, and Schutte were in a special relationship with Plaintiffs. Harvest Riverside, Laurie and Schutte created, funded, controlled, set policy, managed personnel, and were responsible for all aspects of managing the Harvest Homes. Harvest Riverside voluntarily took Plaintiffs into the Harvest Homes and agreed to care for and provide for Plaintiffs who were children under the age of 18.

1045. At all material times, Plaintiffs were residents of Harvest Homes in the custody and care of Defendants.

1046. Prior to the last time Plaintiffs were sexually abused by Havsgaard and/or Manescu, Harvest Riverside, Laurie and Schutte were aware and/or on notice of Havsgaard's and/or Manescu's sexual misconduct with minors. By performing the acts alleged herein, it was or should have been reasonably foreseeable to Harvest Riverside, Laurie and Schutte that by continuously exposing and making Plaintiffs available to Havsgaard, they created a risk of harm to Plaintiffs and made Plaintiffs' position worse.

1047. Harvest Riverside, Laurie and Schutte allowed and empowered Havsgaard to represent himself as their employee and/or agent when he recruited Plaintiffs and other children, which gave Plaintiffs an expectation and right to be protected by Harvest Riverside, Laurie and Schutte.

1048. It was or should have been reasonably foreseeable to Harvest Riverside, Laurie and Schutte that by putting and maintaining Havsgaard, a known child sex abuser, in charge of Harvest Homes, Havsgaard would expose Plaintiffs and other child residents of Harvest Homes to other child sex abusers, including Manescu.

1049. It was or should have been reasonably foreseeable to Harvest Riverside, Laurie and Schutte that Havsgaard, a known child sex abuser, would create a system to facilitate his own sexual abuse of Plaintiffs and other minors as well as Manescu's abuse of Plaintiffs and other minors.

1050. Harvest Riverside, Laurie and Schutte assumed responsibility for the safety of Plaintiffs whose parents were not present while Plaintiffs were residents of Harvest Homes.

1051. At all material times, Harvest Riverside, Laurie and Schutte were able to control Havsgaard's conduct related to his custody and care of Plaintiffs and other child residents of the Harvest Homes.

1052. At all material times, Harvest Riverside, Laurie and Schutte were able to control Manescu's conduct related to his custody and care of Plaintiffs and other child residents of the Harvest Homes.

1053. At all material times, Harvest Riverside, Laurie and Schutte owed Plaintiffs a duty of reasonable care to protect him from foreseeable injury and abuse while Plaintiffs resided within the Harvest Homes in Havsgaard's custody and care, and while Plaintiffs relied upon the assurance of Harvest Riverside, Laurie and Schutte of safety and protection.

1054. Harvest Riverside, Laurie and Schutte breached their duties by failing to take any reasonable steps or implement any reasonable safeguards for Plaintiffs' protection.

1055. Harvest Riverside, Laurie and Schutte breached their duties to Plaintiffs by putting Havsgaard, a man with an extensive history of child sexual abuse they knew

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

or should have known of, in charge of children's homes; locating those homes in a country known to attract pedophiles and have weak and corrupt governmental institutions; not regularly inspecting the homes; not regularly checking with staff at the homes about conditions there; not instituting regular training for staff about recognizing and reporting child abuse; not having any safeguarding policies or guardrails in place; instituting lax financial controls such that Havsgaard and/or Manescu were easily able to divert funds into purchases for their sexual favorites and hush money for employees; ignoring reports from credible sources that Havsgaard was an active pedophile taking advantage of children at the homes; after receiving further and conclusive proof of Havsgaard's pedophilia in 2004, leaving him in charge without any reduction in his powers or changes in the way the homes were run or supervised; not reporting Havsgaard to the authorities in California or Romania; not investigating whether Manescu and/or any other persons hired or instructed by Havsgaard with care and custody of Plaintiffs were sexually abusing Plaintiffs and/or other child residents of Harvest Homes; not reporting Manescu to the authorities in Romania; continuing to praise Havsgaard in public despite knowing him to be a pedophile; not trying to identify Havsgaard's victims or help them recover.

1056. At all material times, Laurie and Schutte personally participated in, authorized, directed the wrongful action and inaction by Harvest Riverside and its authorized agents in breach of Defendants' duty of reasonable care.

1057. At all material times, Harvest Riverside, Laurie and Schutte were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiffs, subjecting Plaintiffs to cruel and unjust hardship under the circumstances.

1058. As a direct, foreseeable and proximate cause of Harvest Riverside's, Laurie's and Schutte's breach of their respective duties of reasonable care, Plaintiffs

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

suffered compensable injuries, including physical and emotional injuries as set forth herein.

*NEGLIGENCE PER SE*

1059. Plaintiffs restate the allegations set forth in the preceding paragraphs.

1060. In or around 1999 and continuing thereafter while Plaintiffs were residents in the care of Havsgaard in the Harvest Homes, Harvest Riverside, Laurie and Schutte and their employees and agents received complaints in their professional capacity and within the scope of their employment that minimally raised a reasonable suspicion that Havsgaard was engaging in sexually inappropriate and abusive conduct with Plaintiffs.

1061. At all material times, Plaintiffs were minors under the age of 18 years old.

1062. At all material times, Harvest Riverside, Laurie and Schutte and their employees and agents were mandated reporters within the meaning of Cal. Pen. Code § 11165.7.

1063. By statute, each of Laurie and Schutte and the employees and agents of Harvest Riverside had a duty to present to appropriate authorities the reports of suspected child abuse, neglect, and sexual abuse Plaintiffs suffered while in the care of the Harvest Homes.

1064. At no material time did Laurie, Schutte or the agents or employees of Harvest Riverside report their reasonable suspicions of Havsgaard's and/or Manescu's sexual abuse of Plaintiffs and other minors to appropriate authorities.

1065. The failure to report Havsgaard's and/or Manescu's sexual abuse as required by statute constitutes negligence per se.

1066. At all material times, Defendants were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiffs, subjecting Plaintiffs to cruel and unjust hardship under the circumstances.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1067. As a direct and proximate cause of the failure to report Havsgaard's and/or Manescu's sexual abuse of Plaintiffs, Plaintiffs continued to suffer sexual, physical, and emotional abuse by Havsgaard and/or Manescu while Plaintiffs remained in the care of the Harvest Homes, resulting in the injuries and damages individually set forth herein.

*NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS*

1068. Plaintiffs restate the allegations set forth in the preceding paragraphs.

1069. Harvest Riverside, Laurie and Schutte negligently failed to deal with Plaintiffs in good faith including, but not limited to, by engaging in outrageous conduct by unreasonably, maliciously, oppressively failing to remove Havsgaard and/or Manescu from their positions and from access to children even after discovering that Havsgaard and/or Manescu were sexually abusing Plaintiffs and other children.

1070. As a result of the actions and inaction of Harvest Riverside, Laurie and Schutte, Plaintiffs have suffered severe emotional distress of such substantial and enduring quality that no reasonable person in a civilized society can be expected to endure it.

1071. Plaintiffs have suffered from serious emotional distress including but not limited to weekly nightmares, depression, PTSD, and suicidal thoughts.

1072. The negligent failure by Harvest Riverside, Laurie and Schutte to deal with Plaintiffs in good faith was a substantial factor in causing Plaintiffs' severe emotional distress.

1073. As a result, Plaintiffs have suffered damages as set forth in this complaint.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

## SECOND CAUSE OF ACTION

### NEGLIGENT SUPERVISION

#### *All Plaintiffs Against All Defendants*

1074. Plaintiffs restate the allegations in the preceding paragraphs.

1075. At all material times, Havsgaard was an employee and/or agent of Harvest Riverside.

1076. At all material times, Harvest Riverside, Laurie and Schutte owed Plaintiffs a legal duty to reasonably and adequately supervise the employees and agents selected and entrusted to run the Harvest Homes.

1077. By their action and inaction, Harvest Riverside, Laurie and Schutte breached their duties of reasonable and adequate supervision when they failed, despite known and foreseeable risks of sexual abuse in the Harvest Homes, to regularly inspect the homes; to regularly check with staff at the homes about conditions there; to institute safeguarding policies or mechanisms; to educate, train, or warn Plaintiffs and potential victims of Havsgaard and/or Manescu and their parents; to institute proper financial controls to keep Havsgaard and/or Manescu from readily diverting funds into purchases for their sexual favorites and hush money for employees and others who might report his illegal acts; to act on reports from credible sources that Havsgaard was an active pedophile taking advantage of Plaintiffs and other children at the Harvest Homes after receiving conclusive proof of his pedophilia and theft; to recall Havsgaard or change the way the homes were run and inspected; not investigating whether Manescu and/or any other persons hired or instructed by Havsgaard with care and custody of Plaintiffs were sexually abusing Plaintiffs and/or other child residents of Harvest Homes; and to timely report Havsgaard and/or Manescu to authorities in California or Romania.

1078. At all material times, Laurie and Schutte personally participated in, authorized, or directed the wrongful action and inaction by Harvest Riverside and its

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

authorized agents in breach of Harvest Riverside's, Laurie's and Schutte's duty of reasonable and adequate supervision.

1079. At all material times, Harvest Riverside, Laurie and Schutte were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiffs, subjecting Plaintiffs to cruel and unjust hardship under the circumstances.

1080. The failure of Harvest Riverside, Laurie and Schutte to reasonably and adequately supervise Havsgaard, Manescu, and other employees and agents in Harvest Homes was a direct, proximate, and substantial factor in causing Plaintiffs to suffer compensable injuries, including physical and emotional injuries as set forth herein.

## THIRD CAUSE OF ACTION

### NEGLIGENT RETENTION

#### *All Plaintiffs Against All Defendants*

1081. Plaintiffs restate the allegations in the preceding paragraphs.

1082. At all material times, Havsgaard was an employee and/or agent of Harvest Riverside.

1083. At all material times, Laurie and Schutte had the authority to control the terms and conditions of Havsgaard's employment with Harvest Riverside, including the authority to terminate his employment.

1084. During his employment with Harvest Riverside, Havsgaard was or became unfit or incompetent to perform the work for which he was hired.

1085. During his employment with Harvest Riverside, Havsgaard's unfitness and/or incompetence created a particular risk to others, including Plaintiffs.

1086. Harvest Riverside, Laurie and Schutte knew or should have known Havsgaard was or became unfit and/or incompetent to perform the work for which he was hired because of the particularized risk to others.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1087. Despite actual or constructive knowledge of Havsgaard's unfitness to perform the work for which he was hired, Harvest Riverside, Laurie and Schutte failed to take appropriate remedial action to terminate Havsgaard or otherwise alter the terms and conditions of his employment to address Havsgaard's particularized risk of harm to Plaintiffs.

1088. Havsgaard's unfitness and/or incompetence harmed Plaintiffs.

1089. The negligence of Harvest Riverside, Laurie and Schutte in retaining Havsgaard despite actual and constructive notice of Havsgaard's unfitness and/or incompetence was a direct, proximate, and substantial factor in causing Plaintiffs' harm.

1090. At all material times, Laurie and Schutte personally participated in, authorized, or directed the wrongful action and inaction by Harvest Riverside and its authorized agents in breach of the duty of Harvest Riverside, Laurie and Schutte not to retain an unfit person.

1091. At all material times, Harvest Riverside, Laurie and Schutte were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiffs, subjecting Plaintiffs to cruel and unjust hardship under the circumstances.

1092. The failure of Harvest Riverside, Laurie and Schutte to reasonably and adequately supervise Havsgaard and other employees and agents in the Harvest Homes was a direct, proximate, and substantial factor in causing Plaintiffs to suffer compensable injuries, including physical and emotional injuries as set forth herein.

*(This space is left intentionally blank)*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FOURTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *All Plaintiffs Against All Defendants*

1093. Plaintiffs restate the allegations in the preceding paragraphs.

1094. By their actions and inaction, Defendants engaged in outrageous conduct that is so extreme as to exceed all bounds of decency in a civilized society.

1095. By their actions and inaction, Defendants acted knowingly and willingly with the intent or with reckless disregard of the probability of causing emotional distress despite actual and constructive knowledge of Plaintiffs' peculiar susceptibility to emotional distress due to their young age, unstable living conditions, and previous sexual and emotional abuse by Havsgaard and/or Manescu.

1096. As a result of the actions and inaction of Defendants, individually or collectively, Plaintiffs have suffered severe emotional distress of such substantial and enduring quality that no reasonable person in a civilized society can be expected to endure it.

1097. The actions and inaction of Defendants were the direct and proximate cause of Plaintiffs' severe emotional distress.

1098. At all material times, Laurie personally participated in, authorized, or directed the wrongful and outrageous action and inaction by Harvest Riverside and its authorized agents which resulted in Plaintiffs' damages.

1099. At all material times, Defendants were guilty of oppression, fraud, and/or malice insomuch as they, individually or collectively, acted with intent or willful and conscious disregard for the rights or safety of Plaintiffs, subjecting them to cruel and unjust hardship under the circumstances.

1100. As a result, Plaintiffs have suffered damages as set forth in this complaint.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

# FIFTH CAUSE OF ACTION

## CIVIL CONSPIRACY IN VIOLATION OF CALIFORNIA LAW

### *All Plaintiffs Against All Defendants*

1101. Plaintiffs restate the allegations in the preceding paragraphs.

1102. Defendants conspired with others both known and unknown, and continue to conspire, to commit intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking offenses, and to cover up those offenses and the conspiracy.

1103. Defendants and Manescu formed a group of two or more persons who conspired and agreed to a common plan or design to commit tortious acts, including intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking.

1104. Defendants formed the conspiracy on an unknown date no later than 1999, when Cojocnean, working as an agent of Harvest Riverside, learned from Roman, the Harvest Homes and Local Foundation Finance Director, that Roman had evidence of Havsgaard's pedophilia, and reported this to officials at Harvest Riverside.

1105. Defendants had actual knowledge that tortious acts including intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking were planned by the co-conspirators and concurred and participated in the tortious scheme with knowledge of its unlawful purpose.

1106. Defendants intended to aid their co-conspirators in the commission of the planned tortious acts, including intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1107. Defendants committed numerous wrongful acts, including intentional infliction of emotional distress, battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking against Plaintiffs in the State of California pursuant to their agreement with their co-conspirators.

1108. Defendants committed overt acts in California in support of the conspiracy that included, among others, the following:

a.  Continuously funding Havsgaard and the Harvest Homes after receiving notice of Havsgaard's and/or Manescu's sexual battery of Plaintiffs and other minors;

b.  Discussing, assisting in, facilitating, and processing donations for Havsgaard's activities in Romania;

c.  Failing to institute financial controls and audit procedures to identify and stop Havsgaard's and/or Manescu's misuse of Harvest Riverside funds to serve their sexual predation of Plaintiffs and other minors;

d.  Failing to institute routine inspections, safeguarding policies or guardrails at the Harvest Homes;

e.  Leaving Havsgaard and/or Manescu in their positions after receiving notice of their sexual battery of Plaintiffs and other minors;

f.  Threatening Harvest Riverside employees with termination if they raised internal complaints or legal claims against Laurie or the organization; and

g.  Covering up and otherwise failing to report Havsgaard's and/or Manescu's sexual battery of Plaintiffs and other minors to appropriate authorities.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1109. Even after concluding Havsgaard was a pedophile, Defendants paid Havsgaard $200,000 and kept quiet about his history of assaults, leaving him at the helm of the Harvest Homes to abuse existing residents and attract new ones for abuse.

1110. Defendants' affirmative conduct in furtherance of the conspiracy was undertaken with the express and/or implied agreement or understanding that Laurie and Schutte and others would facilitate and/or enable the intentional infliction of emotional distress, sexual battery, negligence, negligence per se, negligent infliction of emotional distress, negligent supervision, negligent retention, and sex trafficking in order to enrich themselves and Harvest Riverside.

1111. At the time Laurie and Schutte joined the conspiracy, they were aware that Havsgaard and/or Manescu had committed many past acts of sexual, physical and emotional abuse of children who resided at the Harvest Homes.

1112. Plaintiffs were damaged as a direct result of Defendants' agreement and actions in furtherance of the conspiracy.

1113. Defendants' conduct has caused and continues to cause Plaintiffs serious and permanent harm and damage.

## SIXTH CAUSE OF ACTION

### AIDING AND ABETTING

#### *All Plaintiffs Against Laurie and Schutte*

1114. Plaintiffs restate the allegations in the preceding paragraphs.

1115. In committing the acts alleged herein, Laurie and Schutte had actual knowledge of the torts of sexual battery, intentional infliction of emotional distress, and sex trafficking being committed by Havsgaard.

1116. Through their action and inaction, Laurie and Schutte knowingly gave substantial assistance to Havsgaard's commission of sexual battery, intentional infliction of emotion distress and sex trafficking on Plaintiffs.

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1117. As an actual and proximate cause of the wrongful and malicious acts of Laurie and Schutte, Plaintiffs have suffered physical, emotional, and psychological harms in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ("TVPRA"), 18 U.S.C. §§1591(a) and 1595(a)

### *All Plaintiffs Against All Defendants*

1118. Plaintiffs restate the allegations in the preceding paragraphs.

1119. Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 1591(a)(1).

1120. Havsgaard knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiffs for the purpose of causing them to engage in commercial sex acts through force, fraud, or coercion in violation of 18 U.S.C. § 1591(a).

1121. Section 1591(a) applies extraterritorially to sex trafficking in Romania by virtue of 18 U.S.C. § 1596(a) because an alleged offender, Havsgaard, is a national of the United States.

1122. Defendants' conduct caused Plaintiffs serious and permanent harm, including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm. As victims of sex trafficking in violation of 18 U.S.C. § 1591(a), Plaintiffs may bring a civil action against Havsgaard as a perpetrator, and against Laurie, Schutte and Harvest Riverside as beneficiaries pursuant to 18 U.S.C. § 1595(a).

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

1123. Laurie, Schutte, and Harvest Riverside knowingly benefited by receiving something of value from participation in a venture that they knew or should have known was engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

1124. As a result, Plaintiffs have suffered damages as set forth in this complaint.

## EIGHTH CAUSE OF ACTION

## ILLICIT SEXUAL CONDUCT IN FOREIGN PLACES IN VIOLATION OF 18 U.S.C. §§ 2423(c) and 2255

### *All Plaintiffs Against Havsgaard*

1125. Plaintiffs restate the allegations in the preceding paragraph.

1126. In violation of 18 U.S.C § 2423(c), Havsgaard is a U.S. citizen who travelled to Romania and engaged in coerced sexual abuse of Plaintiffs.

1127. Havsgaard engaged in a commercial sex act with Plaintiffs.

1128. Plaintiffs were minors at the time of the events complained of herein.

1129. As a direct result of Havsgaard's violations as described herein, Plaintiffs have suffered and will continue to suffer from the psychological and economic damages as described above.

1130. Plaintiffs seek remedies to which they are entitled under 18 U.S.C § 2255(a) including actual damages and the costs associated with this suit, including a reasonable attorney's fee.

## DEMAND FOR JURY TRIAL

1131. Plaintiffs hereby demand a jury trial in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendants awarding the following relief:

A. Damages in amounts to be established at trial, including without limitation, damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish and physical injuries, loss of past, present and

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*

future enjoyment of life, and past and future lost earnings and earning capacity, and out-of-pocket expenses, punitive damages and liquidated damages;

B.  Pre- and post-judgment interest;

C.  Attorney's fees;

D.  A fund administered by the Court to locate and compensate victims of Defendants yet unknown; and

E.  Such other and further relief as the Court may deem just and proper.

Dated: March 6, 2026

McALLISTER OLIVARIUS

By: */s/ Jan Cervenka*

Jan Cervenka

*Attorneys for Plaintiffs*

CONSOLIDATED AMENDED COMPLAINT
*Barbu, et al. v. Harvest Christian Fellowship, et al.*